BILLY J. WILLIMS, OSB #901366
United States Attorney
District of Oregon
**MICHELLE HOLMAN KERIN, OSB #965278**
Assistant United States Attorney
michelle.kerin@usdoj.gov
1000 SW Third Avenue, Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000
Attorneys for United States of America

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **3:18-CR-00161-IM** |
| **v.** | **GOVERNMENT'S SENTENCING MEMORANDUM** |
| **NATHAN WHEELER,** | |
| **Defendant.** | **Hearing: Oct. 24, 2019 at 10:00 a.m.** |

People entrusted defendant Nathan Wheeler, a Certified Professional Accountant, with their life savings. He promised to make solid investments with their money and instead, he stole it from them. Once he stole it, he used it in two primary ways: (1) to live an extravagant and decadent life he could not otherwise afford; and (2) to build a marijuana empire ready to dominate the market once Oregon legalized it for recreational use. His victims included minor children whose deceased father named Wheeler the trustee for his estate, retiring couples who saved over a career of hard work, a former silver medalist for the United States Olympic snowboard team, and more.

**GOVT'S SENTENCING MEMO**                                                    **Page 1**

Given his egregious conduct and the impact his crimes have had on the victims, the government recommends a sentence of 51-months imprisonment.

## FACTUAL BACKGROUND

### A. Nathan Wheeler Stole Money from Victims to Fund a Decadent Life and his Own Personal Business Ventures.

1. <u>Wheeler was a CPA who promised his clients he would safely invest their money, but stole it instead</u>

Wheeler was a CPA in Oregon. Beginning in 2012, he operated a practice with a licensed Oregon lawyer, JS, called Bridge City Advisors. Wheeler was involved in several other businesses, including real estate development, a strip club and manufacturing and distributing marijuana.

Wheeler used his position as a CPA and his connection with Bridge City Advisors to induce clients and others to invest in real estate development. He made specific promises to his clients about the use of the funds, the rate of return, and sometimes, promised a security interest in real property. Wheeler stole the money his clients invested and used it on himself or on other business ventures for his benefit. In inducing his victims to invest, Wheeler prepared LLCs for the investment vehicle, naming himself a member. He further opened bank accounts and sought to have all of his clients' accounts at the same financial institution. In doing so, he attempted to get signature authority of their accounts so he could transfer funds himself. He used several bank accounts to facilitate his fraud and other illegal activity, particularly an account in the name of TWG Advisors dba Nathan Wheeler (TWG Advisors). This account played a key role in the laundering of his marijuana proceeds and the theft of client funds.

### a.    *Wheeler stole from the C Trust*

One of Wheeler's first victims was the C Trust, a trust for the benefit of two minor children whose father, DC, became ill and died in April 2011. PSR ¶24. C Trust was to ensure for the education and care of the two minor children. Wheeler was named trustee of the C Trust before DC's death. *Id.* Wheeler operated DC's businesses until December 23, 2011, when the businesses were sold for $800,000. *Id.* Both before and after the sale of DC's businesses, Wheeler stole significant funds from the C Trust for his own personal use.[1] Five days after the business was sold, December 28, 2011, Wheeler diverted $737,502 to pay off a note to acquire Trotter Downs II—a 44-acre development in Washington (Trotter Downs). PSR ¶¶ 23-24. Trotter Downs became a joint business venture of Wheeler, JS and others. In July 2014, the United States seized 25-lots of Trotter Downs. *USA v. Twenty-Five (25) Real Properties et al.*, USDC Case No. 3:14-cv-01124-SI. This case is still pending.

All of the lots at Trotter Downs were and remain titled in Wheeler's company, TWG Advisors. And despite being the primary source to purchase Trotter Downs, neither C Trust nor its beneficiaries have any recorded lien on any of the lots and Wheeler has done nothing to protect the C Trust. PSR ¶28. Instead, as further explained below, Wheeler continued to leverage Trotter Downs to swindle other investors so he could quickly use their money to support his lavish lifestyle and fund his marijuana operations. Moreover, as outlined in the Victim Impact Statements and the PSR,

---

[1] The United States will introduce testimony at the sentencing hearing that Wheeler stole at least $45,000 from the C Trust for his own personal use.

**GOVT'S SENTENCING MEMO**                                            **Page 3**

Wheeler refused to pay for expenses of the beneficiaries explaining that the funds were frozen because of a lawsuit DC had been involved in.  PSR ¶25. In reality, Wheeler had already stolen the funds and none remained for the true purpose of the trust.

> b.    DK

DK was a silver medalist for the United States Olympic snowboard teams in 2002 and 2006. PSR ¶29. He wanted to capitalize on his notoriety by creating his own line of snowboarding equipment. Wheeler was DK's CPA.  From January 2011 through 2013, Wheeler embezzled more than $962,000 from DK—making multiple unauthorized diversions each year. PSR ¶29. Wheeler accomplished this by diverting funds into multiple corporate bank accounts, all controlled by him, including the TWG Advisors account. Wheeler also ensured that DK's federal and state tax returns were deposited into an account in DK's name that Wheeler had signatory authority over.

> c.    Ca L

Ca L is a retired law enforcement officer who invested $236,500. PSR ¶32. Wheeler explained that he was a real estate investor and that Ca L's money would be used as hard money loans for developers. Wheeler set up a LLC for Ca L's investments, and made himself a member. Despite his promises to Ca L about the use of her investment, he used her funds for himself. For example, shortly after Ca L's $140,000 investment in November 2013, he purchased an engagement ring for his fiancé for $27,500 and used $50,000 to begin construction on a massive outbuilding that he planned to use to manufacture marijuana.

/ / /

**GOVT'S SENTENCING MEMO**                                                        **Page 4**

   *d.*  *CL*

In 2013, Wheeler recruited CL to invest in Trotter Downs—he promised CL a first priority security interest in specific lots, plus 12% interest. PSR ¶36. He told CL that the lots were ready to build and that he already had a buyer lined up for the property. Wheeler promised that CL's investment funds would be held in trust in Wheeler's account and disbursed as construction was completed. Based on this, CL invested $213,900 on April 1, 2013. Wheeler quickly spent those funds for his own personal use, including a transfer of $50,000 to the Las Vegas Hard Rock Café. PSR ¶39. In July 2014, Wheeler assured CL that his investment was safe and that the home was near completion. Days later after being contacted by law enforcement, CL drove to Trotter Downs and found the property was bare land and no construction was under way.

   *e.*  *JB/JB*

JB/JB came to Wheeler at the recommendation of their former CPA. Wheeler induced JB/JB to take their lifetime savings in their 401K and re-invest it in a self-directed IRA. PSR ¶40. This would permit JB/JB to make a hard money loan purportedly to Wheeler's client for the development of Trotter Downs. PSR ¶41. JB/JB did not understand that Wheeler's company was the actual owner of Trotter Downs nor that he was developing Trotter Downs.  In October 2013, JB/JB made a $467,000 investment in Trotter Downs. Wheeler promised that the money would stay in escrow until Trotter Downs drew against the loan and that all the funds would be used for that purpose.

**GOVT'S SENTENCING MEMO**           **Page 5**

JB/JB also made a second investment of $75,000 for a housing development in Eastern Oregon. PSR ¶42. Finally, in April 2014, JB/JB made a third investment of $485,000 with the understanding that they would receive a 10% return and the investment was for a well-known commercial builder. Wheeler showed JB/JB the commercial builder's tax documentation to assure them that the company would be able to pay back the purported loan.

All of Wheeler's promises about the investments were lies. As demonstrated below, none of JB/JB's money went where Wheeler told them it would go. And while he made some interest payments, that was largely the result of Wheeler's ability to obtain money from additional investors.

> ### f.    MM/SM

MM/SM used Wheeler as their CPA as early as 2007. PSR ¶44. Beginning in 2011 and through 2013, MM/SM invested approximately $1,137,517 with Wheeler. PSR ¶47. Wheeler told them their investments were in real estate in Washington and Happy Valley, Oregon. Throughout the course of their relationship with Wheeler, Wheeler provided false statements indicating their money was invested with specific people or projects. Wheeler lulled them into believing their investments were successful because he made various interest payments to MM/SM until mid-2014 using funds stolen from other victims. PSR ¶46.

> ### 2.    <u>Wheeler was motivated by greed</u>

To what end did Wheeler use the money he stole from his victims? To live an over-the-top, decadent lifestyle marked by gambling and partying. He also used it to

**GOVT'S SENTENCING MEMO**                                                                 **Page 6**

fund his various, unsuccessful businesses. The government's financial analysis shows that often within hours and days after his victims wired Wheeler money he promised he would invest on their behalf, he transferred it to his various accounts and used it in large chunks including at the Hard Rock Café in Las Vegas, strip clubs, traveling, or for his marijuana grow operations.

a.      *Wheeler manipulated Oregon's medical marijuana laws and stole money from his victims to ready himself for entry into the recreational marijuana market*

Wheeler stole his client's money to build the appropriate infrastructure to enter Oregon's recreational marijuana market. In late 2013, law enforcement began investigating Wheeler and his associates. Wheeler and others were manipulating Oregon's medical marijuana program so that they could quickly enter the recreational use market once Oregon made marijuana legal. On February 5, 2014, local law enforcement executed a search warrant at Wheeler's home in Happy Valley and another residence associated with Wheeler in Damascus, Oregon. The search and investigation revealed that Wheeler paid individuals to act as growers under the OMMP, but Wheeler paid for all the costs and directed the care and distribution of the marijuana. Wheeler was selling marijuana inconsistent with state law, including distributing it out of state.[2] At the time of the search in February 2014, Wheeler was interviewed by law enforcement and admitted he wanted to be a leader in the marijuana industry once marijuana was legal for recreational use in Oregon. PSR ¶52.

---

[2] The financial investigation revealed Wheeler received cash deposits from illegally distributing his marijuana through the TWG Advisors account. From July 1 through December 31, 2012 (six months), Wheeler received  $143,390 in out of state cash deposits from Washington, Idaho and New York for the illegal distribution of marijuana.

**GOVT'S SENTENCING MEMO** **Page 7**

Like all large-scale drug investigations, a big component of the investigation involved a review of the financial accounts held by Wheeler. It quickly became clear that Wheeler was using significant funds from his clients to fund his marijuana business.

> b.    *Wheeler used the money he stole to live an extravagant lifestyle marked by gambling and partying*

Wheeler also lived an indulgent and decadent life all on the backs of his clients. Whatever promises he made to his victims, as soon as money came in, it went to Wheeler. Wheeler spent it on gambling, traveling, eating out and generally living an over-the-top lifestyle.

For example from July 31, 2012 through December 31, 2012 and then from July 1, 2013 through June 2014, Wheeler had more than 150 debit card charges totaling $201,229 at Portland strip clubs just through the TWG Advisors account.

The disbursements of JB/JB's investments are also illustrative. On October 2, 2013, JB/JB gave Wheeler $467,400 to invest in Trotter Downs.  That same day, Wheeler transferred the funds from JB/JB's account to his own in the name of CW Holdings.  Wheeler subsequently transferred $291,200 from CW Holdings account to TWG Advisors in four separate transfers:

| 10/02/2013 | $467,460.00 | | JB/JB | **CW Holdings** |
|---|---|---|---|---|
| 10/03/2013 | | $100,000.00 | | To TWG Advisors |
| 10/07/2013 | | $100,000.00 | | Interest payment to MM/SM |
| 10/10/2013 | | $60,000.00 | | Io TWG Advisors |
| 10/14/2013 | | $1,873.00 | | JS |
| 10/14/2013 | | $1,873.00 | | JS |
| 10/17/2013 | | $100,000.00 | | To TWG Advisors |
| 10/22/2013 | | $12,000.00 | | Transfer to 7558 |

**GOVT'S SENTENCING MEMO**                                          **Page 8**

| 10/25/2013 | $3,432.50 | MH/MH |
|---|---|---|
| 10/29/2013 | $31,200.00 | T0 TWG Advisors |
| | | Interest payment to |
| 10/29/2013 | $7,665.00 | MM/SM |

In October 2013, the month Wheeler transferred $291,200 to TWG Advisors, he spent

$306,591.35 in debit card charges and checks written for personal expenses, including

for his marijuana business venture.    Below is a sample:

-Ruth Chris Steakhouse - $380.50
-Urban Garden Supply - $3,418.36
-Urban Garden Supply - $3,327.26
-Urban Garden Supply - $1,619.48
-Stark Street Steakhouse - $4,600
-Schleifer Furniture - $1,494.97
-Pier One - $1,699.58
-Lowes - $1,934.29
-Lowes - $4,345.71
-Petco - $711.73
-Coastal Farm - $702.02
-The Gun Broker - $3,391.94
-The Gun Broker - $600
-Trax Bend, OR Tickets - $2,450
-Trax Bend, OR Tickets - $820.25
-Central Oregon Sporting - $2,495
-Central Oregon Sporting - $770
-Saddle Up Romco - $1,555.49
-Stark Street Steakhouse - $2,315
-Stark Street Steakhouse - $456.25
-Stark Street Steakhouse - $2,285
-Best Buy - $2,649.27
-REI - $1,404.53
-MD - $8,000 (marijuana tender)
-AC - $6,000 (fiancé)
-AC - $1,000 (fiancé)
-MD - $7,000 (marijuana associate)
-MM - $2,000 (marijuana tender)

**GOVT'S SENTENCING MEMO** **Page 9**

-JT Home Theater Design - $4,700
-KH - $3,500 (ex-wife)
-PGE - $1,738.07 (power for marijuana)
-MD - $4,000 (marijuana associates)
-M&M Contractors - $2,400 (Mike McCoy's company)
-Trailer's Plus - $7,443.75
-Hutcho Construction - $10,516 (construction of outbuilding to manufacture marijuana)
-JS - $10,000 (business partner in accounting firm/marijuana grows)
-DH - $1,727 (marijuana tender)
-MD - $3,200 (marijuana tender)
-PV LLC - $2,300 (rent for rental house to grow marijuana)
-PV, LLC - $2,300
-JS - $5,000 (marijuana associate/partner)
-GJ Hanken, Inc - $12,416 – (Down payment for construction of outbuilding to manufacture marijuana)
-MD- $4,000  (marijuana tender)
-CB - $5,902.62 (marijuana tender)
-MM- $4,000 (marijuana tender)
-MM- $2,000 (marijuana tender)
-Olgas Cleaning - $800
-CB - $4,500  (marijuana tender)
-Division of Child Support - $400
-Squares Electric - $8,836
-RH- $7,500 (final payment on property)

JB/JB made an additional $486,000 investment on April 10, 2014. That same day, Wheeler transferred the entire amount to CW Holdings and then transferred $200,000 to his TWG Advisors account. Twenty days later he transferred $10,000 more from CW Holdings to TWG Advisors.  Here is a sample of how he spent the hard-earned money of JB/JB:

**From the CW Holdings Account:**

April 28, 2014 – Wheeler transfers $60,000 to Las Vegas Hard Rock Casino
May 2, 2014 – Wheeler transfers $50,000 to Las Vegas Hard Rock Casino

**From TWG Advisors Account**

-$10,000 – Bridge City Advisors
-$7,000 – JM/SM (interest payment on money stolen)
-Stubhub - $1,108
-Stark Street Steakhouse - $2,350
-Nordstroms - $1,302.55
-Best Buy - $2,086.82
-Marriott – St. Kitts, Nevis - $1,004.68
-ATM Withdrawal - $603.00 – St. Kitts
-Bobby Vans - $171.74 – Jamaica
-JFK Airport - $610.09
-Alaska Air - $858
-Alaska Air - $858
-ATM Withdrawal Club Rouge - $306.00
-ATM Withdrawal Club Rouge - $306.00
-ATM Withdrawal Club Rouge - $306.00
-Petco - $738.20
-Dicks Sporting Goods - $999.95
-Bebe - $1,164.80
-Stubhub - $2,177.60
-Alaska Air - $470
-Alaska Air - $470
-Alaska Air - $470
-Alaska Air - $470
-Alaska Air - $532
-Marriott St. Kitts - $1,561.03
-Apple - $1,047.85
-River City Boats - $2,000
-PGE - $3,050.32
-Clackamas County Tax Collector - $2,795.26
-K.W - $3,500 (ex wife)
-MM - $4,674.24 (marijuana associate)
-CB - $3,700 (marijuana associate)
-G Hanken Construction - $2,554
-JB - $5,500 (marijuana grow partner)
-AC - $3,500 (fiancé)
-Rockaway Shores VOA - $7,000

-Nate's Rides N Waves - $10,400
-CB - $2,000 (marijuana associate)
-JC - $15,000
-WFG Title - $1,500
-CB - $2,500 (marijuana associate)
-KM - $5,760 (marijuana tender)
-AC - $3,000 (fiancé)
-JS - $6,000 (marijuana associate)
-MD - $5,300 (marijuana associate)
-GRS Erectors - $29,990 (outbuilding for marijuana grow)
-JS - $13,000 (marijuana associate)
-MD $5,500 (marijuana associate)

The point is this, Wheeler took money from people who trusted him and believed him. He made very specific promises about where that money would go. Instead, the money went to his opulent lifestyle and marijuana business.

### 3.     Wheeler's conduct had a devastating effect on his victims

As the Victim Impact Statements make clear, Wheeler's criminal conduct was devastating to his victims. The government anticipates that several of the victims will want to address the Court prior to sentencing and pursuant to the Crime Victims Rights Act.

### B.     The Charges, The Plea Agreement & Guideline Computations

On May 24, 2018, Wheeler waived Indictment and plead guilty to a two-count Information, charging wire fraud, a violation of 18 U.S.C. §1343 and evasion of tax assessment, a violation of 26 U.S.C. §7201.

The parties agree that the defendant is a Criminal History Category I. The government agrees with the guidelines calculation outlined in the PSR. PSR ¶¶70-92. The plea agreement permits defendant to dispute the government's guidelines

**GOVT'S SENTENCING MEMO**                                          **Page 12**

calculation and argue for any lawful sentence. The government agrees to recommend the low-end of the resulting guidelines range.  Below is a summary of the parties' guidelines disputes:

| Enhancement | Government Position | Defendant's Position |
|---|---|---|
| Base— USSG § 2B1.1(a) | +7 | +7 |
| Loss USSG § 2B1.1(b) | +18 (more than $3.5 million) | +16 (more than $1.5 million) |
| Sophisticated Means USSG § 2B1.1(b)(10)(C) | +2 | 0 |
| Substantial Financial Hardship USSG § 2B1.1(b)(2)(A)(iii) | +2 | Unknown |
| Abuse of Trust USSG § 3B1.3 | +2 | 0 |
| Acceptance of Responsibility USSG § 3E1.1 | -3 | -3 |
| Other adjustment | -4 | -4 |
| **Total Offense Level** | **24** | **16** |
| **Resulting Guidelines Range** | **51-63 Months** | **21-27 Months** |

## ARGUMENT

### A.    Contested Guidelines Issues

1.    <u>The loss caused by Wheeler's crimes is more than $3.5 million</u>

a.    *General principles regarding loss for sentencing purposes*

The advisory guidelines require the district court to correlate the severity of the sentence to the amount of the loss. U.S.S.G. §2B1.1(b)(1).  "[T]he sentences of defendants convicted of federal offenses should reflect the nature and magnitude of the loss caused or intended by their crimes. . . . [L]oss serves as a measure of the seriousness of the offense and the defendant's relative culpability and is a principal factor in

**GOVT'S SENTENCING MEMO**                                           **Page 13**

determining the offense level. . . . . *Id.* comment (backg'd).  Ordinarily, a district court uses the preponderance of evidence standard of proof when finding facts at sentencing, such as the amount of the loss caused by a fraud.  *United States v. Hymas,* 780 F.3d 1285, 1289-90 (9th Cir. 2015); *United States v. Treadwell*, 593 F.3d 990, 1000 (9th Cir. 2010), *citing United States v. Armstead*, 552 F.3d 769, 776 (9th Cir. 2008).  "Where an extremely disproportionate sentence results from the application of an enhancement, the government may be required to satisfy a 'clear and convincing' standard of proof." *Treadwell* 593 F.3d at 1000 (*quoting United States v. Zolp*, 479 F.3d 715, 718 (9th Cir. 2007)).

"The Court need not make its loss calculation with absolute precision; rather it need only make a reasonable estimate of the loss based on the available information." *United States v. Zolp*, 479 F.3d at 718 (9th Cir. 2007).  Courts should "take a realistic economic approach to determine what losses a defendant truly caused or intended to cause."  *United States v. Allison*, 86 F.3d 940, 943 (9th Cir. 1996).

In calculating loss for sentencing purposes, the Court may use either the actual loss suffered by the victim or the loss intended by the defendant, whichever amount is greater. U.S.S.G. § 2B1.1 cmt. n.3(A) (2016).  *See United States v. Popov*, 742 F.3d 911, 915 (9th Cir.2014) (citing U.S.S.G. § 2B1.1 cmt. n. 3(A)); *United States v. Pollock*, No. 3:14-CR-00186-BR, 2016 WL 1718192, at *3 (D. Or. Apr. 29, 2016), aff'd sub nom. *United States v. Pollock*, 700 F. App'x 577 (9th Cir. 2017).

Actual loss is defined in the guidelines as the "reasonably foreseeable pecuniary harm that resulted from the offense." *Id.*  A reasonably foreseeable pecuniary harm is

the "pecuniary harm that the defendant knew or under the circumstances, reasonably should have known was a potential result of the offense." *Id.*  Intended loss is defined as "the pecuniary harm that the defendant purposely sough to inflict." U.S.S.G. § 2B1.1, cmt. n.3(A)(ii).  *United States v. Zolp*, 479 F.3d 715, 718–19 (9th Cir. 2007). Because actual loss in this case is more than intended loss, actual loss is the measure. Because the dispute regarding the loss is not "extremely disproportionate," the government must prove the difference in loss by a preponderance of the evidence standard.

        *b.*        *The loss attributable to Wheeler is more than $3.5 million.*

Below is a chart outlining the approximate dates Wheeler stole money from his clients and the amounts. They total more than $4.4 million:

| Summary of Embezzled Funds by Nathan WHEELER | | |
| --- | --- | --- |
| Date | Amount | Client |
| 1/3/2011 | $49,000.00 | DK |
| 4/5/2011 | $40,000.00 | DK |
| 9/7/2011 | $39,500.00 | DK |
| 12/28/2011 | $737,502.16 | CT |
| 9/21/2011 | $500,000.00 | MM/SM |
| | $461,517.00 | MM/SM |
| 10/11/2011 | $170,000.00 | MM/SM |
| Total 2011 | $1,997,519.16 | |
| | | |
| 1/12/2012 | $49,500.00 | DK |
| 1/31/2012 | $30,000.00 | DK |
| 3/27/2012 | $50,000.00 | DK |
| 6/5/2012 | $130,000.00 | DK |
| 7/9/2012 | $70,000.00 | DK |
| 12/6/2012 | $360,000.00 | DK |
| 2011-2012 | $45,006.00 | CT |
| | | |
| Total 2012 | $734,506.00 | |
| | | |
| 2/21/2013 | $40,000.00 | DK |
| 2/21/2013 | $65,000.00 | DK |
| 3/15/2013 | $96,500.00 | CA. L |
| 4/1/2013 | $213,900.00 | CL |
| 5/13/2013 | $49,500.00 | DK |
| 6/3/2013 | $1,000.00 | DK |
| 7/3/2013 | $1,000.00 | DK |
| 8/20/2013 | $35,000.00 | DK |
| 9/11/2013 | $1,000.00 | DK |
| 10/2/2013 | $467,460.00 | JB/JB |
| 10/9/2013 | $1,000.00 | DK |
| 11/8/2013 | $1,000.00 | DK |
| 11/21/2013 | $140,000.00 | CA. L |
| 12/23/2013 | $75,000.00 | JB/JB |
| | | |
| Total 2013 | $1,187,360.00 | |
| | | |
| 1/1/2014 | $1,000.00 | DK |
| 1/1/2014 | $33,000.00 | DK |
| 4/1/2014 | $1,000.00 | DK |
| 4/10/2014 | $486,000.00 | JB/JB |
| 4/29/2014 | $15,000.00 | DK |
| | | |
| Total 2014 | $536,000.00 | |
| | | |
| | | |
| Total Loss | $4,455,385.16 | |

**GOVT'S SENTENCING MEMO**                                          **Page 16**

Wheeler is entitled to some credits against loss, as more fully described below. The government will submit a more precise loss number taking into account these credits at the sentencing hearing, but the government believes such credits will not affect the final guideline range. The evidence will show that regardless of these credits, the loss for sentencing purposes is more than $3.5 million and an 18-level enhancement is appropriate.

> c.    *Wheeler is not entitled to any offsets for monies paid by him after the fraud was detected*

It is axiomatic under the guidelines that payments made to victims **AFTER** a fraud is detected do not offset loss for sentencing purposes. U.S.S.G. § 2B1.1, cmt. n.3(E)(i).  The time of detection is the earlier of "the time the offense was discovered by a victim or government agency"; or "the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency." In his objections to PSR, Wheeler seeks credits for various payments made to the victims of his crime—some of which were "interest" payments, some were paid on behalf of insurance companies and some paid by him in the middle of litigation his victims filed against him for his fraud. Wheeler is not entitled to a credit against loss for sentencing purposes for any payment made to a victim after February 5, 2014, the day that law enforcement searched Wheeler's homes, marijuana grows and interviewed him. The significant search and interviews of his associates, along with the fact Wheeler knew that he stole money from his clients to pay for his marijuana business, put Wheeler on notice that the offense was about to be detected by a government agency.

**GOVT'S SENTENCING MEMO**                                                    **Page 17**

> ### d.    *Wheeler is not entitled to a $1.2 million offset for real property the government forfeited.*

Wheeler argues he is entitled to an offset for the value of the Trotter Downs property. The government anticipates he will submit an analysis indicating that the fair market value (FMV) of those lots are approximately $1.2 million, if sold together. The guidelines permit a credit against loss equal to the FMV of land in "a case involving collateral pledged or otherwise provided by the defendant." U.S.S.G. § 2B1.1, cmt. n.3(E)(ii). In this case, Wheeler promised his victims collateral to secure their "investments," but instead, Wheeler stole their money for his own personal expenses and business ventures and except for two victims, failed to pledge such collateral. Wheeler is not entitled to a credit against loss for the FMV of all of Trotter Downs. Moreover, the FMV the government anticipates Wheeler will proffer fails to account for at least two significant factors and is overstated.

> ### i.    At most, Wheeler is entitled to an offset of the FMV of specific lots that a victim has a recorded lien against.

Only two victims have first priority secured interests in Trotter Downs lots: (1) CL; and (2) JB/JB. The amount of the lien far exceeds the FMV of the lots under any analysis. Any offset for the FMV of Trotter Downs is limited by the Guidelines to the FMV of those lots that were actually pledged as collateral to a victim. And they can only offset the losses of CL and JB/JB. The remaining lots are secured by other lien holders or were unsecured and forfeited by the government and cannot be used to offset loss for sentencing purposes.

**GOVT'S SENTENCING MEMO**                                                  **Page 18**

      ii.       The FMV proffered by Wheeler fails to consider years of unpaid property taxes and the overgrown condition of the land

The government intends to present evidence at the sentencing hearing about the FMV of Trotter Downs. It will demonstrate the FMV is significantly less than Wheeler's anticipated proffered FMV. Two significant facts must be considered in determining the FMV: first, for several years before the government seized Trotter Downs, Wheeler failed to pay state property taxes on each of the lots. As such, there are significant unpaid taxes which will need to be paid in escrow or will be deducted from any sale price. By 2017, the unpaid taxes on Trotter Downs exceeded $106,000. Since property taxes are a priority over any lien-holder, this significantly impacts the FMV of the lots and any credit against loss. Second, the FMV must take into account the current condition of the land. Trotter Downs' value was as a development of a subdivision. Because Wheeler failed to invest money in it over time, despite promising his investors that was what he was doing with their money, and the government seized it in 2014, Trotter Downs is overgrown and the lots need to be clear and regraded. The government believes Wheeler's proffered FMV has not taken these important factors into account.

### 2.    Wheeler's Scheme Involved Sophisticated Means.

Under U.S.S.G. § 2B1.1(b)(10)(C), a two-level enhancement applies if "the offense … involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." The commentary to this section defines "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." *Id.* § 2B1.1, cmt. n.9(B).

**GOVT'S SENTENCING MEMO**                                     **Page 19**

Conduct such as hiding assets or transactions, or both, using fictitious entities, corporate shells, or offshore financial accounts ordinarily indicates sophisticated means. *Id.* at cmt. n.9.

The Ninth Circuit has upheld the imposition of the sophisticated means enhancement where a defendant's scheme was "sufficiently more complex" than a routine scheme. *United States v. Aragbaye*, 234 F.3d 1101, 1108 (9th Cir. 2000) (*quoting United States v. Ford*, 989 F.2d 347, 351 (9th Cir. 1993)). "[T]he essence of the definition is merely 'deliberate steps taken to make the offense . . . difficult to detect.'" *See also, United States v. Fife*, 471 F.3d 750, 754 (7th Cir. 2006) ("The sophisticated means enhancement does not require a brilliant scheme, just one that displays a greater level of planning or concealment than the usual tax evasion case."); *United States v. Kontny*, 238 F.3d 815, 821 (7th Cir. 2001) ("In light of its purpose and context, we think 'sophistication' must refer not to the elegance, the 'class,' the 'style' of the defrauder . . but to the presence of efforts at concealment that go beyond . . . the concealment inherent in tax fraud.").

The Ninth Circuit has also held that "the enhancement [also] properly applies to conduct less sophisticated than the list articulated in the application note." *United States v Jennings*, 711 F.3d 1144, 1145 (9th Cir.2013) (*citing United States v. O'Doherty*, 643 F.3d 209, 220 (7th Cir. 2011); *United States v. Clarke*, 562 F.3d 1158, 1160, 1165 (11th Cir. 2009); *United States v. Lewis*, 93 F.3d 1075, 1082–83 (2d Cir. 1996) (applying enhancement to scheme involving fake bank accounts of non-existent businesses).

**GOVT'S SENTENCING MEMO**                                                     **Page 20**

In *United States v. Tanke*, 743 F.3d 1296, 1307 (9th Cir. 2014), the Ninth Circuit affirmed the imposition of the sophisticated means enhancement where the defendant "created at least six false invoices and falsified carbon copies of checks * * * on at least 10 occasions to conceal the payments." *Id.* (*citing United States v. Horob*, 735 F.3d 866, 872 (9th Cir. 2013) (per curiam)).

In *Horob*, defendant was convicted of bank fraud and other crimes stemming from his fraudulent scheme to obtain millions of dollars in loans from federally insured banks. In order to obtain the loans, *Horob* gave the banks security in non-existent cattle. In affirming the district court's decision to apply the two-point enhancement for "sophisticated means", the Ninth Circuit noted that defendant had manipulated several people to lie for him, used several different bank accounts (including accounts of other people) to move funds around, and fabricated numerous documents. Moreover, "the complicated and fabricated paper trail made discovery of his fraud difficult." *United States v. Horob*, 735 F.3d 866, 872 (9th Cir. 2013) (per curiam).

The Ninth Circuit affirmed the use of the sophisticated means enhancement where a defendant took "coordinated and repetitive steps" to transfer money for his personal use that was meant for the benefit of the victim of his crimes. *United States v. Augare*, 800 F.3d 1173 (9th Cir. 2015). Other circuits have upheld the imposition of the sophisticated means enhancement in similar circumstances. *See United States v. Rettenberger*, 344 F.3d 702, 709 (7th Cir. 2003) (affirming a finding of sophisticated means where the appellant engaged in "[c]areful execution and coordination over an extended period . . . ."); *United States v. Ghertler*, 605 F.3d 1256, 1267-68 (11th Cir.

**GOVT'S SENTENCING MEMO**                                        **Page 21**

2010) (affirming enhancement where "the totality of [defendant's] activities carried out over an extended period of time is sufficient to support the district court's finding that [defendant] used sophisticated means[,]" where the fraud extended over an 18-month period); *United States v. Bistrup*, 449 F.3d 873, 882-83 (8th Cir. 2006) (affirming sophisticated means enhancement and noting that "[w]hile some of [the defendant's] acts individually may not have been particularly sophisticated, there were complexities in his overall scheme").

   As described in the PSR, Wheeler prepared false deeds, false financial statements and other documents to facilitate and conceal his scheme from his victims. In addition, he created an elaborate series of companies, LLCs and other entities—both his own and with his victims to provide the appearance of legitimacy.  He further established separate bank accounts for these entities, often obtaining signatory authority from his victims. Wheeler used this sophisticated organization to move money through these companies and bank accounts, both giving the fraud the appearance of propriety and concealing it. S/A McGeachy, an agent experienced in unwinding complex financial transactions and organizations will testify that financial transactions were difficult to unwind in this case because of the manner in which Wheeler used these entities and accounts to move the victims' money and conceal his fraud. By way of example, below is a list of the various entities created, controlled and used by Wheeler and the financial institution in which the entity held an account:

**Key Bank**
100 Dollar Throw
Avalanche Construction

**GOVT'S SENTENCING MEMO**                                                    **Page 22**

Bridge City Advisors
Cloverdale Enterprises
CW Holdings
David Coverdale Trust and Nathan Wheeler Trustee
DND Nurseries
Garden State Nursery
Great Ideas LLC
Greener Pasture Farms
Headhunter Holdings
Million Dollar Throw
Token Holdings
TWG Advisors
Zombie Holdings
Nathan Wheeler Personal Bank Account

**<u>Columbia State Bank</u>**
BVW Funds
Nathan and Karli Wheeler Personal Account

**<u>Washington Trust Bank</u>**
Bridge City Advisors
Bridge City Law
CW Holdings
Garden State Nursery
Great Ideas
McDonald holdings
Rouge PDX
Token Holdings
TWG Advisors
Zombie Holdings

As this Court can see, Wheeler used "complex or especially intricate offense conduct pertaining to the execution or concealment of an offense" and a two-level enhancement for sophisticated means is appropriate.

**GOVT'S SENTENCING MEMO**                                        **Page 23**

### 3. Wheeler Abused a Position of Trust in Stealing His Victims' Money and the Enhancement is Appropriate.

Under U.S.S.G.§ 3B1.3, the Court may increase the offense level by two if the "defendant abused a position of public or private trust * * * in a manner that significantly facilitated the commission or concealment of the offense." To support the abuse of trust enhancement, "a position of trust ... must be established from the perspective of the victim." *United States v. Technic Servs., Inc.*, 314 F.3d 1031, 1048 (9th Cir. 2002). The proper inquiry the sentencing court should undertake before applying the enhancement is: (1) whether the defendant held a position of private or public trust, which is a position characterized by "professional or managerial discretion"; and (2) if so, whether the abuse of this position "significantly facilitated" the commission or concealment of the crime.  U.S.S.G. § 3B1.3, cmt. n.1. *United States v. Laurienti*, 731 F.3d at 973 (citing *United States v. Contreras*, 581 F.3d  1163, 1168-1169 (9th Cir. 2009), *aff'd in relevant part, vacated in part*, 593 F.3d 1135 (9th Cir. 2010)); *United States v. Lindsey*, 660 Fed. Appx. 563, 566 (9th Cir. 2017).  "[T]he presence or lack of professional or managerial discretion represents the decisive factor in deciding whether a defendant occupied a position of trust." *Id.* "A defendant has this discretion when, because of his or her special knowledge, expertise, or management authority, he or she is trusted to exercise substantial discretionary judgment that is ordinarily given considerable deference." *Id.* (citations omitted).

In an unpublished memorandum opinion, the Ninth Circuit held that the district court properly applied the two-level enhancement for abuse of a position of trust in the sentencing of a loan officer who was convicted of bank fraud and aggravated identity

theft.  *United States v. Kim*, 390 Fed.Appx. 675 (9th Cir. 2010); 2010 WL 2990995.  The Court reasoned that defendant Kim, held a position characterized by professional discretion.  She not only assisted customers with loan paperwork, and acted as a translator for her customers, she exercised significant discretion in determining what information she relayed to clients and to the bank, and how to best acquire loans for her customers.  The Ninth Circuit also found that Kim's position facilitated the crimes by enabling her to obtain personal identifying information of her clients and use that information to acquire unauthorized loans in their names.  *Id.* at 677.

Reading the PSR and Victim Impact Statements, it is clear that Wheeler had significant professional discretion and that the victims of his crimes relied in large part on his experience, position and advice in making financial decisions. Indeed, it's hard to imagine a more clear cut case in which this enhancement is applicable.

### B.    Government's Recommended Sentence

Given the guidelines, the factors in 3553(a) and in particular the egregious conduct of the defendant, a sentence of the low-end resulting guideline range, 51 months, is appropriate.

1.    The Court May Consider Any Information in Sentencing Defendants.

A sentencing judge may exercise wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed. *Pepper, v. United States*, 562 U.S. 476, 487-490 (2011); *Williams v. New York,* 337 U.S. 241, 246 (1949). "Highly relevant— if not essential—to [the] election of an appropriate sentence is the possession of the fullest information possible concerning

**GOVT'S SENTENCING MEMO**                                                    **Page 25**

the defendant's life and  characteristics." *Williams,* 337 U.S. at 247. "Permitting sentencing courts to consider the widest possible breadth of information about a defendant 'ensures that the punishment will suit not merely the offense but the individual defendant." *Pepper*, 562 U.S. at 488 (citing *Wasman v. United States,* 468 U.S. 559, 564 (1984)). Congress incorporated this concept into the statutory sentencing scheme:

> No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.

18 U.S.C. §3661. The Sentencing Commission, in turn, incorporated this concept in the Guidelines:

> In determining the sentence to impose within the guideline range, or whether a departure from the guidelines is warranted, the court may consider, *without limitation,* any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law. *See* 18 U.S.C. § 3661.

USSG § 1B1.4 (2010) (emphasis added). Both Congress and the Sentencing Commission therefore expressly provide discretion to the sentencing courts to "conduct an inquiry broad in scope, largely unlimited either as to the kind of information [they] may consider, or the source from which it may come." *Pepper*, 562 U.S. at 488; *United States v. Tucker,* 404 U.S. 443, 446 (1972).

/ / /

/ / /

/ / /

**GOVT'S SENTENCING MEMO**                                                                **Page 26**

2.    <u>The factors in 18 U.S.C. §3553(a) warrant a sentence of 51-months</u>

a.    *The Nature and Circumstances of the Offense*

The nature and circumstance of Wheeler's offense warrants a sentence of 51 months. The amount of money Wheeler stole is significant for this District and the manner in which he did it is particularly egregious. Wheeler took money from children who lost their father, retired couples who worked hard during their career and lived frugally, and more. He did this to live a life of debauchery and partying while denying money for braces and education. Moreover, while Wheeler seeks credit for payments made by others in this sentencing, it is notable that he has failed to pay his victims a single penny since mid-2014.

b.    *History and Characteristics of the Defendant.*

While Wheeler is a first-time offender, the scope of his criminal conduct involved at the time of the counts of conviction is pretty staggering—manufacturing and distributing illegal drugs, money laundering, tax evasion and wire fraud. Wheeler has offered little that would support any departure from the low-end resulting guideline range. The history and characteristics of defendant warrants incarceration for 51 months.

c.    *Seriousness of the Offense*

Wheeler's conduct constitutes a serious offense and warrants the low0end resulting guideline range of 51 months.

/ / /

/ / /

**GOVT'S SENTENCING MEMO**                                                        **Page 27**

### d.     Respect for the Law; Just Punishment for the Offense

White collar crime is no less serious or harmful to the community than street crime. Indeed, in this instant case, the defendant's fraud wrought significantly more financial harm than a typical street crime or drug crime.  Yet, legislators and appellate judges have observed a trend:  white collar criminals in high-loss fraud cases receiving disproportionately lenient, non-guidelines sentences.  Some Ninth Circuit appellate judges have attributed this phenomenon, in part, to better funded defense teams, better advocacy, and district court judges who more closely identify with white collar criminals than street criminals.  But there is no justifiable basis for this disparity.

Since *Booker* in 2005 — and its holding that the Sentencing Guidelines are merely advisory — a number of legislators and appellate judges have seen an increase in the number of white collar defendants receiving more lenient, non-guidelines sentences relative to street criminals.

For instance, in a January, 2011 Senate Judiciary Committee hearing on new fraud legislation, Senator Charles Grassley stated:

> Now that the Guidelines have been held to be merely advisory, the disparity and unfairness in judicially imposed sentences that we sought to eliminate on a bipartisan basis are returning, especially in two areas: child pornography and fraud cases of the type we are discussing today.  If potential fraudsters view the lenient sentences now being handed down as merely a cost of doing business, efforts to combat criminal fraud could be undermined. . . Supporting this position is a Reuters analysis of 15 insider trading cases. . . Nationwide, 42 percent of all federal [fraud] sentences were below the guidelines.

*Protecting American Taxpayers: Significant Accomplishments and Ongoing Challenges in the Fight Against Fraud*, Hearing Before the S. Comm. on the Judiciary, 112th Cong. 4 (2011) (statement of Sen. Charles Grassley), reprinted at http://www.gpo.gov/fdsys/pkg/CHRG-112shrg67415/html/CHRG-112shrg67415.htm. Likewise, in October, 2011 testimony before the House Judiciary Committee, Representative James Sensenbrenner stated:

> The increasing frequency of downward departures is undermining sentencing fairness throughout the Federal system. . . There are wide sentencing disparity depending upon what crime the defendant commits. If the defendant is a convicted child porn possessor, he is in luck. Federal judges now lower sentences for child porn professors at the highest rate—30 percent are below the guidelines. It is better—a better time also to be convicted of fraud, which has the lower than guideline rate of 17 percent.

*Uncertain Justice: The Status of Federal Sentencing and the U.S. Sentencing Commission Six Years After U.S. v. Booker*, Hearing Before the Subcomm. on Crime, Terrorism, and Homeland Security, H. Comm. on the Judiciary, 112th Cong. (2011) (statement of Rep. James Sensenbrenner), reprinted at http://judiciary.house.gov/_files/hearings/printers/112th/112-142_70669.PDF. According to some appellate judges in the Ninth Circuit, this trend is particularly pronounced in this Circuit.  In *United States v. Edwards,* 622 F.3d 1215 (9th Cir. 2010), Circuit Judges Gould, Bybee, Callahan and Bea dissented from the denial of a rehearing *en banc* to review the reasonableness of the defendant's sentence.   In the dissent, Judge Gould explained the phenomenon of white collar criminals in the Ninth Circuit receiving disproportionately more lenient sentences:

**GOVT'S SENTENCING MEMO**                                            **Page 29**

> Because of the nature of their crimes, white-collar offenders are uniquely positioned to elicit empathy from a sentencing court. *See United States v. Ruff*, 535 F.3d 999, 1007 (9th Cir. 2008) (Gould, J., dissenting) ("[D]istrict courts sentencing white collar criminals can more often identify with the criminal. . . But, socioeconomic comfort with a criminal convict is not a sufficient reason to show such extreme leniency. . ."); Kenneth Mann et al., Sentencing the White-Collar Offender, 17 Am.Crim. L.Rev. 479, 500 (1980) (concluding from a survey of federal judges that they evinced particular "understanding" and "sympathy" "for the person whose position in society may be very much like their own," and that "factors intimately related to the defendant's social status do receive weight in the judges' thinking" about sentencing). And while judges take seriously violent crime and are forced by congressional mandatory minimums to take seriously drug crimes, there is latent risk in the case of white-collar sentencing that an "it's only money" rationale will result in undue leniency for serious offenses. I have no doubt that [defendant] made a persuasive presentation to the district court that he was an unhealthy, aging retiree repentant of past frauds. Such cases are precisely when we should most rigorously review a sentence's reasonableness to ensure that the justifications relied on at sentencing are supported by objective evidence in the record. *See* Michael M. O'Hear, Appellate Review of Sentences: Reconsidering Deference, 51 Wm. & Mary L.Rev. 2123, 2141-49 (2010) (criticizing appellate deference to trial judge assessment of demeanor evidence at sentencing on the basis of the "emerging consensus in the legal and social science literature that people generally do a poor job in evaluating demeanor evidence," and concluding that a defendant's demeanor "seems about as likely to lead the trial judge astray as to facilitate good decision making"). We know that often criminal defendants who commit other types of crimes will serve some hard time. White-collar offenders like [defendant] should not escape the same punishment simply because they are better-positioned to make a sympathetic presentation to the district judge.

*Id.* at 1216-17.

Judge Gould cited empirical statistics in support of the dissenters' argument. The statistics showed that sentences for white collar criminals in the Ninth Circuit were (i) disproportionately lower than sentences for other criminals, and (ii) disproportionately lower than sentences for white collar criminals in other circuits. *Id.* at 1218 (for 2009, median sentences in the Ninth circuit: fraud (6 months), immigration (21 months), drug trafficking (40 months), firearms (48 months); national median sentence for fraud (18 months)). Judge Gould concluded: "I'm sure there are good explanations for some of these disparities, but we should be concerned about the substantial divergence between our treatment of white-collar criminals and other types of criminals, and between white-collar criminal sentences in our circuit and in other circuits." *Id.* In this case, the government's requested sentence of 51 months promotes respect for the law and is an adequate punishment for defendants.

### e.    Deterrence

White collar crime is particularly amenable to general deterrence. "General deterrence is effective in the context of white collar crime." *United States v. Edwards*, 595 F.3d 1004, 1021 (9th Cir. 2009)(Bea, dissenting). "Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006). "White collar crime * * * usually requires a well-schooled, intelligent criminal, capable of gauging the upside of how others will be gulled by his well-honed fables. This ability to foresee extends also to the possible downside of his fraud: apprehension, conviction, and punishment."

*Edwards*, 595 F.3d at 1021 (Bea, dissenting). ("Because economic and fraud based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence. Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment."); *United States v. Bergman,* 416 F. Supp. 496, 500 (S.D.N.Y. 1976) ("[W]e continue to include among our working hypotheses a belief (with some concrete evidence in its support) that crimes like those in this case [nursing home fraud] – deliberate, purposeful, continuing, non-impulsive, and committed for profit – are among those most likely to be generally deterrable by sanctions most shunned by those exposed to temptation.").  Indeed, the drafters of Section 3553(a) recognized the distinction between white collar criminals and other criminals when it comes to deterrence:

> The second purpose of sentencing is to deter others from committing the offense. This is particularly important in the area of white collar crime. Major white collar criminals often are sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as the cost of doing business.

S.Rep. No. 98–225, at 76 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3259.  On one side of the calculus, white collar criminals weigh the benefits of creating and maintaining a fraudulent enterprise and all the perks – financial, professional, societal status – that come with it.  Against these benefits, they weigh the costs. Namely, they weigh the likelihood of getting caught, the likelihood of being charged, the likelihood of being convicted, and the degree of punishment they might face.

**GOVT'S SENTENCING MEMO**                                      **Page 32**

The perceived certainty of a long prison term often is decisive in the calculus and can deter future violators. *See* James J. Fishman, *Enforcement of Securities Laws in the United Kingdom*, 9 Int'l Tax & Bus. Law 131, 170 (1991) ("Though it may be small satisfaction to defrauded investors, incarcerating perpetrators of financial misdeeds serves as important deterrence to future violators. The certainly of enforcement and prison for white collar criminals is an effective deterrence."). Conversely, insignificant sentences can have the opposite effect. *See id.* at 171 ("And of course, the less punishment that is meted out, the less deterrent effect the sentence will have on others contemplating similar crimes."); *United States v. Cutler*, 520 F.3d 136, 163 (2d Cir. 2008) ("To the extent that the district court's views that this 'type' of offense did not warrant a long sentence and that the relative length of the sentence was relatively unimportant in providing deterrence were meant to apply to [defendant's] convictions for tax evasion and tax fraud conspiracy, the court's views were squarely contrary to the policy judgments articulated by the Sentencing Commission."). The Ninth Circuit has repeatedly upheld sentences in which district courts identified deterrence as an important sentencing consideration. *See, e.g.*, *United States v. Tankersley*, 537 F.3d 1100, 1115 (9th Cir. 2008) (finding sentence reasonable where district court stated at sentencing that "down the road, people need to know, when these messages and actions are taken, they will be held accountable" and "found a compelling need to deter"); *United States v. Orlando*, 553 F.3d 1235, 1239 (9th Cir. 2008); *United States v. Blixt*, 548 F.3d 882, 891 (9th Cir. 2008).

In cases like this one, the deterrent effect, or lack thereof, is magnified. Just as CPAs and other professionals will look to the punishment to see if justice has been done, would-be criminals may look to this sentence to gauge whether they too should attempt a similar fraud. The United States depends on punishments that will help prevent these crimes from occurring because of the unfortunate truth that it cannot bring every fraudster and swindler to justice.  Simply put, to achieve general deterrence, the Court should sentence the defendant to 51 months. The Court must send a message that this conduct will not be tolerated and that the costs of engaging in this behavior are not worth the potential profits.

### f.        *Avoidance of Unwarranted Disparity.*

In sentencing Wheeler, this Court must avoid unwarranted disparities between similarly situated criminals.  Below is a chart of investment fraud cases and resulting sentences within the District:

| Defendant/ Sentencing Date | Case No. | Charges | Sentence | Guideline Range | Loss to Victims |
|---|---|---|---|---|---|
| Harry Proudfoot 4/9/19 | 15-CR-427-SI | Conspiracy to commit wire Fraud, wire fraud, money laundering | 84 months | 121-151 months | $4.02 million |
| Jack Holden 2016 | 13-CR-444-BR-2 | Conspiracy to Commit wire fraud | 87 months | 108-135 months | $1.4 million |
| Johnny "Mickey" Brown 12/21/11 | 06-CR-385-KI | Mail fraud, bank fraud, tax evasion | 130 mos. | 262 - 327 mos. | $6 M+ |
| John Brent Leiske 11/26/12 | 08-453-KI (plus 12-096 formerly CDCA 08-176) | Wire fraud, money laundering | 120 mos. | 210 – 262 mos. Joint sent. w/ CDCA fraud case | $8.17 M |

**GOVT'S SENTENCING MEMO**                                                      **Page 34**

| | | | | | |
|---|---|---|---|---|---|
| Tamara Sawyer 04/30/13 | 10-CR-60122-AA | Bank fraud, wire fraud, money laundering, conspiracy | 108 mos. | 108 -135 mos. | $5.9 M |
| Neil Madison (Yarbrough co-def.) 06/06/12 | 09-CR-484-JO; 10-CR-28-01-JO | Wire fraud, mail fraud | 96 mos. | 235-293 mos. | $8.5 M |
| Casey Jene Yarbrough 03/14/12 | 10-CR-2802-JO | Conspiracy to commit wire & mail fraud | 36 mos. (joint rec.) | 78 – 97 mos. | Over $1 M but less than $2.5 |
| Lawrence Heim 10/31/12 | 11-CR-345-HZ | Wire fraud | 51 mos. | 51 – 63 mos. | $4.1 M |
| Hui "Judy" Wang 06/17/13 | 11-CR-452-HA | Wire fraud | 41 mos. | 41 – 51 mos. | $2 M |
| Yusaf Jawed 09/23/13 | 13-CR-125-HA | Mail and wire fraud | 78 mos. | 97 – 121 mos. | $6.47M |
| Mark Neuman | 11 –CR-0247-BR | Mail and wire fraud | 78 mos. | PRS rec. 188 mos. | $13.7M |
| Tim Larkin | 11 –CR-0247-BR | Mail and wire fraud | 54 mos. | PSR rec. 108 mos. | $13.7M |
| Lane Lyons | 11 –CR-0247-BR | Mail and wire fraud | 54 mos. | PSR rec. 97 mos. | $13.7M |
| Brian Stevens | 11 –CR-0247-BR | Mail and wire fraud | 48 mos. later reduced by J. Mosman to time served (approx. 18 mos. due to coopera-tion and other intervene-ing issues) | | $13.7M |
| Jonathan Kendig 10/24/11 | 10-CR-430-KI | Wire fraud | 24 mos. (joint rec. per PA) | 24-30 mos. | $1.6M+ |
| Kevin Sawyer 4/30/13 | 10-CR-60122-AA | Bank fraud | 27 mos. | 21 – 27 mos. | $360 K |

**GOVT'S SENTENCING MEMO**                                    **Page 35**

As this Court can see, a sentence of 51 months in this case does not create an unwarranted disparity and is in line with sentences imposed in other cases.

### C.    Restitution & Forfeiture

The parties request that the Court set a hearing 60 days from the date of sentencing to address the issues of restitution and forfeiture.

Dated: October 19, 2019                         Respectfully submitted,

                                                BILLY J. WILLIAMS
                                                United States Attorney


                                                /s/ Michelle Holman Kerin
                                                MICHELLE HOLMAN KERIN, OSB#965278
                                                Assistant United States Attorney