IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

UNITED STATES OF AMERICA,           )
                                    )
                    Plaintiff,      )   Case No. 3:18-cr-00161-IM-1
                                    )
              v.                    )
                                    )   October 24, 2019
NATHAN WHEELER,                     )
                                    )
                    Defendant.      )   Portland, Oregon
_____)

SENTENCING

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE KARIN J. IMMERGUT

UNITED STATES DISTRICT COURT JUDGE

                              APPEARANCES

FOR THE PLAINTIFF:
                    MICHELLE HOLMAN KERIN
                    U.S. Attorney's Office
                    1000 SW Third Avenue
                    Suite 600
                    Portland, OR 97204

FOR THE PLAINTIFF:
                    KATIE DE VILLIERS
                    U.S. Attorney's Office
                    1000 SW Third Avenue
                    Suite 600
                    Portland, OR 97204

FOR THE DEFENDANT:
                    DAVID T. MCDONALD
                    David T. McDonald, P.C.
                    833 SW 11th Avenue
                    Suite 625
                    Portland, OR 97205

COURT REPORTER:    Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
                   United States District Courthouse
                   1000 SW Third Avenue, Room 301
                   Portland, OR 97204
                   (503)326-8191

                         *    *    *

INDEX

PLAINTIFF'S WITNESS:                                    PAGE:

 SCOTT McGEACHY

 Direct Examination by Ms. Kerin                          26

 Cross-Examination by Mr. McDonald                        56

 Redirect Examination by Ms. Kerin                        70

DEFENDANT'S WITNESS:

 TIFFANY COUCH

 Direct Examination by Mr. McDonald                       76

 Cross-Examination by Ms. Kerin                           83

TRANSCRIPT OF PROCEEDINGS

(October 24, 2019)

(In open court:)

THE COURT: Good morning, everyone. Please be seated.

Ms. Kerin, if you would call the case, please.

MS. KERIN: Thank you, Your Honor. Good morning. We're here on United States v. Nathan Wheeler. It's Case No. 18-cr-161. Mr. Wheeler is present in the courtroom. He's represented by David McDonald this morning. Michelle Kerin for the government. Your Honor, with me at counsel table is AUSA Katie de Villiers and Special Agent Scott McGeachy.

This is the time set for the sentencing of Mr. Wheeler. The government is ready to proceed. There are a number of disputed sentencing issues, guideline calculation issues for the Court to decide. The government intends to present Special Agent McGeachy to testify as to some of the facts underlying those contested matters.

Also, in the courtroom, there are several victims of Mr. Wheeler's crimes who would like to address the Court. In the courtroom this morning is Jonathan and Jennifer Buss, Sheryl and Mark McDonald, Hogan Coverdale, Adele Coverdale, Shawn-Anne Coverdale, Misty Dewitt, and Daniel Kass. The government is ready to proceed.

THE COURT: All right. Thank you.

Mr. McDonald, is that -- I'm assuming no relation with the victims.

MR. McDONALD: No relation. It's a common last name. Good Scotch name.

David McDonald on behalf of Mr. Wheeler. He appears out of custody. Ms. Kerin correctly states the other matters. With me today, in court -- who I have back here is Tiffany Couch, who is with Forensics -- excuse me -- Acuity Forensics. She did the -- a lot of the forensic accounting for us and provided the charts that the Court has seen. And also my paralegal Carol Duncan. I don't have them at counsel table because we're just -- space.

Ms. Couch may testify later. Depends upon the testimony of Special Agent McGeachy. Don't know yet.

THE COURT: All right. If you need anyone to sit closer to you, that's fine too. Just the chairs.

MR. McDONALD: If I need that, I'll have someone come up.

THE COURT: Okay.

MR. McDONALD: I may just go back to the bar on occasion.

THE COURT: All right.

MR. McDONALD: Thank you.

THE COURT: So I did have a chance to speak to counsel in chambers just to go over a little bit of the order

that I expected things to proceed today. Let me first just mention the universe of documents that I have received in connection with the case to make sure that I have what you have intended to provide to me. And, specifically, I have the government's sentencing memorandum. I have letters from all of the victims that were mentioned. I have the reply to the defendant -- government's reply to the defendant's sentencing memo. I have defendant's sentencing memo. I have an amended sentencing memo, and then I have the reply to the government's sentencing memo, and then a supplemental reply to the government's supplemental -- excuse me -- a supplemental reply to the government's memo. I have, then, also, just a couple of letters from the lawyers on some of the different issues in the case. Anything -- any other pleading that you expect me to have that -- and, obviously, there were numerous exhibits with the defense sentencing information. I have actually a binder of materials that were submitted to me.

Anything else that I'm missing?

MS. KERIN: Not from the government's perspective, Your Honor. Thank you.

MR. McDONALD: No, Your Honor.

THE COURT: Okay. And I have had an opportunity to read all of those things. Let me go over with you here just what I expect to be the order of things. I think it would be helpful to just get some initial opening statements, if you

will, about what you expect in terms of what witnesses to present today and just what you have teed up. I think I'm understanding what the issues are and, in particular, the -- but what you expect the evidence to show and what evidence you expect to put on.

In terms of, then, I think we want to go over just what is agreed to about the PSR and about what is not agreed to about the PSR. And, as I understand it, the bulk of the evidence presented here today is just about how to calculate loss but not about the other objections that defense has on the -- to the presentence investigation report guidelines calculations.

Then I know the lawyers want me to rule on whether the issue of law that after -- or payments made by Mr. Wheeler to victims following his discovery of the investigation, would they be -- offset the losses in the case, and I can -- I will tell you how I'm prepared to rule on that when we get to that before the presentation of evidence.

And then I will want to hear from the witnesses then about the loss information and any of the other PSR factors if any of the witnesses will be testifying about that.

Then I would -- I know we talked a little bit about the order where victims would want to state something. I think it might be helpful, actually, to have the victims -- I'll telling you how I'm ruling on the -- well, actually have the victims testify at that point so the government then can make your

argument about why the applicable guideline range is what you think it is, then hear Mr. McDonald's argument of the guidelines, and then obviously defendant gets the last word for his allocution.

So I'm not sure how long everything is going to take, but let's -- it's a dynamic process, so we can see sort of where we get to.

Why don't I first hear from Ms. Kerin of what are the key issues you hope to present evidence about today and ultimately argue about. I understand that your recommendation is going to be 51 months in prison, and I understand your guideline calculation. So why don't you tell me what you expect to show through your evidence today.

MS. KERIN: Yes, Your Honor. As you indicated, the key conflict over the guidelines calculation is with respect to loss. And there are a few issues with respect to loss that the Court is going to need to decide. The government intends to call Special Agent Scott McGeachy, who will provide the factual basis for the government's contentions regarding the calculation of loss.

The first issue that is in dispute is the loss to the Cloverdale Trust. The government asserts that the loss is in -- over the $737,000 that Mr. Wheeler stole in order to buy the Trotter Downs properties but that over the course of 2011 and 2012 Mr. Wheeler siphoned funds from that trust for his own

personal use in the same way that he used the money of the other victims for his own -- his lifestyle choices and the marijuana grow.

The government's evidence will show that over -- between 2011 and 2012 more than $941,000 in deposits were into that trust and that the purpose of the trust, the purpose for Mr. Wheeler being declared the trustee, was to ensure for the educational and living expenses of the two minor children who were the beneficiaries.

The issue is ripe because the defendant has sought to seek credit of more than $32,000 of purported payments and that that amount be deducted from the $737,000 that Mr. Wheeler stole to purchase Trotter Downs. And the government contends that that is not a correct analysis; that even if those payments were before February of 2014, that the amount that Mr. Wheeler was entrusted with over the course was 941,000, and so the $32,000 in payments that he actually used, consistent with his legal obligations, cannot be deducted from the amount he stole; that it's deducted from the total amount. So that's a significant issue. And, as I said, Special Agent McGeachy will testify about Mr. Wheeler's withdrawals from the Cloverdale Trust.

The more significant issue is the one that you spoke of, Your Honor, and that is what payment to the victims can be credited against loss for sentencing purposes. And if Your Honor decides that in the government's favor, the

present -- the factual presentation will be significantly streamlined. I don't think that the parties dispute that there were numerous payments made by Mr. Wheeler to some of the victims throughout the course of the scheme, and then even more significant payments made by Mr. Wheeler and others following the detection of the fraud. And it's the government's position that the guidelines are absolutely clear that payments made after the fraud is detected are not credited to loss, period. And there are no other provisions within the guidelines that provide for additional credits against loss if they're made after the detection of the fraud.

And as a factual matter, the government will present evidence that as of February 5, 2014, when federal and state agents raided Mr. Wheeler's marijuana grow operations, his home in Happy Valley, and then later in Damascus, when they interviewed Mr. Wheeler and asked him about Trotter Downs, they asked him about TWG Advisors and about the significant number of cash flowing through his accounts that, under the guidelines, that was the date of detection.

And the guidelines provide that the date of detection is the earlier of either the time the offense was discovered by government agents or that the -- the time the defendant knew, or reasonably should have known, that the offense was detected. And given these questions to Mr. Wheeler, he knew, or reasonably should have known, as of February 5, 2014, that the

government was about to discover the massive fraud that he was engaged in.

If the Court decides that it's a later date, there are several specific payments that we will need the Court to rule on whether they should be credited or not. There's payments with respect to an investment called SureSeal, which is mentioned throughout the documents before the Court. There are payments and judgments that were made in civil proceedings, both between Mr. Wheeler, on the one hand, and the victims, as well as civil proceedings involving Mr. Wheeler's business partner and the victims on the other. There were payments made by the PLF and other insurers, and so it's a ripe -- all of those occurred after the date that the government contends the fraud was detected.

We don't think that they should be included, but if this Court decides that they should, we'd like to present evidence with respect to those payments.

The other significant issue with respect to loss and credits against loss are the 25 pieces of parcels of property that the government seized in July of 2014. As you know, Your Honor, it's the government's contention that Mr. Wheeler is only entitled to a credit against loss for collateral actually pledged.

THE COURT: That was two of the properties, right, or two of the subdivisions?

MS. KERIN: I think there's 17, actually. On page 6 of the government's reply memo is a chart that indicates two victims have --

THE COURT: Two victims.

MS. KERIN: Yes, two victims have first priority secured liens in 17 of those properties. So there's two issues with respect to the properties. One is collateral pledged, and it's the defendant's contention that, "Oh, well, the government seized it, and now we're releasing it, so that's collateral pledged," and it's -- the government disagrees with that strongly.

As this Court knows, you can't have an interest in real property, unless it's in writing, under the statute of frauds, and the only collateral that's pledge is to the Busses and to Mr. Liu, and that the credit, given the current condition the government asserts -- Special Agent McGeachy will testify about the valuation of these properties by the government, the process of it. The fact that there's almost $100,000 in outstanding property taxes against it, and that the credit against the loss for those properties is approximately $600,000.

THE COURT: So is that another legal issue that you hope I'll decide before your presentation of the evidence because it will allow you to focus the presentation?

MS. KERIN: Yes, Your Honor. That would be

significant because I think the factual dispute about who has the first priority lienholder -- there's no factual dispute with respect to that.

THE COURT: That was -- both of these issues have been briefed extensively in your pleadings, so --

MS. KERIN: So the -- and then the second issue is what is the fair market value? What should the credit actually be against loss? And you have two competing appraisals or valuations, I should say. They are not necessarily appraisals.

And, obviously, the government contends its valuation is superior because it's a lot-by-lot assessment, and in this case, that's the more accurate valuation.

And, finally, with respect to guideline calculations, the defendant has objected to the application of sophisticated means in this case. Special Agent McGeachy will testify about the very complicated nature of the organization that Mr. Wheeler set up and the manner in which he moved money throughout various bank accounts. He will testify that in his vast experience this was an incredibly -- these are incredibly difficult financial transactions to unwind, and we think that the sophisticated means application is appropriate.

The defendant also disputes that there should be a dual application of both the sophisticated means and the abuse of trust enhancement. It's the government's contention that the Court can't simply choose not to find, if there's evidence to

support it, both the sophisticated means and the abuse of trust; that there's no authority for this Court to just disregard, in the guideline calculation, the application of those two if they're applicable.

The defendant's real argument is not really one about guidelines calculation, but it's about factors under 3553(a), in that the guidelines overrepresent the harm, and the government obviously disagrees with that.

THE COURT: All right. Thank you, Ms. Kerin.

Mr. McDonald, just brief remarks on what you expect to present today.

MR. McDONALD: Thank you, Your Honor. I want to address two things with regards to the loss right off the bat. One is if you take the government's number, which is $4,455,385.16, and everything that they say is pretty correct, I still believe that they are -- the number of loss will be less than $3.5 million, and I would like to explain why.

First, if we -- if you picked the February date of February 4, 2016 -- or, excuse me, 2014, with the exception of the SureSeal payment to the McDonalds, which I'll get to in a minute, we believe that the total loss -- excuse me -- the total paid between the McDonalds and the Busses would be above $400,000. There would be -- we believe that the Coverdale payments should be credited back, and that's at 32,867. And then if we use just the government's numbers on the Buss lot --

on the lots that the Busses and the Liu -- Mr. Liu had on Trotter Downs and you take away all the taxes and you take away all the fees and everything, we still come up with a number of 422,000 as to the Buss lots and almost 64,000 as to the Liu lots.

So we come up with a total -- if we include the government's numbers with all the taxes and just the lots for the two victims on Trotter Downs and you include the SureSeal payment to the McDonalds, we come up with a loss number of 3,473,006 -- $364.75.

THE COURT: So it's a 400 -- 3,473,000.

MR. McDONALD: 364.75.

THE COURT: Okay.

MR. McDONALD: That's if the government is a hundred percent right. We don't believe they are.

First, as to loss, there are four basic issues the Court will have to address. The first, and I think it's the most important, is the Trotter Downs property. There are 25 lots. There is no dispute that those lots were paid for and bought by TWG Advisors -- Mr. Wheeler, Jeremy Swanlund and Scott Phillips -- with money that came from the Coverdale Trust -- Cloverdale Trust.

The individuals' names are "Coverdale," but, I think, the trust was called "Cloverdale," just so you know the difference.

Mr. Wheeler remained the trustee for that trust up until

the point where the properties were seized, and they were in his name. They would be collateral as to the Coverdales because it was him who had the authority, based upon his duties as the fiduciary, to work those properties. Whether or not he violated his fiduciary duties, that's a different aspect of it, but he actually had purchased the properties with their money, and those properties still would be -- they would be, in fact, innocent owners of the property because he's the trustee for the Coverdales, and that property should be to them. That would be the whole $737,000.

At a minimum, the Buss property and the Liu property is collateral. Under the government's theory, the --

THE COURT: I don't want to go too much into the argument. I'll allow you to make argument after the evidence.

MR. McDONALD: Okay.

THE COURT: Just sort of teeing up the issues would be helpful.

MR. McDONALD: One of the issues will be whether or not that collateral goes to all of the properties or simply the ones that -- where the people have a secured interest, meaning the Busses and Mr. Liu.

Either way, if you value those properties at the market value that we provided to the Court, with the comps that we provided to the Court, at $50,000 a lot, that's $1.25 million. You back off the taxes, which are about $136,000, on all of

those lots, and you're still at over a million dollars. You back off eight percent of what it would cost to sell those lots, you're still over a million dollars. That against the $4.5 million alone brings you below the $3.5 million on loss.

In terms of the day of discovery, the government was focused on unlawful production of cannabis, in violation of the Oregon Medical Marijuana Act, back in January and February of 2014. That was their major focus. And, yes, there was a lot of money that went back and forth through the TWG Advisors accounts. There's no question about that. But there was not a focus on whether or not any of those funds had been unlawfully used or whether or not they were going to be unlawfully used.

And as you will see, Mr. Wheeler continued to make regular payments, as he would have always made, prior to the time of the 14th. Nothing changed. He kept making his regular payments.

By May of 2014 he had hired a lawyer, and the lawyer had spoken to the government, and there was mention that the property at Trotter Downs could have been bought with funds that had been pilfered from the Cloverdale Trust.

THE COURT: Do you agree, though, that -- there's a dispute about whether it's February or May, but do you agree that any payments made by Mr. Wheeler post May, in your version, would not be credited to the loss?

MR. McDONALD: With two exceptions.

THE COURT: Okay.

MR. McDONALD: One is -- and these are the SureSeal payments. In one account, money had been provided to SureSeal, that belonged to Danny Kass, in the amount of a hundred thousand dollars. SureSeal had -- and that had been done pursuant to loans. Mr. Kass had not received the benefit of the payments from those loans, and they will tell you that that money went -- some of that money went to Mr. Wheeler, but when -- but that money was still with SureSeal. And when -- when the detection came in the summer of 2014, Mr. Kass hired Mr. Banks to recoup that money.

And what they did was they went to Mr. Wheeler, through his lawyer, and they unwound that loan and repaid that hundred thousand. That loan could have stayed there, and then Mr. Kass's actions would have been against SureSeal to pay the money and pay that money back. But instead of doing that, they just unwound the loan and paid the money directly, at his request.

THE COURT: So "they" and "his" -- "his" is Kass and "they" is --

MR. McDONALD: So SureSeal unwound the loan at the request of Mr. Kass for that hundred thousand dollars. We believe that should be credited against the total loss, because the government includes it, because it was in an investment that wasn't loss yet, and it certainly wasn't loss because,

when requested to unwind the loan, it was paid back. Okay?

The other one is McDonald/SureSeal. That was, I believe, a loan, as well, that came in the summer of 2014. It was a loan of money that belonged to the McDonalds, to SureSeal, and over the next three years -- it was a 36-month loan. Over the next three years they got regular payments every month and, in fact, made $120,000. That's not loss because it's continued investment by Mr. Wheeler, on behalf of the people that he was working with, to -- in order to make money for them. And he did. This wasn't direct payments back to the McDonalds to say, "I stole all your money. I'm going somewhere else to get it to pay you back." That's what this loss recovery is.

This is money to which those -- the Busses and the McDonalds and the Kasses were entitled based upon investments, and they got it.

In terms of if you get past these, the other two items is the settlement agreements. There is $499,000 in total settlement agreements that were paid, and we provided the Court with those settlement agreements. I won't go into the details of them, but we believe that that loss is not attributable to Mr. Wheeler. That loss is attributable to Mr. Swanlund and his actions. Even though he wasn't prosecuted, there were civil actions against him. He had money that he got through insurance and paid off people through confidential settlement agreements with releases, including the Bar and another

insurance company.

That money, that 499,000, should be deducted from the 4,500,000 because it's not loss attributable to Mr. Wheeler. It's loss attributable to Mr. Swanlund. That's why he paid it.

And, finally, I think the Court has to make a decision on whether or not other settlement agreements constitute stipulations by the parties on the amount of loss.

As you know, these matters were in civil litigation several years before the criminal cases were brought. Mr. Kass was in negotiations with Mr. Wheeler and his lawyers in 2015, and they agreed on a settlement, which included a $700,000 confession of judgment. That's a stipulation, as to the loss, by the two parties prior to criminal case being brought.

With regards to Ms. Love, she also sued Mr. Wheeler in Multnomah County Circuit Court, and got a judgment against him, that he stipulated to, in the amount of $140,000. I mean, there's a difference of almost $300,000 -- and I'll give the Court the exact numbers as we go forward -- between Mr. Kass, the loss alleged by the government, and the stipulation of 700,000.

Same with Ms. Love. Ms. Love, I think, was a difference of $95,000.

THE COURT: So let me ask you. On the settlement agreement issue, that's -- there's no dispute about the facts or the amounts at issue in those cases. So it's just a matter

of me making the legal determination about whether a civil settlement is an appropriate calculation of the loss?

MR. McDONALD: And to be candid with the Court, I found no cases on it.

THE COURT: Okay.

MR. McDONALD: I looked around the country.

THE COURT: Okay. So then -- and the other thing is I had a question on the discovery, although you dispute whether it should be February or May.

MR. McDONALD: Yes.

THE COURT: Is there any factual dispute that I'm going to hear evidence about, or can I simply make the decision about whether it makes a difference about -- a legal decision -- whether it should be February or May, or do I need to hear the evidence to make that decision?

MR. McDONALD: Well, you may want to hear the evidence to make that decision, but it's not going to be that much. I mean --

THE COURT: Is it any different than what's been in the pleadings?

MR. McDONALD: I don't think so, no.

THE COURT: Do you dispute what happened at those events that would be indicative of whether or not there was actual discovery?

MR. McDONALD: I do some, factually, yes, because I

don't know exactly what they're going to say.

THE COURT: That's fine.

MR. McDONALD: But I do believe that in terms of whether or not it's the February 4th date or the May date, the Court still will have to bifurcate that determination as to whether or not the SureSeal payments would be -- even though they're made post detection, would they still be credited against the loss because they are ongoing investments?

THE COURT: Okay. All right. Let me --

MR. McDONALD: I won't address the sophisticated means and abuse of trust now, but --

THE COURT: We'll get to that point. Perfect. Let me ask, first, with regard to -- and who do we have from Probation? Also, if you could state your appearance.

THE PROBATION OFFICER: Jessica Lehmann.

THE COURT: I know everyone has had a chance to review the presentence investigation report, and although -- and I did see where the defense has presented some corrections or modifications to that. Are there any other corrections? I understand there's a dispute about guidelines -- or application of certain guidelines, but is there anything from the government that is inaccurate about the presentence investigation report that should be here on the record?

MS. KERIN: The only difference between the government's position at sentencing and what is in the PSR is

with respect to the Cloverdale Trust loss, and that issue arose after we understood that the defense was seeking a credit against payment. We had an opportunity to review the trust in more detail and realized that the loss was $45,000 more.

THE COURT: And it didn't affect the guidelines calculation?

MS. KERIN: Yeah, it was irrelevant to the guidelines calculation, from the government's perspective.

THE COURT: Okay. And, Mr. McDonald, any other corrections, now that you -- other than what you've already lodged as part of the record, to the guidelines -- the PSR report as written?

MR. McDONALD: No. I just wanted to point out to the Court that the 45,000 that Ms. Kerin referred to is part of that total number of 4,500,000 that we're dealing with now and that that number is different than the number in the PSR for that purpose.

THE COURT: Okay. And, Mr. Wheeler, did you have a chance to review the presentence investigation report and go over the facts and discuss it with your attorney?

THE DEFENDANT: Yes, I did, Your Honor.

THE COURT: Your lawyer says now he doesn't find any errors in the report. Obviously, he's challenging certain aspects of it. Have you found anything that you have not brought to your lawyer's attention already, in terms of any

errors in the reports?

THE DEFENDANT: No, I haven't, Your Honor.

THE COURT: Okay. Thank you. So then I'll adopt the presentence report as written, as -- but I haven't yet decided on the application of which guidelines I'll apply in this case.

Let me just make a couple of legal rulings, and then we can start with the government's presentation of evidence in the case. I have -- there was quite extensive briefing on some of the issues that you have now mentioned will be the crux of the hearing today. Let me say I was persuaded that the weight of the authority is that the defendant is not entitled to credit for payments that are made after the discovery date, and I'll leave open what the date is because that's an issue in dispute, whether it's February 5, 2014, or May, as the defense argues, but it does seem to me that the -- the law favors the government's view on this and that he is not entitled to credits for payments made after discovery of the -- he reasonably should have known, or did know, about the -- that he was under investigation.

With respect to the Trotter Downs property, it -- I also find that only with regard to the Liu and Buss properties -- well, the two victims that had the first security interest as -- can that be credited towards the loss but not all of the rest of the Trotter Downs property?

Then I don't yet have a position on the SureSeal payments.

I need to hear some of the evidence about that.

Also, with regard to the settlement agreements, I do not find that civil settlement agreement amounts dictate the loss analysis in this case. So although they may be a factor that could be considered in evaluating loss, they are not dispositive, in my view.

So with that, why don't I hear from the government's first witness.

MS. KERIN: Thank you, Your Honor. The government calls Special Agent Scott McGeachy.

DEPUTY COURTROOM CLERK: Sir, if you would please approach the witness stand. Remain standing and raise your hand.

SCOTT MCGEACHY,

called as a witness on behalf of the Plaintiff, being first duly sworn, is examined and testified as follows:

THE WITNESS: I do.

DEPUTY COURTROOM CLERK: Thank you. Please be seated.

And, sir, if you would state your full name, spelling both first and last for the record.

THE WITNESS: Scott McGeachy. S-c-o-t-t. M-c-G-e-a-c-h-y.

DEPUTY COURTROOM CLERK:  Thanks.


DIRECT EXAMINATION

BY MS. KERIN:

Q.   Good morning.  Where are you employed and what is your title?

A.   I'm employed with IRS criminal investigation as a special agent.

Q.   And how long have you worked there?

A.   Over 18 years.

Q.   And have you always had the title special agent?

A.   Yes, I have.

Q.   And do you have a specialty that you investigate?  Like, are there specific types of crimes that you investigate?

A.   Pretty much the last 12 years I do the financial component of drug investigations.

Q.   And can you describe to the Court generally what that involves?

A.   Yeah.  Usually, I work side by side with the local drug groups:  DEA, Portland Police Bureau Drugs and Vice Division.  They identify a drug organization.  And, typically, when we run into -- or when they run into components, like a lot of money movement or assets being purchased, I'll join the case and investigate that aspect of it.

Q.   And is it fair to say that in larger drug investigations

there is a significant financial focus with respect to those organizations?

A.    Yes.

Q.    And do they often involve complicated structures?

A.    Yes, they can.

Q.    And complicated movement of money?

A.    Yeah.  They typically try and conceal and disguise the money.

Q.    Over the course of the 12 years in which you have done that, you have had the opportunity to review how many different types of drug organizations and their movement of money?

A.    Several dozen.

Q.    Okay.  And do you have a background in accounting or finance?

A.    I have a bachelor's in -- an emphasis in accounting and finance and a CPA license.

Q.    Okay.  Can you describe for the Court when you became involved in the investigation regarding Nathan Wheeler and how that occurred?

A.    Yes.  So the initial investigation started -- I believe it was June or July of 2013.  It came into the Oregon Liquor Control Commission.  They went to Portland Police Bureau Drugs and Vice Division for assistance.

     Portland Police Bureau Drugs and Vice Division had it for a while and identified that there was a significant financial

component, and they came over to ask for my assistance at that point, which would have been around late fall 2013.  Fall 2013, somewhere in there.

Q.   And what did they tell you about the -- what's the significant financial transaction?  Describe for the Court how that occurred.

A.   Well, what they had is they had information of -- at that time marijuana was -- you could grow it for medical purposes, that the grows were significantly larger than the amount of medical marijuana cards, and a cursory look at the financials showed significant cash deposits coming in from Washington, Idaho, into Mr. Wheeler's TWG Advisors account and significant checks being kited through there that nobody could really unwind.

Q.   So as of the fall of 2013, you were involved with the investigation of Mr. Wheeler; correct?

A.   Correct.

Q.   And there was already underway a financial analysis of the TWG Advisors account?

A.   Correct.

Q.   And at that time did you also know that Mr. Wheeler was a CPA?

A.   Yes.  That was, in fact, another primary reason they came and asked for my assistance.

Q.   At that point, in the fall of 2013, did you understand

that there were numerous bank accounts associated with Mr. Wheeler and his various entities?

A.   We -- one of the cursory searches we do, when we start an investigation, is we go to the Oregon Secretary of State and kind of just key in the name and see what corporations they may have registered to them because it's fairly common in drug investigations that people will set up shell companies or whatnot.  And if I recall correctly, there was a significant number of Oregon corporations that Mr. Wheeler was registered under.

Q.   And given your training and experience, do you also know that that is an indicia of fraud as well?

A.   Yes.

Q.   And was that particularly true since Mr. Wheeler was a CPA?

A.   Yes.  And -- but we had to do the investigation first. But we identified a significant number of these corporations.

Q.   Okay.  Were you prepared -- were you involved in preparing the search warrant for Mr. Wheeler's Happy Valley residence that occurred on February 5, 2014?

A.   So, yes, I assisted with it.  It was actually a state search warrant.  I did not -- I was not the affiant. David Jackson, at Portland Police Bureau, wrote the warrant, and then I assisted with the paragraph or two about the finances related to that affidavit.

Q.    And what did you describe for the Court with respect to the finances?

A.    We described -- I can't recall the amount, but a significant number of cash deposits going into Mr. Wheeler's TWG -- TGW -- TWG Advisors account -- I get that mixed up -- excuse me -- from out of state, which it is significant, with respect to the marijuana grows, because at that time that's kind of, you know, the direction -- it's getting transported out of state.

Q.    As of February 5, 2014, before the search warrant, were you aware of the Trotter Downs property?

A.    Yes.

Q.    What did you know about it?

A.    We knew that there was investors -- that there was money that was flowing through accounts and that there were investors that had an interest in that property, and that was -- simply put, that was kind of just one thing we knew.

Q.    And just to be clear, at this point, February 5, 2014, neither you nor Portland Police understood the significant fraud that Mr. Wheeler was engaged in?  Just to be clear.

A.    Correct.

Q.    Okay.  And you did not know at that point that he stole the money from the Cloverdale Trust in order to purchase Trotter Downs?

A.    That is correct.  Did not know.

Q.   But it is fair to say that as of February 5, 2014, you were investigating his financial transactions.  Is that fair?

A.   Absolutely.

Q.   And all of his financial accounts?

A.   Absolutely.

Q.   And the purchase of Trotter Downs and who the investors were?

A.   Correct.

Q.   You were present February 5, 2014; correct?

A.   Correct.

Q.   Did you have an opportunity to interview Mr. Wheeler?

A.   Yes, we did.  I think on three different occasions throughout the course of the search warrant.

Q.   And during the course of that interview, did you ask Mr. Wheeler about the TWG Advisors account?

A.   Yes.

Q.   What did you ask him, and what did he say?

A.   He said -- we asked him about it because that was the account -- the focus at that time was that account, and that there was these transactions coming in, along with the cash deposits, and he said -- he described it as basically a catchall for his -- his investments.

     He went on to say that in 2013 he thought he had earned 350- to 400,000 from his investment in Trotter Downs.

Q.   So you also asked him about Trotter Downs?

A.   Correct.

Q.   Who did he say owned Trotter Downs at that juncture?

A.   He said TWG Advisors had 1.5 million in debt, which included a subdivision, Trotter Downs, in Rainier, Washington.

Q.   Did he indicate who the investors were of Trotter Downs?

A.   He indicated one investor.

Q.   Were they any of the victims that you discovered Mr. Wheeler stole money from?

A.   Not here.

Q.   Okay.  Did you ask him about other financial transactions during this -- these various interviews on February 5, 2014?

A.   Yeah.  I mean, we asked -- there was some talk about -- there's a nursery business, Garden State Nursery, and it was a nursery business, and there was a -- had been a marijuana grow on the premises as well.

Q.   Okay.  Following February 5, 2014, did your investigation continue?

A.   Yes.

Q.   Did you interview anybody who indicated that Mr. Wheeler may know about the criminal investigation?

A.   Yes, I did.

Q.   And who was that?

A.   Mr. Shawn Carey.

Q.   What did he tell you?

A.   He said that he was a principal partner in Club Rouge, a

gentlemen's club, with Mr. Wheeler, and he said Mr. Wheeler had been tipped off early on about the ongoing marijuana investigation.

Q.   And when did you interview Mr. Carey?

A.   It would have been shortly after the execution of the search warrants.

Stand by.  I've got it right here.  May 7th.

Q.   Okay.  In July 2014 you wrote an affidavit supporting the seizure of the Trotter Down lots; correct?

A.   That's correct.

Q.   So between February 2014 and July 2014, what did you find out about Mr. Wheeler's finances, given where you were in February of 2014?

A.   Well, part of -- prior to February 5th of 2014, we could see the movement of money between accounts, and we could see large cashier's checks coming from people.  In these types of investigations, you typically don't go overt and talk to these people prior to the search warrant.

So after the search warrant, we started making contact with these people -- Mr. Kass, Carole Love, different investors or -- or different people that we could identify these large cashier's checks and movement of money.

Q.   And what did you discover in the course of that?

A.   We discovered that a lot of these funds or large checks from investors were simply being stolen by Mr. Wheeler for his

own personal use.

Q.    Okay.  So between February of 2014 and July, it moved pretty quickly to uncover the fraud.  Is that fair?

A.    That's correct.

Q.    Okay.

MS. KERIN:  Your Honor, those are all the questions I have about the detection of the fraud.  I'm happy to have Mr. McDonald cross-examine him with respect to that discrete issue or continue in his testimony regarding the other disputed issues.

THE COURT:  I think let's just hear the full gamut of issues and then allow cross-examination.

MS. KERIN:  Okay.  Great.

BY MS. KERIN: (Continuing)

Q.    I would like to turn your attention to an analysis of the Cloverdale Trust.

A.    Okay.

Q.    Okay.  Can you describe, just very generally, what the Cloverdale Trust is.

A.    It was a trust that was set up two days prior to the death of DK Coverdale in April of 2011.  The exact date, I don't recall.  And it was to basically manage the trust.  And he had a business -- DK Wilds -- at that time, and sell the business for funds for his two sons.

Q.    And what was Mr. Wheeler's role?

A.   He was trustee.

Q.   Okay.  And can you describe for the Court the type of bank account or the accounts in which these funds were in?

A.   So there was a Key Bank account.  The other accounts, I -- I don't have.  Never had.  But there was a Key Bank account that was opened in -- on July 8, 2011.  So that's May, June, July.  It's about three months after his death.  And that's the principal account for the trust.  Key Bank was the account at that time that he used for his business -- businesses.

Q.   And who is the signatory on that account?

A.   Mr. Nathan Wheeler.

Q.   And are there any other signatories on that account?

A.   Not that I recall.

Q.   And based on your review -- you looked at all the financial records of this account?

A.   I did.

Q.   And based on your review, is there evidence that anyone else was drawing funds from the account or utilizing the account other than Mr. Wheeler?

A.   No.

Q.   What is the, like, length of activity?  You said July of 2011 until when?

A.   So the account was open on July 8th of 2011.  December 21, 2011, to give you a snapshot, is when the business is sold for $800,000.  So between April of 2011 and December 21, 2011, it

was operating as a business. It had income and it had expenses.

Following the sale of the business, it continued to operate; but, principally, after about January of 2012, there wasn't really -- there were just very few transactions. It really stopped. I mean, there were no more checks by November of 2012. It remained open until June of 2013.

Q. So between July of 2011 and the sale of the property, this is an income-producing trust; correct?

A. Correct.

Q. Okay. And then after that, there -- the sale proceeds were deposited?

A. Sale proceeds deposited. And then there's some checks kind of winding down the business that would be deposited in there.

Q. And between July of 2011, when the bank account was opened, and the end of 2012, what's the total amount of deposits that are placed in this trust for the benefit of the Coverdale children?

A. 941,448.

MR. McDONALD: Could you give me those dates again, please, sir? I'm sorry.

THE WITNESS: July 8, 2011, through November 28, 2012.

MR. McDONALD: Thank you. Sorry to interrupt.

THE WITNESS: No problem.

BY MS. KERIN: (Continuing)

Q. Those are the -- the deposits exceeded $941,000?

A. Correct.

Q. Okay. And in the course of your investigation, did you do a comprehensive review of the transactions out of that account?

A. I did.

MS. KERIN: Okay. And I -- may I approach, Your Honor?

THE COURT: Yes.

BY MS. KERIN: (Continuing)

Q. I'm going to hand you what's been marked Government's Exhibit 2. It's attached to the government's reply memo as 2 as well.

Do you recognize this document, Special Agent McGeachy?

A. Yes, I do.

Q. And what is it?

A. It's just a summary chart that I put together related to the funds that I believe Mr. Wheeler embezzled out of the Cloverdale Trust.

Q. Okay. And how did you make the determination that these were the funds embezzled? Explain that to the Court, please.

A. I basically looked at what appeared to be -- what were normal operating expenses and then what were the expenses that seemed outside of the -- what would seem not normal to the

trust. And these are identical expense that I would also see in TWG Advisors. Principally, it was the other big company. But you'd see some of these in other Key Bank accounts as well.

These mirrored, kind of, the TWG Advisors. Most of these are either ATM withdrawals or charges at local hotels or strip clubs.

Q. In making your assessment of whether these were used for Mr. Wheeler's personal use or whether they benefited the trust, did your interview with the victims inform as you well?

A. Yes.

Q. Okay. And can you describe for the Court some of the instances or the things that Mr. Wheeler told them about whether funds were available?

A. Yes. So the two children who were the beneficiaries, I interviewed both the mothers, and they both had significant issues getting money out of the trust when requested. Whether it was for braces or travel, they were subsequently -- they couldn't get an accounting for the trust either, and then they were subsequently told that there was a civil lawsuit filed against DK Wilds and that the bank account had been frozen and there were no more funds left.

Q. So did the victims tell you that for a period of time they were unable to receive any payment from Mr. Wheeler because of this purported freeze of their assets?

A. Yes. They thought that there was no money; that they

couldn't have access to the money.

Q. Okay. And did you investigate whether there was a freeze of the assets?

A. So, yes, I looked into it. There was a civil suit against the business; however, the money had long since been spent. That came well afterwards.

Q. And so what is the total amount that you determine -- based on your analysis, your review of the bank records of this account and others, and your interviews of the victims, what's the total amount that you believe Mr. Wheeler embezzled from the Cloverdale Trust?

A. Approximately $782,732.

Q. And with respect to the remainder of the trust, the additional 941 minus 782, what happened with those funds?

A. Those are the funds that were used to pay the expenses or bills, or what have you, out of the trust.

Q. But this 782, that's the actual loss to the trust?

A. Yes.

Q. Okay. I would like to touch briefly with you about the SureSeal payments that were discussed.

First I would like to focus on the SureSeal payments with respect to Mr. Kass. I'm going to hand you what has been marked Government's Exhibit 6 and 7.

THE COURT: Ms. Kerin, did you want to move into evidence Exhibit 1, which is, I think, what you already showed

Special Agent McGeachy, or do you want to rely on -- I think the page -- it's the first page of your exhibits in your government's reply to defendant's sentencing memorandum, or do you want me to receive that exhibit into evidence?

MS. KERIN: Yes, please receive that exhibit into evidence.

THE COURT: Any objection?

MR. McDONALD: No, Your Honor.

THE COURT: Is that identified as Exhibit 1?

MS. KERIN: It's actually Exhibit 2. I'm sorry. They were marked out of order.

THE COURT: That's fine. So Exhibit 2 is the spreadsheet that we were just talking about.

MS. KERIN: Exhibit 6 and 7.

BY MS. KERIN: (Continuing)

Q. Let's talk about Mr. Kass's investment in SureSeal.

What are the dates Mr. Kass invested in SureSeal?

A. There are three separate investments in SureSeal. The initial investment should be January 24th of 2012. There was a secondary investment, June 7th of 2012, and a third investment. The second investment was 30,000; the one on January 24, 2012, was 50,000; and the third investment was December 28, 2012. That was for 20,000.

Q. Okay. So a hundred thousand dollars total?

A. Correct.

Q.   Exhibit 6, I believe, is the notes between Mr. Kass and SureSeal; is that correct?

A.   That's correct.

Q.   Okay.  What's the term?  When is the maturity date for the January 24, 2012, investment?  It should be on the second page.  The term?

A.   Second page.  How far down?

MS. KERIN:  May I approach, Your Honor?

THE COURT:  Yes, that's fine.

BY MS. KERIN: (Continuing)

Q.   What is the term -- the maturity date -- for that investment?

A.   The maturity date is two years, so January 24, 2014.

Q.   So under the terms of that note, the investment was due back to Mr. Kass as of January 24, 2014?

A.   That's correct.

Q.   Okay.  And with respect to the investment on June 7, 2012, what's the maturity date for that investment?

A.   That's two years as well.  So June 7, 2014.

Q.   And with respect to the last note, December 28, 2012, what's the maturity date?

A.   It's three years, so that's going to be December 28 of 2015.

Q.   Okay.  Do you know, were there any payments of the -- SureSeal payments of which the defense seeks credit against

loss? Were there any payments from SureSeal as of January 24, 2014, the date that the payments were due?

A. Like a balloon payment?

Q. Yes.

A. No.

Q. Okay. And what about as of June 7, 2014? Did SureSeal repay Mr. Kass those amounts that were due?

A. No. Not according to my information.

Q. Okay. What happened with these three notes?

A. On June 1, 2014, there was a new promissory note drawn up in which they were combined.

Q. All three notes were combined?

A. Uh-huh. And there's a new term of three years, from June 4th -- starting on June 4, 2014. So to mature June 1st -- excuse me. June 1, 2014, to mature June 1, 2017, and it was signed by Kevin Huber, the manager of SureSeal, and signed by Mr Kass.

Q. As of June 1, 2014, based on your investigation, did Mr. Wheeler or SureSeal have the permission of Mr. Kass to extend these notes beyond their maturity date?

A. No.

Q. Okay.

MR. McDONALD: Objection. May I ask a question in aid of objection?

THE COURT: No. You'll have a chance to

cross-examine; but if you have an objection with a legal ground, you can make that.

MR. McDONALD: I'll wait. Thank you, Your Honor.

THE COURT: Go ahead, Ms. Kerin.

MS. KERIN: Thank you.

BY MS. KERIN: (Continuing)

Q. Now, with respect to the three notes that were extended, are any of those notes signed by Mr. Kass?

A. No.

Q. And the payments that went from Mr. Kass -- purportedly from Mr. Kass to SureSeal, were those actually paid by Mr. Kass?

A. So it -- it -- one's a cashier's check, a Key Bank cashier's check. I don't know who it's -- whether it came from a business related to Mr. Kass or not. I know the $20,000 loan came from TWG Advisors, and I know the $30,000 loan came from Avalanche Construction, which was the construction business for the Trotter Downs property in Rainier Washington --

Q. So two of the three payments came from Mr. Wheeler's accounts?

A. Correct.

Q. And did you see that prior to these payments being made to SureSeal, Mr. Wheeler had used Mr. Kass's funds for his own?

A. Prior to this? Yes.

Q. Okay. And at the time that these loans were made to sure

seal, Mr. Kass was unaware of Mr. Wheeler's theft of his funds?

A. Correct.

Q. Okay. And over the course of your investigation, did SureSeal make interest payments on those promissory notes?

A. Yes, they did.

Q. And did Mr. Wheeler dutifully provide those to Mr. Kass?

A. Some were provided to Mr. Kass, and other interest payments were stolen by Mr. Wheeler, including, I believe, one after February 5, 2014, search warrant.

Q. And are you aware of the date of the payment -- the $100,000 payment approximate -- that Mr. Wheeler seeks credit for against loss that was made by SureSeal to Mr. Kass?

A. So I'm -- I don't have the records for that. That happened between attorneys, but it was after my contact with Mr. Kass.

Q. Okay. The bank accounts for Mr. Kass, in which these deposits or interest payments were deposited, can you describe for the Court who has signatory authority; who created these accounts; who has control over them?

A. So some of the accounts went -- some of the money went back to Mr. Kass in his -- his own accounts, and then at a certain point in time, I believe it was about late 2013, 2014, an Ameritrade account was set up. The mailing address went back to Mr. Wheeler's CPA firm, and Mr. Wheeler had control over this account.

So as checks were mailed back, they were deposited into an Ameritrade account, controlled by Mr. Wheeler, in which he was also embezzling some of the funds from Mr. Kass and depositing it into that Ameritrade account.

Q.   Okay.  And are you familiar with the SureSeal investments made by the McDonalds?

A.   Yes.  I mean --

Q.   And I'm going to -- this is not marked.

I'll hand you what I wrote on the side "Government Exhibit 8."

MS. KERIN:  I don't have stickers.  I apologize, Your Honor.

DEPUTY COURTROOM CLERK:  I think I have some.

BY MS. KERIN: (Continuing)

Q.   Does that look familiar to you?

THE COURT:  What exhibit number is that?

MS. KERIN:  Government Exhibit 8.

THE WITNESS:  Yes, it does.

BY MS. KERIN: (Continuing)

Q.   What is that?

A.   That is a promissory note between SureSeal, LLC, and McDonalds Holdings, LLC, for $50,000.

Q.   And what is the maturity date of that note?

A.   So the maturity date is -- it's dated October 10, 2011. It's a two-year investment.  With a maturity date, it would be

October 10, 2013.

Q.   Okay.   Do you know if that note was paid off by 2013, by SureSeal, to the McDonalds?

A.   I believe the investments with the McDonalds were not paid off until after the search warrant -- the February 5th search warrant.

Q.   Over the course of this time, did you see -- around this time in October of 2011, did you see that Mr. Wheeler was embezzling funds from the McDonalds and using them for his own?

A.   Yes.   Mr. Wheeler -- early on, the McDonalds had three large investments, I believe, in 2011, and that those funds were embezzled.

Q.   Based on your investigation, at that time, did the McDonalds know that Mr. Wheeler was using their funds for his own personal use?

A.   No.   Specifically, their funds were used to purchase a house in Beaverton that Mr. Wheeler resided at, and they -- they had no idea that their money had essentially purchased Mr. Wheeler's residence and was held for two years.

Q.   Okay.   I'm going to show you what has been marked as Government's Exhibit 9.

Can you describe for the Court Government's Exhibit 9?

A.   It's a $356,235 promissory note dated October 24, 2011.

Q.   And who is it between?

A.   McDonald Holdings and the borrower is listed as

Nathan E. Wheeler.

MS. KERIN: I'm sorry. Just a second, Your Honor.

I'll withdraw that, Your Honor.

THE COURT: Okay. So that's Exhibit 9 is withdrawn?

MS. KERIN: Yeah. Withdraw Government's Exhibit 9, yes.

BY MS. KERIN: (Continuing)

Q. I would like to talk about -- that's all I have for the SureSeal with respect to the McDonalds and Mr. Kass.

I would like to move on to the Trotter Downs property.

You've already testified that you prepared the affidavit for the seizure of those properties; correct?

A. That's correct.

Q. Okay. And did the Internal Revenue Service have an appraisal made of those properties?

A. Yes. We have done it a couple different times.

Q. Okay. I am going to hand you what has been marked Government's Exhibit 1.

MS. KERIN: I have one for the Court, as well, this time, Your Honor.

THE COURT: I'm sorry. You said Exhibit 1?

MS. KERIN: Yes.

BY MS. KERIN: (Continuing)

Q. Can you describe for the Court what that is?

A. So this is a -- it lists the 25 parcels that we have

seized.  The addresses are in the first column.  The second column represents their approximate values to date.  I don't -- they weren't appraised, but approximate values per date.  Third column lists the outstanding property taxes that are due and owing on these 25 parcels.  And then the fourth column are the initials of the investors that have a security interest in those specific parcels.

Q.    Can you describe for the Court the process that the Internal Revenue Service and subcontractors used in order to determine the value that is in the second column of Exhibit 1?

A.    Yes.  So they -- the contractor hired three independent real estate agents in that area.  They did a parcel-by-parcel valuation of each of these properties, and they had three separate estimates done by these real estate brokers, and then this is kind of the value that they estimated for each piece of property.

Q.    And is it your understanding that they took into account, for example, the lot size of each property and the -- where it is within the subdivision?

A.    Yes.  Yes.  So I do know -- we had this question yesterday.  Lot 1 was significantly larger than the rest of the lots, and that is why you would see a $64,000, you know appraised value versus -- most of them said about 39,000.

Q.    Okay.  And does that desk -- does that number in that second column, does that include any of the costs that would be

associated in selling this property?

A.    No.    That's a separate expense.

Q.    Okay.    And is it your understanding -- does the valuation at all take into account kind of what it would cost to bring the lot to the standard where it could be developed?

A.    Yes.    So there's expenses that are going to be charged against these lots, to get it, you know, maintained and what have you, to get it ready to sell.

Q.    But that's not included in the valuation in column two; right?

A.    No.

Q.    And so then at the bottom of column two, $687,000, what does that represent?

A.    That represents the total value that has been earmarked for the two victims that had security interests in those properties.

Q.    And the number at the bottom of the third column, 91,264, it's negative.    What does that represent?

A.    That is the taxes due and owing on that property -- on those parcels.

Q.    And then the last number in the final column, 595,736, what is that number?

A.    That number would represent the value -- without taking into -- without taking into account the expenses for selling it, of those parcels earmarked for the two investors.

Q.   Okay.   Great.

Finally, I want to talk with you about the manner in which Mr. Wheeler accomplished his significant fraud of these victims.

Can you describe for the Court, generally, the number and the types of organizations and businesses that Mr. Wheeler set up, both from the victim perspective as well as his own organization and business model?

A.   Yes.   So Mr. Wheeler had an accounting company, and then he had his own corporation, TWG Advisors, that was kind of a catchall company.   I guess how he explained it is correct.

So there was a CPA firm, an accounting company.   He was -- worked in-house with a law firm.   There was a nursery business he was involved in, at one point two different strip clubs, there was a trust, and then there was various other entities set up to receive money distributions from these various businesses, such as a strip club.

And then Mr. Wheeler also would typically set up his clientele with another corporation for the investments -- a separate corporation -- so each client would also have a separate company.

Q.   And what was Mr. Wheeler's role in the separate companies that he set up for his clients?

A.   It varied client by client.   Some of them he had access to view their accounts; some of them he had access to, for the

accounts, to -- to write checks; and some just set up the separate accounts themselves. So it varied client by client.

Q. Okay. In the course of your investigation, you interviewed the victims in this case; correct?

A. Correct.

Q. And what did they tell you about Mr. Wheeler's requests regarding financial accounts?

A. What exactly.

Q. Did Mr. Wheeler indicate that he wanted to be a signatory on the victims' financial accounts?

A. Yes. Some of them, he requested signature authority; some were uncomfortable with it, but they allowed him the ability to view the account; and some allowed him to have it.

Q. Did he request the victims maintain an account in Key Bank, for example, or one specific financial institution?

A. Yeah. Yes. He wanted them all within the same financial institution for the -- I think for the ease of being able to do transfers and what have you.

Q. And you had an opportunity to review all of the financial accounts Mr. Wheeler was a signatory on?

A. Yes.

Q. How many accounts were there?

A. Well, as far as signatory accounts, I -- I don't have that exact number, but as far as accounts related to this investigation, there was 28 different bank accounts that kind

of transpired over three separate financial institutions that we looked at.

Q. And in your experience and -- was it difficult to unwind the financial transaction?

A. It was very significant, and a number of financial transactions were exorbitant.

Q. Why is that? Can you explain that to the Court?

A. The sheer amount of money that was running through them. From the standpoint of the dollar amount, the large investments that would go in. And, typically, once investment money hit, that money would be blasted out to various different accounts. It could go to the nursery; it could go to TWG Advisors; it might be going to Avalanche Construction; it might be going into the trust. You know, money hits the trust, it's going out of the trust, and it -- it was a -- it was a nightmare to try and unwind.

Q. And based on your training and experience, does that make a fraud more difficult to detect for a layperson?

A. Yes. Significantly more difficult.

Q. Okay. When you interviewed witnesses and victims, did they indicate to you whether they received financial accounting from Mr. Wheeler?

A. Some requested it. They may have gotten it early on. Most of them never received kind of the, I don't know, yearly evaluation, or anything like that, related to their

investments.

Q.  Did victims report to you that they received false financial accounting from Mr. Wheeler?

A.  Victims were being told their money was being invested, A, and it would be invested -- diverted for his own personal use. So they were told one thing on the outset, but it was going towards his personal use.

MS. KERIN:  Just a second.  Your Honor.

BY MS. KERIN: (Continuing)

Q.  During the course of your investigation, did you understand that Mr. Wheeler prepared, for example, deeds that were never filed or other financial documents to induce victims into believing that they had a secured interest?

A.  Deeds that were not filed?  I can't recall that.

Q.  Okay.  Or deeds that were delayed over a significant period of time that were prepared and then filed much later?

A.  Yes.  There were deeds that were -- that were delayed in filing significantly from the investment date until when they got filed, and the clients were having to ask for copies of those deeds.

MS. KERIN:  That's all.

Thank you, Special Agent McGeachy.

THE COURT:  All right.  Cross-examination.  And I think -- how much time do you think you need?

MR. McDONALD:  Probably an hour.  He was up there for

an hour.

THE COURT: Do you want to take a break for lunch? I'm going to take a shorter lunch, but maybe 45 minutes, and we can resume at quarter to 1:00.

MR. McDONALD: That will be fine.

THE COURT: Does that work? And so we'll take a break, and then we'll start with cross-examination. You may step down.

Thank you. We'll recess 45 minutes.

(Recess taken.)

THE COURT: Good afternoon, everyone. Please be seated. We're on the record.

Mr. McDonald, just for the record, the direct examination was 45 minutes. So I did want to make sure we had enough time for your witnesses too. How many witnesses do you expect to call?

MR. McDONALD: I may have one, and she'll be short.

Two things: One is I listened to the agent's testimony with regards to his interviews of Mr. Wheeler. I had not reviewed those in the last month or so, and then he provided me with a copy of the MOI. His discussions that I read through in that report and what he testified to are consistent, and so we will -- based upon that, we will not be contesting the February 4th date.

THE COURT: Okay.

MR. McDONALD:  I will be cross-examining him on and dealing with the SureSeal payments because I believe that they are still -- should be credited against the loss and dealing with the other issues that we discussed, but I let Ms. Kerin know and I wanted to let the Court know that I believe for -- generally, for payments, the difference between February and May is negligible, and I think, after the testimony, it's clear to me that the law would support the Court's finding of a February date.

THE COURT:  So just since we're talking about it now, I do find, based on no opposition from the defense on that issue, that the date of discovery that he was under investigation was February 5, 2014.  And then, consistent with my other ruling, any credits that occurred after that date would not be -- would not offset any loss calculations.

MR. McDONALD:  Under 2B1.1.  It would still go to restitution, and that's a different argument and a different place, but --

THE COURT:  Right.

MR. McDONALD:  All right.

MS. KERIN:  Your Honor, before, I said that I was finished with Mr. McGeachy's direct examination.  I forgot to ask the Court to move into evidence Exhibits -- I think you have received Exhibit 2, but Government's Exhibit 1, Government's Exhibit 6, Government's Exhibit 7, and

Government's Exhibit 8.

THE COURT:  Any objection to any of those exhibits?

MR. McDONALD:  No, Your Honor.

THE COURT:  All right.  Those will be received.
Government's Exhibits 1, 6, 7, and 8.

MS. KERIN:  Thank you, Your Honor.

THE COURT:  Mr. McDonald, whenever you're ready.

CROSS-EXAMINATION

BY MR. McDONALD:

Q.  I'm going to go a little bit out of order than what
Ms.  Kerin did and hit the ones that I want to go to first.  So
first I'm going to talk about the Trotter Downs property, if
that's okay.  Are you ready?

A.  Absolutely.

Q.  Okay.  Good.  So Trotter Downs property is located in
Rainier, Washington; correct?

A.  Correct.

Q.  And it's a subdivision that's close to Olympia and
Tumwater?

A.  Correct.

Q.  It's almost, like, sort of like a little suburb of the
metropolitan area around Olympia?

A.  I'm not an expert in the --

Q.  Geographically.

A.   It's close to Olympia.  That's all I know.

Q.   All right.  And you're aware that markets are warm right now, so people are selling things frequently?

A.   I have no basis of knowledge for any sort of market up in the Olympia, Washington, area.

Q.   Okay.  So you didn't discuss the availability of housing and its impact on value with the people who gave you your information?

A.   No.  I -- I had zero discussions with anybody that prepared any sort of analysis on this whatsoever.

Q.   You had zero discussions with the people who prepared the analysis that you testified to?

A.   Yeah.  I -- I didn't have any conversations with the three real estate brokers that had any analysis.

Q.   You don't have any reports from them or underlying data?

A.   I do not have any reports or underlying data.

Q.   And do you have any CVs of these individuals?

A.   CVs?  No, I do not have any CVs.

Q.   Do you have any information regarding -- withdrawn.

     So no supporting documents of the information that you testified to, but you did have a spreadsheet; right?

A.   Yes, I have a spreadsheet.

Q.   Okay.  And the numbers that you testified to came from that spreadsheet?

A.   That's correct.

Q.   Okay.   Did you verify those numbers against anything?

A.   No.

Q.   So you didn't verify the taxes or cost of sale?

A.   So the taxes were done by a special agent in my office. That's her primary job.

Q.   Okay.

A.   So I'm relying on Special Agent Brandy McKibben for that.

Q.   We can rely on the taxes in your exhibit at $91,264 -- it's Government's Exhibit 1 -- for the 17 lots?

A.   For the 17 lots.   Yes.   I have no doubt that that is what they are.

Q.   So have you reviewed the information that I provided to the United States Attorney's Office regarding the value of those properties?

A.   I think your valuation was 1.25 million.

Q.   Yes.

A.   Yes.   Yes, I've seen that.

Q.   And it was based on $50,000 per lot from an individual -- a real estate person in the area by the name of Paul Valentine?

A.   Right.   Seems kind of similar to what we have done, except for we had three real estate agents.

Q.   Okay.   That you didn't talk to?

A.   No, I -- I did not personally talk to them.

Q.   Okay.   Let's just go with your number for a minute, shall we?   The government's number, according to Exhibit 1, shows a

value of the 17 properties at $687,000; is that correct?

A.    That's correct.

Q.    And the government shows property taxes due on those 17 lots, as opposed to all of the lots, at 91,264?

A.    That's correct.

Q.    Leaving a total value on that property, after back taxes are paid, of $595,736?

A.    That's correct.

Q.    Okay.  Now, do you know what the cost of sale would be?

A.    The cost?

Q.    Yeah.  How much would it cost -- what percentage or how much would it cost per lot to sell those lots?

A.    I don't.  But there is an expense involved.  I actually may have something.  If you want me to try to dig it up, I may have something here.

Q.    Sure.  If you have any idea of what it might be.

A.    Do you want -- because I don't, off the top of my head.  I can dig through some of these documents and find it.

Q.    So did you see the note that we sent where our real estate agent said it would be 8 percent for -- of the value of the property for cost of sale?

A.    I read it, but I don't recall.  But I'm sure I read it.

Q.    Do you have any reason to disbelieve 8 percent would be the cost of sale, according to the realtor that we retained?

A.    Can I just -- I'm just going to go on the record:  I'm not

a real estate expert. I don't know what the valuation is or how much the selling costs are. That's completely out of my wheelhouse. That's not something that I can offer an opinion on.

Q. Okay. So you don't have any reason to dispute the 8 percent? You personally.

A. I don't -- I have no idea about -- we have competing valuations that are within 50 -- you know, a couple hundred thousand dollars. I don't know.

Q. Okay. That's fine.

You talked about some deeds for these properties that had been delayed. Do you remember that?

A. Yes.

Q. And as a general rule, when you were reviewing the legal work for this -- these transactions, the legal work was done by Jeremy Swanlund, and the deeds were created and drafted and sent by him?

A. Yes. Although, I believe Mr. Wheeler, on one occasion, may have prepared a deed for -- or had his assistant prepare a deed for one of the loans.

Q. Okay. Generally, when you were looking at this, the legal work was done by Mr. Swanlund?

A. As far as I can tell, generally.

Q. And there Mr. Liu actually was communicating with Mr. Swanlund in order to get the deeds for these lots that are

at Trotter Downs?

A.    Yeah, he was communicating with Mr. Wheeler and Mr. Swanlund, trying to get that deed, after his investment.

Q.    Correct.

A.    Correct.

Q.    That's what I wanted to establish.  Thank you.

      Okay.  I would like to move to SureSeal if I could.

A.    Sure.

Q.    According to your information, Mr. Wheeler was, at times, using funds that belonged to Mr. Kass for reasons unrelated to Mr. Kass's benefit.  Is that fair to say?

A.    Correct.

Q.    But Mr. Kass had given Mr. Wheeler a full power of attorney, had he not?

A.    I didn't see that.

Q.    You haven't seen a power of attorney signed by Danny Kass in March of 2012?

A.    No.

Q.    I have it electronically, if I may.

      You do know that Mr. Kass signed a number of powers of attorney for Mr. Wheeler to fill this -- do his taxes; is that right?

A.    I didn't look at the -- Mr. Kass's taxes.  That wasn't my wheelhouse.

Q.    Well, in the government's document -- you secured a number

of financial documents for the government as part of this investigation?

A.    A ton.

Q.    Okay.  And in those were powers of attorney, signed by Mr. Kass, for Mr. Wheeler to handle his financial obligations?

A.    Like I said, I have boxes of stuff from this, so I don't recall.  I'm more than happy to take a look at anything.

            MR. McDONALD:  I'm going to bring it forward here in a minute.

       Well, I thought I had it.  The one I have is not the one I'd had, so I'm going to have to --

       Just a moment, Your Honor.

            THE COURT:  That's fine.

            MR. McDONALD:  I'm going to move on and come back to it if I can find it.

            THE COURT:  That's fine.

            MR. McDONALD:  As we've said, there's a lot of documents.

BY MR. McDONALD: (Continuing)

Q.    It's fair to say that a hundred thousand dollars was paid into SureSeal by Mr. Wheeler on behalf of Danny Kass.

A.    That's correct.

Q.    And that money was paid into SureSeal prior to February of 2014?

A.    That would be correct.

Q.   And SureSeal, on occasion, was paying interest payments on that money to Mr. Kass, some of which you believe Mr. Wheeler stole from him; but, still, SureSeal was making regular payments?

A.   There was regular payments; some of which Mr. Wheeler diverted and some that went to Mr. Kass.

Q.   Right.  I thought that's what I said.

A.   You said "I believe."  I know.

Q.   Oh, you know.  Okay.

A.   Yeah.

Q.   Fine.

So now we know that prior to February of 2014 SureSeal, pursuant to written agreements, has a hundred thousand dollars of Mr. Kass's money, of which they're making payments?

A.   Prior to February 1st of 2014?

Q.   Yes.

A.   Yes.

Q.   Okay.  And we know that at some point in time Mr. Kass decided that he didn't -- no longer wanted SureSeal to have that money; correct?

A.   That would be -- would have been after I spoke with Danny.

Q.   And are you aware that, through attorneys, Mr. Kass was paid that hundred thousand dollars from SureSeal at his request?

A.   Yeah.  Post-February 5, 2014.  After my interview with

Danny in June.

Q. So Mr. Wheeler didn't give the money back to Mr. Kass. It came from SureSeal, where the money had been invested by Mr. Wheeler on behalf of Mr. Kass?

A. The actual function of how the money got to Mr. Kass, that's outside my realm of knowledge. I don't know anything about how it got from point A to point B.

Q. Okay. So you're not aware that Mr. Banks, Mr. Kass's attorney, worked with Mr. Suede (phonetic) to have a wire from SureSeal to pay off Mr. Kass?

A. I don't know how that transaction came about. I know that money was returned. How it came about, I have no basis of knowledge.

Q. Okay. Do you, then, also know that SureSeal no longer has the hundred thousand of Mr. Kass's?

A. Current?

Q. And it's been paid to Mr. Kass?

A. Oh, yeah, currently. Yeah, they don't have that hundred thousand.

Q. Okay. But they did have it prior to 2014?

A. Correct.

Q. Okay. I'm going to switch to Mr. -- to the McDonalds, for a moment, with SureSeal.

The document that you had was one of actually two documents that were SureSeal agreements. There was a hundred

thousand dollars from the McDonalds into SureSeal. One dated in, I believe, June of 2011 and one dated in October, and there were two -- excuse me, one check and one wire payment to SureSeal, each of $50,000.

A. I see the $50,000 loan, or the note, October 10, 2011. And the second one was --

Q. I believe it was June 2011 with a payment made in October -- on October 5, 2011, from McDonald Holdings to SureSeal.

A. McDonald Holdings to SureSeal. Bear with me.

Q. Sure.

A. You said October -- the second one was --

Q. There was one payment of $50,000 on October 5, 2011, and there was a wire transfer -- I believe it was on November 10, 2011.

A. I'm not disputing the second $50,000. I just -- I don't have the date in front of me.

Q. Okay. Do you believe that SureSeal, prior to 2014, had a hundred thousand dollars of money from McDonald Holdings that had been invested with them?

A. Yes.

Q. Okay. And you know that they were getting interest payments on that money?

A. Yes.

Q. And you know that that money stayed there with SureSeal?

A.    Yes.

Q.    And you know that as a result of that, starting in 2014, SureSeal still had the hundred thousand dollars, but they began making payments back to the McDonalds at a rate which included both principal and interest until it was paid off?

A.    Yes.

Q.    So the money that had been invested in SureSeal was never lost, but, in fact, it was being -- it was an investment that was performing as it was supposed to?

A.    Correct.  How the money gets there, I don't know.  But there was a hundred thousand.  It was invested, and it continued to be invested after February 5th.

Q.    And it continued to be paid off?

A.    And it continued to be paid off.

Q.    So the money wasn't gone and taken away from the McDonalds as of February 2014.  It was just being -- it was still invested in SureSeal?

A.    It was still invested in SureSeal.

Q.    Thank you.

I'm going to switch to the Coverdales.  Okay?

Before I get there, just let me ask you one question.  You seem to suggest that Mr. Wheeler used a number of accounts sort of randomly.  Going from one and going to another.  Money would be paid into one and going to another.

A.    Correct.

Q.   So he would deposit, like, $20,000 from TWG into the Cloverdale Trust account, and then he would take out money and spend it at the Hard Rock Cafe?

A.   Yeah.   And I don't think that's unique to Ponzi schemes.

Q.   I'm not asking you whether it is or not.   I'm asking you whether he did it.

A.   Yeah.   Money was getting moved all over the place.

Q.   And according to Exhibit 2 and the Coverdales, there's a lot of deposits into that account from TWG Advisors.   I got 5,000 one time; 5,000 another time.   Are those monies that came from Mr. Wheeler's accounts into the Cloverdale Trust?

A.   Yeah.   So money was going out of the Cloverdale Trust and into the Cloverdale Trust.

Q.   Okay.

A.   It was kind of a back-and-forth type of deal.

Q.   Okay.

A.   So it made it difficult to try and unwind this.

Q.   All right.   I understand.   I mean, some money was going to Avalanche Construction.   You know Avalanche Construction to be the construction company that was working to build homes at Trotter Downs; right?

A.   Yeah, that was -- that was the construction company that they were trying to --

Q.   To use to --

A.   -- to try to build homes with.

Q.    Okay.    So on these transfers, then, to Avalanche Construction that were being given to them, that could be on benefit of the loan that was made -- or the purchase of the Trotter Downs properties because they're using money now to improve those properties?

A.    Mr. McDonald, nobody knew about this.    Nobody knew where the trust money went.    They didn't know that they even had property.

Q.    I'm not asking you whether or not they --

A.    Let alone an investment in housing.

Q.    Sir, I'm not asking you whether or not they knew.    That's not my point.    My point is money from the trust went to Avalanche Construction, which you know to be developing and investing those properties; correct?

A.    The money from Avalanche was going all over from there. It's a classic scheme of moving money from one account to another.    I -- just because it went to Avalanche doesn't mean that's where -- the ultimate spot that it was spent.

Q.    Fine.

You stated that Mr. Wheeler had a number of LLCs; is that right?

A.    That's correct.    Several companies.

Q.    So he had -- I can go through a couple of them.    He had Zombie Holdings.    Do you remember that one?

A.    I do.

Q.   And that was for the ownership of Rouge -- Club Rouge; correct?

A.   Right.  Distributions from Rouge.

Q.   And that was with Mr. Swanlund and, I think, Mr. Phillips?

A.   Yeah.  That changed over time, but yeah.

Q.   And there was Rouge PDX, LLC?

A.   Correct.

Q.   And that was set up for the sale of the property?

A.   I don't know the reason behind it, but, yeah, there was Rouge PDX.

Q.   Okay.  And it's not unusual for people in your practice, regular businessmen, to have businesses that are set up as LLCs?

A.   Yes.  But I would not expect all the funds to be commingled between all the LLCs.  That's what made it difficult.

Q.   I understand that.  But what I'm suggesting is that each of these LLCs were each for individual businesses, and, in fact, the TWG was Mr. Wheeler's individual LLC?

A.   But they weren't run for the individual businesses.  I -- I agree with you.  You set up a company --

Q.   Okay.  I like that.

A.   You set up a company.  Your income goes in there.  Your expenses go out there.

In this case, that's not how it worked.  Money went in,

and it got shotgunned to all these different companies and spent and moved back and forth.

Q.    Almost randomly?

A.    I don't -- I don't know.

MR. McDONALD:  Okay.  That's fair.  Thank you.  I don't have any further questions.

THE COURT:  Any redirect?

MS. KERIN:  Yes, Your Honor.  Thank you.

REDIRECT EXAMINATION

BY MS. KERIN:

Q.    I would like to start with the Trotter Downs property. Mr. McDonald asked you about these transfers from the Cloverdale Trust to Avalanche Construction.

Do you remember those questions?

A.    Yes.

Q.    And Mr. McDonald asked you whether it was possible that those transfers were being used to develop the Trotter Downs property.  Do you remember those questions?

A.    Yes.

Q.    In the course of your investigation over these last five years, reviewing bank accounts and talking to all the people that you've talked to, is there any evidence that Mr. Wheeler was developing -- using money from investors and the Cloverdale Trust to develop the Trotter Downs properties?

A. There's no -- there was a couple houses built, but I have no evidence that the money from Cloverdale Trust was being used to develop houses.

Q. And, in fact, the 25 lots that are seized in the forfeiture action, what's the status of those lots?

A. Status? They're -- they have a government lien on them.

Q. Right. But are they developed?

A. No, they are empty.

Q. Is there any property on them?

A. Just bare land.

Q. Okay. With respect to the transfers from the trust to Avalanche, were those -- based on your review of all of these, was that for the benefit of the trust?

A. No. That was not for the benefit of the trust.

Q. Does the trust have any interest that's recorded anywhere in any of these properties?

A. No. And just to fall back on that, the -- the mothers who had children in the trust were told that their funds had been seized and held up in a civil litigation. They were never -- nobody was ever advised of any interest whatsoever in any property.

Q. Okay. I would like to talk with you about the SureSeal investment just real quick.

A. Sure.

Q. What's the relationship between Mr. Wheeler and the

principal of SureSeal?

MR. McDONALD: Objection. Relevancy.

THE COURT: Overruled.

THE WITNESS: They're good friends.

BY MS. KERIN: (Continuing)

Q. And how so?

A. Mr. Wheeler had worked preparing his finances for the past five and a half years.

Q. And did you interview the principal of SureSeal?

A. I did.

Q. What did he tell you about the financial situation of SureSeal?

A. That the money -- their business needed the investment money to operate.

Q. Okay. Did he indicate that there had been any kind of financial problems with SureSeal?

A. No. Just that he needed -- I think it was just that he needed the money to continue operating his business.

Q. And you were asked about whether SureSeal continued to make payments to Mr. Kass and the McDonalds. The principal payment, based on your review of the promissory notes, was overdue before the payments -- the final payments were made to the McDonalds and Mr. Kass; is that correct?

A. I know for Mr. Kass. I don't know how that unwound with the McDonalds.

Q.   Okay.  And when you interviewed Mr. Kass, you talked about how Mr. Kass did not want his investment with SureSeal at the time that you interviewed him.  When did that interview occur?

A.   I had -- it -- it occurred in June.

Q.   What year?

A.   Of 20 -- the year we did the search warrant.

Q.   Okay.  '14?

A.   '14.  Thank you.

Q.   What did you tell Mr. Kass about his investment in SureSeal?

A.   I notified him that there was about a hundred thousand dollars invested with the company and that I believed that it was a going concern and that he could potentially obtain that money back.

        MS. KERIN:  That's all I have.  Thank you.

        THE COURT:  Thank you.  You may step down.

    Do you have any further witnesses, Ms. Kerin?

        MS. KERIN:  We do not, Your Honor.  Thank you.

        THE COURT:  Thank you.  Witnesses for the defense.

        MR. McDONALD:  Yes, Your Honor.  I'm going to call Tiffany Couch for a few questions.

        THE COURT:  That's fine.

        MR. McDONALD:  Before I call her, though, I would like to offer the exhibits that I attached to my pleadings, I believe they're admitted for purposes of this hearing.

Generally, I don't do that, but since the government was marking their exhibits and admitting them, mine have been filed under seal, and I'd ask that they be admitted.

THE COURT: Yours are probably still under seal. I certainly can look at the exhibits that are appended to your pleadings. Do you want to produce a copy that we actually mark as Defense 101 through whatever or --

MR. McDONALD: I could, but I'm afraid because some of them overlap with the protective order, so that's why I filed everything under seal is because I didn't want some things to be there and some not.

THE COURT: Right. So I don't know that technically I need to move them into evidence. They're part of the sealed pleadings in the case.

MR. McDONALD: As long as the Court will consider them for those purposes, that and the email we sent this morning with regards to the property appraisal. That was the last thing we sent this morning in response to the government's information.

THE COURT: That I did see, but I didn't know what to do with that information. I think that is -- is that somehow confidential?

MR. McDONALD: That's not confidential. I can make that Defendant's 1 for the purposes of the hearing.

THE COURT: I think you should separately move that

into evidence.

MR. McDONALD: Then I will do that.

THE COURT: Because that has not been filed in the court record. It's just an email that I think you sent to my clerk.

MR. McDONALD: I was just trying to give the Court advanced notice of other documents we were going to rely on and things were going back and forth between Ms. Kerin and I pretty extensively.

THE COURT: Do you have a copy of -- another copy of that that you want to mark as an exhibit?

MR. McDONALD: I do. If you'd give me just a minute to find it, it's in one of these voluminous notebooks.

THE COURT: That's fine. I tell you what, why don't you call your next witness, or is the witness going to use that document?

MR. McDONALD: No, she is not.

THE COURT: Ms. Kerin, do you object to my receipt of Exhibit -- should we call it Defense 101?

MS. KERIN: No, I don't, Your Honor.

THE COURT: All right. So I'll receive 101 whenever it is ready to be admitted.

MR. McDONALD: Okay. Thank you, Your Honor. I appreciate that.

THE COURT: Go ahead and call your witness.

DEPUTY COURTROOM CLERK:  Raise your right hand for me.

TIFFANY COUCH,

called as a witness on behalf of the Defendant, being first duly sworn, is examined and testified as follows:

THE WITNESS:  I do.

DEPUTY COURTROOM CLERK:  Please be seated.  If you would state your full name, spelling both first and last for the record.

THE WITNESS:  My name is Tiffany Couch. T-i-f-f-a-n-y.  C-o-u-c-h.

DEPUTY COURTROOM CLERK:  Thanks.

DIRECT EXAMINATION

BY MR. McDONALD:

Q.   Thank you.  Ms. Couch, I just spoke briefly with Ms. Kerin, and she'll agree you're qualified as a forensic accountant to testify in these proceedings.

MR. McDONALD:  If the Court would so find?

THE COURT:  That's fine.

MR. McDONALD:  Thank you.

///

///

///

BY MR. McDONALD: (Continuing)

Q. Ms. Couch, are you familiar with Nathan Wheeler?

A. I am.

Q. How long have you been familiar with him?

A. Since May of 2014.

Q. And what -- in what capacity did you become familiar with him?

A. I was hired by his previous attorney to do forensic accounting for all of his accounts.

Q. And do you have a business that does forensic accounting?

A. Yes. I'm the owner of Acuity Forensics.

Q. And once Mr. Wheeler was -- changed counsel to me, did you continue to work with me on Mr. Wheeler's case?

A. I have.

Q. And during the time that you worked with me, have you gone through government documents, as well as old files and folders of the former attorney?

A. I have.

Q. And have you become familiar with the financial issues that have been discussed here today?

A. Very much so.

Q. Excuse me. I apologize.

And have you assisted me or tried to assist me in developing what we thought would be a loss number for the government -- for the -- that would be applicable to

Mr. Wheeler?

A.    I have.

Q.    And if we were to look at the government's total loss, they now list it at $4,455,385, I think, and 16 cents. We'll round it up to -- round it down to 385. Is that the number you're familiar with and have been working with in at least the past few days since that number has come forward?

A.    It is.

Q.    Okay. Have you done an accounting of pre-February payments to the McDonalds, by Mr. Wheeler and/or his entities, February 2014, in terms of payments to that -- to them?

A.    I have.

Q.    And can you tell the Court what that number is pre-February?

A.    So if you will let me pull it up here.

So Mr. Wheeler was making payments to several of the investors in 2011, 2012, 2013, and 2014.

Q.    And specifically as to the McDonalds prior to February of 2014 or prior to -- let's be exact -- prior to February 5, 2014?

A.    Correct. So the payments to the McDonalds prior to -- the last payment, I believe, was in January of 2014. There were regular payments being made. It was $324,540.

Q.    And did you also look at the SureSeal payments that were made to the McDonalds from the investment in SureSeal?

A.   Yes.   So the McDonalds' investment in SureSeal happened in October and November of 2011 and --

Q.   Do you know how much the initial investment was?

A.   There were two separate wires of $50,000 each.

Q.   I believe one was a check and one was a wire.

A.   I think you might be right.  One was a check, and one was a wire.

Q.   So there was an initial hundred-thousand-dollar investment back in 2011?

A.   Correct.

Q.   Was that about the time that the McDonalds and Mr. Wheeler opened the McDonald Holding Company?

A.   It was.

Q.   And after that time, those regular payments of $7,000 or $8,000 were being made regularly to the McDonalds on a monthly basis from Mr. Wheeler?

A.   Correct.

Q.   And that was that $324,540?

A.   Correct.

Q.   All right.  You also looked at payments that were made to the Busses or Buss Co. by Mr. Wheeler.  And specifically to pre-February 2014, do you have a number that you put together for them?

A.   I do.  It's $19,080 were paid to either the Busses or Buss Co. Holdings.

Q.   Okay.  And one of those payments, I think -- let's just double-check -- may have been February 6th or 7th of 2014.

A.   Well, that was the date it cleared the bank.

Q.   Okay.

A.   So I did include it.

Q.   So the dates on your charts are the dates where the checks clear the bank, not the actual time they were paid?

A.   Correct.  So I included that one because I made the assumption -- we can go back and look at the check, but I made the assumption that that had been -- that had been written and mailed to them prior to or on or -- you know, prior to that February 5th date.

Q.   Okay.  And what was the amount of that check, just so the Court knows?

A.   If you'll give me a minute, I'll find it.

Q.   I will.

A.   The February 6th payment actually came from Bridge City Law, and it was for $4,770.

Q.   Is that payment consistent with the prior payments in 2013 and on January 8, 2014, to the Busses?

A.   Yes.  They were regular payments of $4,770.

Q.   Okay.  So you believe that the 19,000 is a fair number pre-raid?

A.   Correct.  Pre-February, uh-huh.

Q.   Have you also looked at the government's documents

regarding their assessment of the Buss lots and the Liu lots and how much they're valued at?

A.   I have.

Q.   And how did you construct the value of the Buss lots and the Liu lots, using the government's figures?

A.   I used the government's value of the lot itself.  So not taking into account the appraisal that you provided me, but instead using the government's spreadsheet with a value, less the property taxes, which looked pretty close to our research on the same issue; and then I took 8 percent of the gross sale or gross value of each lot and subtracted that amount as a reasonable cost to sell a piece of real estate in Washington state to come up with a net value of the Buss-related losses -- excuse me -- Buss-related lots and the Liu-related lots.

Q.   So and what did you come up with for the Buss-related lots?

A.   I came up with a value net of property taxes and cost of sale of $470,749.99.

Q.   And for the Liu lots?

A.   Those were two lots.  Same calculation.  Value minus property taxes, minus 8 percent off the gross value, for a net number of $70,025.55.  So 70,025.55.

Q.   So of those payments, can you quickly give a total of the 324, the 19, the 470, and the 70 for us, please?

A.   If we were to add the 324 and the payments made to the

McDonalds prior to February, $19,080 to the Busses, $470,750 on the lots, plus $70,026 on the Liu lots, that's a sum of $884,395.54.

Q. All right. And when you looked at the McDonald Holdings, did that hundred thousand dollars that was put into SureSeal ever come out of SureSeal in -- in between the time that it went in and the time that it was paid out between 2014 and 2017?

A. No.

Q. So the McDonalds had an original $100,000 investment that interest payments were made over time to McDonald Holdings.

A. Every month.

Q. And then starting in 2014 there was a change, and it was principal and interest payments together, depleting that hundred thousand down?

A. Correct. So the principal and interest started in the middle of 14 and were paid over -- I can't remember if it was 2016 or 2018, but for several years they received principal and interest payments and --

Q. Do you have the total number of principal and interest payments, as well as -- excuse me. Do you have a total of the return on that hundred-thousand-dollar investment?

A. So just from July 2014 forward, the Busses received a total of --

Q. You mean the McDonalds?

A.   I'm so sorry.

Q.   That's all right.

A.   The McDonalds received a total of $119,571.48 so that, just for that time period, was an increase on their original investment of $19,571.48.

Q.   And if you add just the hundred thousand dollars to your prior total, using the government's figures, what is that total?

A.   $984,395.54.

Q.   And if you added in the -- the --

A.   The interest?

Q.   Yeah.

A.   That would get that figure to $1,003,000 -- excuse me. $1,003,967.02.

Q.   Okay.  Did you --

        MR. McDONALD:  That's all the questions I have.

        THE COURT:  Cross-examination?

        MS. KERIN:  Just a few.


                    CROSS-EXAMINATION

BY MS. KERIN:

Q.   Ms. Couch, you have testified in a lot of investment fraud cases; correct?

A.   I have.

Q.   And primarily for the defense; correct?

A.    Primarily.  Most of my testimony -- probably the testimony related is probably with the defense, but I've testified on both sides.

Q.    Yes.  In fact, you have testified in one of my cases; correct?

A.    In a case that I helped put together.

Q.    Yes.

A.    Yes, I did.

Q.    Okay.  So you're familiar, generally, with Ponzi schemes and investment frauds.  Is that fair to say?

A.    Of course, yes.

Q.    And you know --

       MR. McDONALD:  I'll object.  Outside the scope of direct.  I was asking about specific payments to specific people at specific times.  If she wants to dispute those payments, that's one thing, but to go beyond that -- I kept my questions very succinct.

       THE COURT:  Overruled.

    Go ahead.

BY MS. KERIN:  (Continuing)

Q.    You know that a hallmark of a Ponzi scheme or an investment fraud scheme is to provide interest payments to the victims; correct?

A.    I would not agree with that statement, actually.

Q.    No?

A.   No.

Q.   Why not?

A.   What you often see in a Ponzi scheme are no payments at all.  Interest payments sometimes, but usually the payments are not necessarily even being made.

Q.   Well, you would agree that a hallmark of a Ponzi scheme or an investment scheme is lulling victims into believing that their investment is secure; correct?

A.   That would be one of the promises made, yes, that's correct.

Q.   And in some instances that is achieved through interest payments; correct?

A.   It's usually achieved through the promise of a larger investment payment to be made than if you were going to put it into, for example, the stock market.  It's not necessarily true in terms of actual payments made.

Q.   Have you seen other cases where interest payments are made in order to lull victims into believing that their investment is secure?

A.   I have seen that, yes.

          MS. KERIN:  Okay.  Thank you.  That is all I have.

          THE COURT:  Any redirect?

          MR. McDONALD:  No.

          THE COURT:  Okay.  You may step down.  Thank you.

Any further witnesses?

MR. McDONALD:  No, Your Honor.

THE COURT:  Why don't I have argument on the issue of loss, and I don't -- because I don't think any of the victims are talking about the loss amount specifically.  So let's hear the argument on the loss issues and actually all of the guidelines factors at this time.  So let's start with the loss, and I'll make a determination.

MS. KERIN:  Thank you, Your Honor.

At this point I think that the only real disputed issue between the parties is whether the SureSeal payments should be credited against the loss.  And as an initial matter, this Court should look at the plain language of the guidelines, which states that any payments made after the fraud is detected, which this Court has found is February 5, 2014, may not be credited against loss.

What you heard today, this testimony, is that prior to the investment in SureSeal, Mr. Wheeler stole money from the McDonalds and Mr. Kass.  Those individuals, had they known that Mr. Wheeler was a thief and not acting in their best interest, they would not have continued their relationship with Mr. Wheeler.  The defense wants you to believe that this is just a regular investment that Mr. Wheeler didn't have any control over, but the fact is that the victims were denied the information necessary for them to make an informed decision whether they wanted their money to go to SureSeal.

What you also heard is that Mr. Wheeler stole interest payments with respect to Mr. Kass. So this wasn't a regular investment. This was an investment that Mr. Wheeler directly profited from as well.

In addition --

THE COURT: Can I ask you a question?

MS. KERIN: Yes.

THE COURT: With respect to at least what I understood the defense presenting -- or that the McDonalds received $119,571.48, for example, is that -- would that be after February 5, 2014?

MS. KERIN: That's correct. The two SureSeal payments that the defense said should be included, the one for Mr. Kass and the 119 for the McDonalds, all occurred after February 5, 2014.

THE COURT: Do you dispute that?

MR. McDONALD: No. I just dispute that it's loss because it's not, but I'll have my chance in a minute.

THE COURT: Okay.

MR. McDONALD: I don't dispute that the payments came to the McDonalds when they say they came.

THE COURT: Okay. But those would be credits post discovery; correct?

MR. McDONALD: No, they're not, because they are not loss. The payments are within a legitimate investment. And

because they're a legitimate investment, they're not lost to the investors.

THE COURT: Okay. I've got it.

MR. McDONALD: Because they're not loss to the investors, it's not loss. All of those payments are not payments against a loss. They're still an investment that they have a right to have.

THE COURT: So --

MR. McDONALD: The money was never stolen.

THE COURT: So in terms of -- let me ask you if, for example, the evidence shows that there was misrepresentation in getting that money in the first place from those investors, does it matter that --

MR. McDONALD: No. Because there's agreements between -- so Mr. Wheeler had authority, power of attorney, with Mr. Kass and had authority with the McDonalds, through the McDonald Holdings operating agreement, to do with that money. There was no agreement that he could or could not do certain things.

THE COURT: But he was allowed to use it for himself? He was allowed to buy his own home. Is that accurate?

MR. McDONALD: There wasn't anything that said he could not. He just was -- I'm just telling you there wasn't.

Now, he did that, but he also put that money back into the McDonald Holding accounts when he sold that home. So what I'm

saying is that --

THE COURT: You can't really --

MR. McDONALD: This was a company that money was given to with written agreements that weren't fraudulent. The written agreements were signed and executed. We know they weren't fraudulent because the McDonalds got all of their money back out of it, and Mr. Kass got his back out of it when he asked for it.

They could have let -- that money was not a loss. It is simply investing. It's like if I was taking everybody's money and I invested part of it in Apple stock, and that Apple stock was still there, still invested at the time that they found out that I was doing a Mike Milliken on penny stocks and blowing everything up, that Apple stock is not lost. And to pay it back at that time or to sell it and pay it back isn't a credit against the loss because it was never a loss at all. It's a legitimate investment.

THE COURT: So which piece of what Mr. Wheeler did with the money would be under the category of a legitimate investment? So, for example, in something that was likely to bear interest, so to carry out a fiduciary responsibility, is there anything he invested in that would even arguably be a legitimate investment?

MR. McDONALD: In terms of -- of what he was doing with the money?

THE COURT: Yeah.

MR. McDONALD: I don't think that that is even an issue. The issue is simply whether or not, in this particular case, did he invest money with a company. He did. Did that company have the money in their books? They did. Was there a written agreement that they had to pay certain amounts of money back to Mr. Kass and the McDonalds? They did. And then when -- and then eventually they paid all of the principal back to Mr. Kass and all of the principal back to Mr. McDonald. None of that is loss.

Just like if I -- if I sold the Apple -- you know, Danny Kass says, "I don't want to have Apple stock anymore. I want it sold," that's not credit against the loss of something else. It's a legitimate business expense, and we know that because the money was paid back by the company to whom the money was loaned under a legal loan agreement. There's nothing that says those loan agreements are fraudulent.

THE COURT: But you're calling them investments. So if I'm -- were they just loans that these people agreed to give him money to --

MR. McDONALD: They were loans at 12 percent interest. Those are hard money loans. Hard money loans are not unusual in difficult times, and this was still, you know, 2013, 2014. They were making hard money loans at 12 percent. 12 percent is a high interest rate. It's a good interest rate.

And the McDonalds got 12 percent on theirs all the way through. So instead of a hundred thousand, they got $119,000 back on a return on investment.

THE COURT: Okay.

MR. McDONALD: Over three years.

THE COURT: All right. Ms. Kerin.

MS. KERIN: I have two points to make to what Mr. McDonald said. First, this power of attorney is kind of offensive if Mr. McDonald is suggesting that Nathan Wheeler had the power of attorney to make these withdrawals for things like the Hard Rock Casino and other information. I think it boarders on a lack of acceptance of responsibility.

The second thing is they keep calling these legitimate investments, but as I indicated, a very significant piece of information is that neither the McDonalds nor the Kasses knew that Mr. Wheeler was withdrawing funds and using it for his marijuana business and for his extravagant lifestyle. And had they known that, I think it's safe to assume that they would have, as they did in June of 2014, ask to get their money back.

MR. McDONALD: Actually, the McDonalds didn't ask to get their money back. They let it ride through 2017.

MS. KERIN: They withdrew Mr. Wheeler from any access to that loan any further.

And at the time that the -- the evidence before the Court -- there's a lot of reliance on these promissory notes,

but the evidence before the Court is that these promissory notes were significantly overdue by the time of the discovery of the fraud.

If you recall in Government's Exhibit 7, the $50,000 was due to Mr. Kass on January 24, 2014. That had not been paid. On June 7, 2014, $30,000 was due to Mr. Kass. That had not been paid. In addition, half of the McDonalds' money was owed to them in 2013, I believe.

So those were already -- SureSeal was already in breach. And the only thing that facilitated the repayment to the McDonalds and to Mr. Kass is the fact that the government stepped in, seized the loss, and instructed Mr. Kass and the McDonalds to get -- or at least Mr. Kass to get a lawyer to try and get that money back.

There's -- Mr. Wheeler has already admitted he was stealing interest payments from Mr. Kass over the course of the relationship with SureSeal.

And even Ms. Couch admits that one of the hallmarks of an investment fraud scheme is to lull victims into believing that their investment is secure. The fact that these investment payments were being made to the McDonalds, to the Busses, to Mr. Kass, was only part of Mr. Wheeler's scheme. It was the way that the victims continued to invest money with him, continued to trust him, continued to believe that he was looking out for their best interest and putting the money where

he promised it was.

So the investment payments are nothing more than a mechanism for Mr. Wheeler to perpetuate the scheme and make the victims believe in it.

And again --

THE COURT: Let me ask you a question.

MS. KERIN: Yes.

THE COURT: On the value of the lots, for example, if you accept the defense's valuation, the -- why shouldn't they -- since the money that Mr. Wheeler took was -- is essentially secured by the value of the lots, if you accept what the defense expert states is the value, why shouldn't that count against the full value of the loss amount? Because it is an asset.

MS. KERIN: Yes, Your Honor. On page 6. Let me see. I'm sorry. On page 2 of the government's reply brief, we prepared a chart that had what we believe are the credits against loss, and it included the value of the land in which the Busses and Mr. Liu have a secured interest, and all our amount -- all our credit is more than the credit that Ms. Couch testified to. We did not deduct costs. And that is significant because it makes the loss, if you look at page 2, $3.5 million -- more than $3.5 million, which, for sentencing purposes, is significant.

MR. McDONALD: Wait a minute.

THE COURT: Yeah, what was -- can you just remind me what your total amount was, again, for the value of the Trotter Downs secured property?

MS. KERIN: So we agreed that the credit to Mr. Wheeler against loss should be $595,736, and the difference between our value and the lesser value proffered by Mr. McDonald is that we did not deduct the costs.

THE COURT: Okay.

MR. McDONALD: May I be heard on the value of the lots, Your Honor?

THE COURT: Not yet. Let me have Ms. Kerin finish.

MR. McDONALD: Okay.

THE COURT: Let me ask you, Ms. Kerin, your -- the bottom of the guideline range that you're arguing for is 30 -- oh, it's 3,900; is that right? Or 3,500?

MS. KERIN: I'm sorry? 3.5 million.

MR. McDONALD: 3.5 million.

THE COURT: 3.5.

MS. KERIN: It's an 18-level increase.

THE COURT: So let me ask you even if you were to just add up the numbers that the defense just brought -- submitted testimony about, their total was $884,395; is that correct?

MS. KERIN: As a credit against a loss? Yes.

THE COURT: So if you subtract from your total value

the 4,455,385, minus that 884, you're still above 3.5.

MS. KERIN: Correct.

THE COURT: So does it make any difference?

MS. KERIN: No. Not -- not from our perspective, no. I think that the real dispute between the parties is --

MR. McDONALD: The value of the lots.

MS. KERIN: And the SureSeal payments, whether that should be included or not.

THE COURT: That includes the SureSeal.

MS. KERIN: No, it doesn't. Ours does not. Ours does not.

THE COURT: I'm saying his 884,000.

MS. KERIN: Does not include SureSeal.

THE COURT: Because the value of the lots was 470,749 plus 70,025; right?

MS. KERIN: Yes.

MR. McDONALD: That was using the government's numbers, not ours, Your Honor.

THE COURT: Okay.

MR. McDONALD: I have -- my appraisal value numbers are in our exhibits and in the -- and I was going to argue those. I was just wanting to know what -- if you just use the government's numbers and include the SureSeal payment to Mr. -- to the McDonalds, we are at $984,000, which brings us below the 3.5 million. But if you use our value on the lots of 50,000,

then the number that we gave you, which is -- hold on -- you know, our number for the fair market value is listed in my memorandum. And let me just look at it really quickly.

THE COURT: Ms. Kerin, did you finish?

MR. McDONALD: I'm sorry. I didn't mean to interrupt.

THE COURT: I just wanted to make sure you finished on what you wanted to argue with regard to the loss.

MS. KERIN: Yes, Your Honor, unless you have any other questions.

THE COURT: No.

MS. KERIN: Thank you, Your Honor.

THE COURT: Go ahead.

MR. McDONALD: There's no reason to accept the government's numbers for value. They don't have -- they didn't even identify who the appraisers are. They don't have reports. They don't have underlying source data. Agent McGeachy didn't even talk to the person who supposedly did these.

So we have given the Court a letter from a real estate person, his contact information, his credentials. We have had him review those lots. He has sent a letter that says everything about his knowledge of the area. He sent another email today. And in the utmost of caution, we even included a cost of sale. Okay? Because if you have a cost of sale, that may or may not include -- be loss. I mean, they would have had

a cost of sale anyway, so I don't know that the cost of sale would be loss.

So really what we are asking the Court is for the value of the lots, for the lots themselves -- is take the 17 lots and multiply by $50,000. That's 700 and -- 17 lots at 50,000.

UNIDENTIFIED SPEAKER: 850.

MR. McDONALD: And the taxes are 136,000.

UNIDENTIFIED SPEAKER: 139,000.

MR. McDONALD: So subtract that, please.

UNIDENTIFIED SPEAKER: 711.

MR. McDONALD: So with a $50,000 lot value, which we have, minus the 139,000 taxes, we're at 7 -- 711,000.

So that -- if you use that number, instead of the one we gave you on the stand, we're way below $3.5 million. They have given you nothing to establish a lot value other than what we have.

THE COURT: So just so I have the numbers right, so the 711,000 is the total that you were asking me to assess for the value of the Trotter Downs lots where two of the -- two of the victims have first security interest in?

MR. McDONALD: Correct.

THE COURT: If you were -- if I were to find -- accept your numbers on the Trotter Downs lots and agree that that should be deducted, and I'm not -- I'm saying for the sake of argument.

MR. McDONALD: Yeah.

THE COURT: But I disagree with you, for the sake of argument, on the SureSeal funds.

MR. McDONALD: Let me run through the numbers for you.

THE COURT: Then it seems to me you're still above the 3.5.

MR. McDONALD: I would not be, and let me tell you why.

THE COURT: Okay.

MR. McDONALD: You would have 324,540 for the McDonalds. That does not include the SureSeal payment. You would have $19,080 from the Busses. You would then have $711,000 from Trotter Downs. That number is over a million dollars. I don't have the exact one in my head, but 711 plus 324 will get you to a million and one, and that puts us below 3.5 million.

If you use our number for the value of the lots, irrespective of whether or not you use the SureSeal, we're still below 3.5 million.

THE COURT: Ms. Kerin, let me ask you about the lot value.

MS. KERIN: Yes.

THE COURT: With respect to -- Special Agent McGeachy did testify he couldn't verify the numbers but understood that

they were from three different appraisers.

First, in terms of the evidentiary standard, I know there was a little bit of a disagreement, it looked like, in the pleadings, on the burden of the standard of proof that applies to the facts underlying the loss calculation. Is it -- defense is arguing it's clear and convincing evidence. And I'm not positive this is going to make a difference, in any event, but clear and convincing evidence versus the government was arguing preponderance of the evidence. Do you have a position on -- he cites the *Hymas* case for that proposition. Is he right, or are you right?

MS. KERIN: I believe that under the *Hymas* case, which we also cite, that the correct standard of proof is preponderance, because the difference between what you're asking to decide is a two-level adjustment in the sentencing guidelines, and I think that the standard in the *Hymas* case is, like, extreme disproportion, or it's a very significant -- when you're deciding a very significant difference between the resulting guidelines, and this is two levels. So preponderance is the appropriate standard.

But if I may, I would like to address the issue with respect to Mr. McGeachy, because the defense --

THE COURT: It's really just which I pick.

MS. KERIN: Right. I mean, the information -- the quality of information before you is exactly the same. The

defendant hasn't had an appraiser come in and testify about all of the different things that they did in order to value these lots. And what makes the defendant's appraisal far inferior than the one that the government has proffered is that this Court has already ruled that the only fair market value that can be deducted from loss is for those specific lots that are collateral pledged; the lots that the Lius -- that Mr. Liu and the Busses have a secure interest in.

The government -- the Internal Revenue Service -- this was Special Agent McGeachy's testimony -- was that the government hired three separate individuals to look at various documents and come up with a spreadsheet that is before this Court.

Those three individuals -- this testimony is unrebutted. Our three experts, within the field in Thurston County, real estate experts, those names have been provided to Mr. McDonald this morning, when the government received them, and that they did a lot-by-lot analysis, taking into account where the lot is located within the subdivision, the size of the lot, and things of that nature.

Also, the government's value specifically deducts the exact amount of property taxes that is due on each specific lot. The government's valuation is a lot more specific, and, again, the quality of evidence, it's irrelevant whether Special Agent McGeachy talked to the real estate agent or not because we don't have Mr. Wheeler's real estate agent here to

cross-examine him about it.  The evidence is the same.

But, again, the government's evidence is a lot more specific and meets the standard of preponderance or clear and convincing.

THE COURT:  Any final words on the loss?

MR. McDONALD:  The government is just wrong.  We have provided the Court with comps, letters from specific people, source data, information in his letters that he has a history in the area, information that he went out and looked at the lots.  They had made -- they initially made a claim that the value of the lots was being overstated because they were overgrown.  He then sent another letter that said, "No, I took into the value the current condition of the lots."

THE COURT:  Where are you?  Which exhibit are you referring to?

MR. McDONALD:  That one is Exhibit 15.  It says -- this is in response to the government alleging that the fair market value is too high for the lots located in the Trotter Downs subdivision -- I'm very aware of the current condition of the property, and that was taken into account when pricing a lot.

THE COURT:  Hold on.  I don't know if I have an Exhibit 15.

MR. McDONALD:  I can forward it to the Court.

THE COURT:  Is it -- an Exhibit 15 to what?

MR. McDONALD: To my memorandum. We filed it separately, I think, as a supplemental -- may I approach?

THE COURT: Sure.

MR. McDONALD: I believe this was filed as an attachment to a supplemental --

THE COURT: Okay.

MR. McDONALD: We also had the email that I provided this morning. If you give me a minute, I believe that's in the Trotter Downs book.

That's the one I was going to mark as Exhibit 1 and the one that was sent by email this morning. It responds, again, that these lots are specific. There's a shortage of lots in the area. He could sell them within 30 days at $50,000 closing.

Now, the government says that they used the specific tax amount for the lots. They did. We just gave you the entire one. The 139 was for all of the lots. So it's actually higher than 711. If you want to use the tax number for just their lots, it's 95,000. So you can subtract another 40,000 -- or add another 40,000 and the number would be 751. I'm sorry. I didn't even think about that.

THE COURT: Which exhibit shows your valuation? Because I don't -- I just want to make sure I take a look at that. Where are you saying that that exhibit is contained?

MS. KERIN: Exhibit 2.

THE COURT:  Is that in your reply brief, or is it --

MR. McDONALD:  It's attached to the original amended memorandum.  It's Exhibit 2.

THE COURT:  So it doesn't have -- you're talking about the letter of October 8th of 2019?

MR. McDONALD:  Yes.

THE COURT:  From Mr. Valentine?

MR. McDONALD:  Yes.

There's a letter of October 8th, and then there's a letter of October 22nd, and then there's an email from this morning.

THE COURT:  Okay.

MR. McDONALD:  Each of them reiterate $50,000 per lot.

THE COURT:  And even though they're -- it sounds like there's quite a differentiation between the value of the lots. In the government's, for example, it shows the lots ranged from 39,000 to 64,000.

MR. McDONALD:  Well, actually, there's one 64,000 outlier, which is not of the 25 that we have.  The 25 that we have are listed as all -- by them, all between 39 and 42 or 45, and some are a little bit lower.  But be that as it may, there's no data to support that.  There's nothing -- there's no source data.  There's no report from any person.  This wasn't put together by the IRS or an FBI agent.  This is somebody calling up people, getting some answers, but we don't know

where that came from. It's not reliable. It's not even identified. She didn't even identify the people by name here. He didn't even talk to them. He doesn't know what they would say.

THE COURT: Does it matter? Sounds like Ms. Kerin provided you with the information today of the three appraisers who prepared the information.

MR. McDONALD: She gave me the names of three people about 8:30 this morning. I gave her the appraisal on October 8th. The government has had these properties since July of 2014, and I get the names of people that I -- you know, I -- and I only got the real estate thing a day or two ago, so it's -- there -- the lot -- the evidence that we provided is by a preponderance of 50,000, because we have a named person, named information, a real estate person. We have given you all that information. They have -- they talk to somebody, and this is the spreadsheet they received. I can't cross-examine a spreadsheet, especially since when he doesn't even know who created it or who talked about it.

THE COURT: Okay. Anything further on the losses?

MS. KERIN: No, Your Honor. Thank you.

MR. McDONALD: I think the biggest issues you just covered.

THE COURT: Ms. Kerin, let me ask you. I'm just trying to see where the difference is. With respect to the --

again, the valuation of the Trotter Down lots, where there's a security interest, what is your total value on those?  Is that 595,736?

MS. KERIN:  Correct, Your Honor.

THE COURT:  Is that before taxes?

MS. KERIN:  That's with the taxes.  The taxes that are due on each specific lot deducted from the fair market value.  And no costs are deducted.

THE COURT:  Before I decide on the loss, I do want to just hear argument on the two additional issues.  The sophisticated means.  So your issue is really just the double counting.  Are you -- do you want to argue there is no sophisticated means, Mr. McDonald?

MR. McDONALD:  I do, but it's short.

THE COURT:  Okay.  Why don't I have -- or, Ms. Kerin, why don't you argue why there -- it's in your briefing.  Do you want to argue anything else about that?

MS. KERIN:  We have nothing else to argue.  We think that the testimony of Special Agent McGeachy supported sophisticated means as that enhancement has been interpreted in the Ninth Circuit, and we provided you several examples of how the Ninth Circuit has done that.  So we have nothing further.

THE COURT:  All right.  Go ahead, Mr. McDonald.

MR. McDONALD:  The only thing I wanted to say is this was more random and reckless than anything else.  There was --

you know, when people -- when he's testified, he said when it went in here and went out there and in here and out there. There really is no rhyme or reason. I asked him, "Well, where could this money have gone?"

"I don't know."

"Where did this money go?"

"I don't know."

The reason is because there was just a complete lack of ability to track anything, and things went in and went out and went in and went out. It wasn't like he planned to go here and there. I mean, if he planned it, he would have done something different than having payments directly to the Hard Rock Cafe out of the Cloverdale Trust. I mean, this -- everything that Scott McGeachy testified to shows a person who is not acting in a sophisticated manner, not trying to hide it.

Now, just because you lie to someone doesn't make it sophisticated. Every person who commits fraud lies, otherwise you wouldn't have fraud. Every person who commits fraud has to take some action that hides the money or deceives the person to whom they're doing it. That's why our statute of limitations are so long. This is not sophisticated.

What it is is clearly an abuse of trust. But to count both the sophisticated means and wrap that into the abuse of trust, it just doesn't make sense in this case.

THE COURT: Okay. And then you also wanted to

argue -- is that the -- there was one other two-level increase that you were arguing about.

MR. McDONALD: Yes. I think this one goes more towards -- it's sort of a hybrid between a cooperation and a 3553(a), and I'm not sure that I need to make it any more clear than what's in our briefing.

THE COURT: Okay.

MR. McDONALD: You're familiar with how these things work intimately. You know what happens when a seasoned district attorney is facing a very serious case and needs someone to help to -- to trigger a plea which will then trigger a longer sentence for more and -- and more people.

In this particular case, on the eve of trial, Mr. Wheeler was called by the prosecutor's office to assist them. He went and testified before the grand jury. New charges were brought. He had to be identified on the grand jury indictment, as you know. New charges were brought. That stopped the trial of the person who they had been investigating for a long period of time. He then took a plea, and then he testified against the co-defendant, who ended up also with being convicted and a lengthy sentence.

That cooperation, in terms of going in and testifying before a grand jury and being identified, is worthy of additional levels down, whether that's as part of a cooperation or part of an 853 -- or 3553(a), and two levels for a

testifying witness is not unusual.

THE COURT: Okay. Thank you.

Anything you wanted to argue on that point, Ms. Kerin?

MS. KERIN: Only that asking -- I agree that the defendant can argue this under 3553(a). I disagree that there's any basis under 5K1.1 to depart because it's within the government's discretion. It has to be made by motion of the government. And the government, in its sole discretion, evaluates the levels that are appropriate for it. And the Court can concur or not. And so in this case I don't think 5K is the appropriate vehicle.

And we have outlined in a letter to you why we think that there should be no further consideration under 3553(a) for the cooperation of Mr. Wheeler in a state case that is unrelated to any of the conduct at issue in this case.

THE COURT: All right. So having reviewed now the pleadings, as well as the exhibits you have submitted as part of this hearing, and also viewing the exhibits you submitted as part of your sentencing memoranda -- both the sealed and unsealed -- as evidence submitted in this case, and having heard the testimony of witnesses, I am prepared to make some rulings on the guidelines calculations and adjustments, and then we'll get to any victim statements that the government wishes to present.

So, first, with regard to the loss, the basic -- I am --

first, I do believe the appropriate standard of proof for the loss that we're talking about in this case, or that's in dispute, is preponderance of the evidence, and so I do intend to use that standard. And I do -- I am persuaded that the government's loss with regard to the Trotter Downs valuation is -- does meet that standard and is not undermined by the quality of the information presented by the defense. I do find they are of -- actually, I -- what makes the government's even more reliable, in my estimation, is that it differentiates specifically by lot and that there was actually a tax agent who was looking at the taxable value of each of those.

As Special Agent McGeachy testified, they are varied and the column for the property taxes due has some bearing on the variation of the value. And with three -- I have to accept as true -- it's undisputed -- that there were actually three realtors from the area who agreed on these values. So although it certainly would be better to have them here in court, I don't have a realtor from the other side disputing it. So I just have to rely on the documents as presented and the information provided and understanding that there was some discovery, albeit it just this morning, provided as to the identity of those realtors. But just looking at the values and having it essentially then followed up with the property tax values from an agent responsible for looking up that kind of information, I find that that is a more reliable document in

Government's Exhibit 1.

So I am going to go with the -- I am going to consider, as I think both parties agree, the value of the properties that were secured -- the only ones that were secured, which are indicated on Government's Exhibit 1, which the total value, as I understand it, is $595 and -- excuse me, $595,736. So that is the value I'm going to accept.

I am not going to consider the SureSeal conveyances, in light of my prior ruling, because they were following the February 5, 2014, date, at which the defendant knew, or reasonably should have known, that his illegal activities were being investigated. I'm not considering those values as part of the loss.

So with regard to all -- those were the issues that were in dispute. So the value, then, is, as between 3,500,00 and 9,500,000, which is an 18-level enhancement under the sentencing guidelines. I'm also going to add the two-level increase for substantial hardship to one or more victims as well as a two-level increase for the sophisticated means.

I disagree with Mr. McDonald that those are necessarily the same and it's double counting with abuse of position of trust. Everyone concedes and agrees that there is an abuse of position of trust. The defendant was in a position, as a CPA, and getting access to money in that capacity, and he was entrusted by folks with their retirement earnings, life

savings, the future of the children. So that was certainly an abuse of position of trust but also was carried out through sophisticated means. It may have had some random nature to it, but with opening literally more than two dozen bank accounts and moving money in essentially a shell game between those bank accounts and into different businesses, that constitutes, in this Court's view, sophisticated means.

So the total from that accounting, I believe, is 31 as an offense level, plus an additional one for the multiple offense adjustment, and then acceptance of responsibility and -- is there any dispute on the acceptance of responsibility?

MS. KERIN: No, Your Honor.

THE COURT: He would get three levels from acceptance of responsibility. And then the government has conceded another four levels down from that. So that's where -- we're now at a base offense level of 25. Is that consistent with what --

MS. KERIN: Yes, Your Honor.

THE COURT: And with a Criminal History Category of I, which is the 57- to 71-month guideline -- advisory guideline range.

So why don't I -- I have not yet considered -- is that -- is Probation catching anything that's inconsistent with your view?

THE PROBATION OFFICER: Your Honor, the probation

office's calculations did not include a one-level offense for multiple counts because the difference between the highest count was over -- I think it's over nine. The one unit doesn't provide any increase. So that's how our calculations are. I don't know if the government or defense agree.

MS. KERIN: We agreed with Probation's recommendation on the guidelines at 24.

MR. McDONALD: 24.

MS. KERIN: And their analysis, under the multiple offense adjustment, that it was zero. So it's 24.

THE COURT: All right. I think I saw somewhere that there was multiple offense adjustment of one, but --

THE PROBATION OFFICER: Correct. But it doesn't score an additional point.

THE COURT: Okay.

THE PROBATION OFFICER: Unless it's 1.5 or higher.

THE COURT: All right. So we're -- 24, then, would be the -- is that consistent with --

MR. McDONALD: Yes.

THE COURT: Assuming those are my findings of the levels, then a 24 is the appropriate base offense level?

MS. KERIN: That's correct, Your Honor.

THE COURT: Okay. 51 to 63 months before we get to any 3553(a) factors.

MS. KERIN: Yes.

THE COURT: So let's now hear from any victims who wish to say anything and then any further argument the government wants to make, and then I'll hear from you, Mr. McDonald.

Did you want to raise something?

MR. McDONALD: Yeah. I just want to go through the numbers really quick.

THE COURT: Sure.

MR. McDONALD: So, just for the record, at -- if you used our number of 50,000 per lot, the value of the 17 lots, minus the taxes, actually per-lot taxes, as are found on the Thurston County website, would be 758,736. That's the number we would ask the Court to use. We know that you're not going to, but that's the number that we have.

In addition, the number for the McDonalds, without the SureSeal, is 324,540. We believe that you should also use the SureSeal payment, which is the $119,000 that was testified to.

There is an additional $19,080 that we want the Court to impose as a credit for the Buss repayments, and that would be a total of -- $19,080 is the one for the Busses, and we also presented the Court with the Coverdale payments of 32,867.09. That goes against -- those are prepayments that went against their number. They added in 45,000. We would like for you to subtract the 32.

THE COURT: Thank you.

MR. McDONALD: Thank you.

THE COURT: Ms. Kerin?

MS. KERIN: I was just going to call up the victims to allocute to the Court.

THE COURT: That's fine. Do you want them to stand right by you?

MS. KERIN: Yes.

MR. McDONALD: I'm sorry. Your Honor, are you going to rule on the -- on the other issue as part of 3553(a), then?

THE COURT: Not yet. I figure I'll hear from all the victims first and then I'll allow you --

MR. McDONALD: I meant the one -- the issue that we talked about with the grand jury. You want to roll that into the final --

THE COURT: I think that's part of the 3553(a) factor.

MR. McDONALD: That's fine.

THE COURT: Because I do agree with the government. They get to make the motion. Their 5K1.1 motion was made. I'm accepting that, but I think your issue could fall under the 3553(a).

MS. KERIN: Your Honor, this is Jonathan and Jennifer Buss. Can you -- you guys can -- you can sit down or --

THE COURT: Sir, if you just state your name for the record, and then I'm happy to hear from you anything you would

like to say about the impact of this offense on your life.

MR. BUSS: My name is Jonathan Buss.

THE COURT: Could you spell it?

MR. BUSS: J-o-n-a-t-h-a-n. B-u-s-s.

I'm reading this to add insight on the fraudulent actions Nathan Wheeler carried out while serving as our trusted certified public accountant. Nathan Wheeler used his ability to obtain trust and subsequently embezzled both mine and my wife's life savings for his personal gain. I started working at the age of 12, picking strawberries at one dollar a crate, and at that time started saving a portion of all the wages I earned to go into a fund for retirement.

From that first job and every subsequent occupation, I was dedicated to saving for the future to enjoy a retirement with adequate funds to pursue interests and traveling abroad.

When acting as our CPA, Nathan Wheeler learned of the significant amounts of money in our 401(k) retirement funds and investments. He advised us to take those funds out of the existing accounts and to create self-directed 401(k) holding companies so he could invest them at higher interest rates. He assured me and my wife the funds would be secured by properties and we would be able to retire much sooner with significantly more assets.

After Nathan gained our trust by pretending to be understanding, we allowed him to direct the majority of our

over 1 million -- $1,028,460 into his fraudulent investments. He instructed us to wire the funds to his TWG Advisors investment account, which he then held at Washington Trust Bank, where he had some contacts to lend credibility to his deceit.

These investments ended up being a ploy to gain access to the money for his personal use and the illegal activities. If we had known what type of activities Nathan was involved in, we never would have loaned a dollar to him.

Nathan forged signatures, forged documents, and fraudulently obtained our life savings.

Because Nathan liked to boast, over time, he told us he owned $2.5 million worth of properties. He said he purchased multiple houses for his brother and sister, as well as investing in rental properties with friends. These purchases, as well as his extravagant playboy lifestyle and illegal -- at the time -- marijuana-growing operations were financed by his fraudulent activities.

We did not find any of this out until Nathan was identified for his illegal activities, then told Jennifer and myself all of our funds had been seized by the feds. Since that time, he has never taken any responsibility for his actions nor made any effort whatsoever to repay us.

Jennifer and myself were left with nearly nothing in our savings and retirement accounts. Our 40 years of disciplined

saving for the future and over a million dollars of retirement money are gone. We will most never likely be able to retire, having to work the rest of our lives. The dream of traveling in retirement has been dashed.

In addition, the laboring and spending of even more funds for legal counsel, in an attempt to recover what was stolen from us, has been traumatic and has hindered financial recovery. Not only the money -- monetary aspect, but Nathan Wheeler's fraudulent actions have caused much undue anguish, stress, depression, and a sense of hopelessness over the last five years, doubting and wondering if we will ever recover, and thinking of the monumental task of trying to begin to save all over again. All this, along with the magnitude of loss, always weighing down on us when thinking about finances.

When this is over -- and we will most likely only recover a fraction of what was stolen from us -- we will try to move on.

As I lay in bed sleepless again, writing this letter -- after writing this letter, I realize the many sleepless nights worrying about Jennifer and my future and our plans. We owned a piece of property on a lake and had our dream house designed and ready for building when Nathan Wheeler fraudulently started his actions and they unfolded.

I made the decision to hold off building and then sold the property to finance our legal and living expenses. This was a

direct result of the mental anguish I was experiencing, hindering my abilities to run our business. I have had many, many debilitating stress headaches resulting from the mental anguish and revisiting and replaying the events. These also have been ongoing and much more frequent as any thoughts of finances or lost plans come to mind.

Seeing and hearing firsthand of Nathan's exhibited behaviors and boasting on social media and to acquaintances that he will most likely get a short sentence at a country club institution only adds to the anguish and feeling of injustice.

All this is taking place while he has been living a carefree life for the last five years. Certainly, this should be considered when making the final sentencing and judgments for restitution.

Nathan Wheeler's unrepentant and unremorseful attitude has recently been displayed in his disputing the amounts of money that he stole by as small as $10,000. Keep in mind that Nathan stole well over a million dollars and did not pay back any of the principal of the loans -- the 19,000 was -- actually, I'm going to add in here -- was interest only -- or any of the legal fees for the default that his signed contracts promised us.

Your Honor, with Nathan Wheeler's exhibited unrepentant behavior and his boasting of a short sentence, all the while continuing his carefree life, unhindered by his fraudulent

actions, and no efforts for repaying his debt, I request, on behalf of all injured parties, that he receive the maximum penalty for his crimes. Please consider the combined 80 years of savings my wife and I have lost as well as the 10 years of combined stress and mental anguish we have had to endure awaiting this outcome and living with the financial loss and mental suffering the rest of our lives.

Nathan, if you are truly remorseful for the fraud you committed against Jennifer and I, you would have taken many opportunities you had to make efforts to repay what you have stolen. However, your continued lifestyle and boasting show you have no remorse for cheating Jennifer and I out of 40 years each of work and savings. Because of this fact, I'm extolling the judge to meet the maximum sentence for your guilt. You mentioned your father was a man of faith and had passed away young. I don't know whether or not to believe that because we have since found out you told us so many lies.

However, I do know if you ever want to meet him in heaven, you must repent, turn from your wrongdoing, and pay restitution, or you will burn in hell. I can only hope serving a long sentence will give you time to acknowledge, regret, repent, and determine to pay restitution to those of us affected by your actions.

I hope and pray to some day accept a sincere apology demonstrated by the repayment for your debts.

THE COURT: Thank you, Mr. Buss.

Did you want to say something as well?

MS. BUSS: I do.

THE COURT: If you could state and spell your full name for the record.

MS. BUSS: Sure. My name is Jennifer Buss. J-e-n-n-i-f-e-r. B-u-s-s.

To you, the judge, I know you have read this letter, but I'm going to reread it to the Court because I'm not sure that Nathan has read it or even his family knows about it.

I am writing this letter to explain the devastating impact on my life as a victim of the actions of Nathan Wheeler. I first met Nathan Wheeler during the year of 2011 and '12, when our longtime CPA, Dale Austin, had proposed a merger with Bridge City Advisors and recommended Nathan Wheeler to us as our new CPA.

Mr. Wheeler has a very personable demeanor and used that to gain mine -- my trust and later used that trust to embezzle my life savings for his personal gain. I started working just shortly after I turned 16 years old and was taught early on to save. My mother took me right to the bank to open a savings account. I was, therefore, pretty religious in putting away a significant amount of my wages into a savings account.

After finishing my schooling, I went to work at U.S. Bank, and for the next 20 years was again disciplined about saving

for the future in a 401(k) plan where the company also matched my funds. I quickly started seeing the benefit of that as my investments increased. I had a significant amount saved up my U.S. Bank 401(k) account and my current company's 401(k) when Mr. Wheeler suggested a better and more advantageous way of investing.

Mr. Wheeler made his extravagant but very convincing investment proposal and suggested I take the funds from the U.S. Bank accounts, as well as my current 401(k), and he would invest them in a way to make much more interest, allowing me and my husband to retire at an earlier age with a significant amount more to live on.

Of course that was appealing to me, and why wouldn't I trust a licensed and reputable CPA business in the state of Oregon who came recommended by a former CPA?

The investment deals Mr. Wheeler proposed over the next ten months were all in real estate properties. We investigated them, we signed off on them, and wired money for what were to be invested into the development of real properties backed by trust deeds. In all regards, Mr. -- in all regards, Mr. Wheeler and his then-associates had set up what appeared to be good company bank accounts, through Washington Trust Bank, where our funds were wired to -- where -- where our funds were wired to for the investments we were making.

My husband and I trusted Mr. Wheeler, and we allowed him

to direct our entire savings over a period of time of $1,030,000 and some change into his proposed investments.

The investments ended up being a farce. He forged signatures and documents, committed wire fraud; had come to find out he was illegally laundering money, which we found out when we were contacted by government authorities. In reality, Mr. Wheeler was living a very extravagant playboy lifestyle, in all aspects of that word, on ours and other victims' money.

As an investor, he used our funds without our knowledge or consent, in part, to build and expand a marijuana enterprise. In carrying out his fraud, he prepared false account statements to us and to his other clients from discovering the unauthorized use of our funds. He used our funds to build pole barns on his property for marijuana growing and preparing to be in the position when Oregon's legalized marijuana use law passed.

Additionally, and important to note here, prior to any talk or redirection of our 401(k) money and investments, he started dropping snippets of taking care of his different family members -- which, by the way, is commendable -- and his hardships when he was growing up. He indicated he was personally employing them and purchasing various properties for family -- for families' housing and making sure they had a vacation now and then since they had no means to do so and he did. He would also drop hints of trying to take care of his

children himself and his children's mother, who he was separated from at the time, and indicated she was a drug addict. True or not, I don't know. All of this to gain our trust and compassion for him prior to making proposed investments through him. He was convincing and seemed smart and hard working as an individual, and we admired that.

When he came under investigation, he said all our funds were tied up by the government and we had been left with nothing. He indicated that the feds had seized all the assets. In reality, he had probably spent most of it on his own lifestyle, family, and illegal practices.

He also told us -- he also told us not to worry; that he would get the money back through the sale of another business he owned, unknown to us at the time, Club Rouge and the sale of his other properties. In fact, he said he would be -- we would be paid back if that meant he had to live on the streets. We were foolish enough to believe that too.

Almost 40 years' worth of dedicated savings, hard work, and over a million dollars of retirement, all gone. We will most likely never be able to retire, having to work the rest of our lives. This life-changing experience has created undue stress, anxiety, severe depression in our home, and the feeling of helplessness, which was never a part of my husband's personality or mine prior to this event.

My marriage and home have been disrupted by arguing and

fighting about whose fault this was and how we could have been so foolish and stupid and caught off guard to let this happen.

Because of the severe depression, my husband had made some poor choices, which we are still dealing with today and would have never had to deal with before this, including having to move two different times within a one-year period; a complete disruption to our lives. We are still working through the trauma and are determined to get back to some level of normalcy. This disruption to our lives still erupts every so often, as currently as this past week, when we knew this hearing was coming. We ended up in another unnecessary argument and separation as we were asked to write these victim impact statements and relive the accounts of Mr. Wheeler and the dealings.

In addition, my mother, who was -- who was elderly at the time, became very ill prior to meeting Mr. Wheeler but took a turn for the worse right in the middle of this entire ordeal and needed me for more care than before. She was well cared for, but certainly not to my standards, and didn't receive the attention I should have been able to provide because of the stress and anxiety, my husband's depression at the time, and the depletion of our funds.

My mother passed away in 2017. She's in a much better place. That's for sure. But I still cannot shake the feelings of remorse I feel, along with the "what ifs" during her care,

and if I could have been more attentive than I was able to be due to these circumstances.

Considering the documented social media posts by Nathan -- which, by the way, you can no longer pull up because the accounts have been deleted -- he is showing no remorse and has a flippant attitude. His pettiness of the recent dispute of what he says he has already paid back to us proves his dismissive and unremorseful attitude. His bragging on social media is really more than I could take. In fact, it repulses me.

I feel for his children that they are being raised by this kind of father, and they probably don't know any differently. I wonder if his current wife even knows of his evil activities and deception. Mr. Wheeler deserves to pay for his misdeeds and for the undue devastation and disruption he put me and my family through.

I hereby request you give Nathan Wheeler the maximum allowable sentence in prison for the crimes he has committed. For us, his victims, an outstanding judgment for the principal amount stolen from us, our legal fees, and outstanding interest payments he fraudulently stole from along with -- with a healthy measure of pain and suffering.

Mr. Wheeler still appears to be living very well and making a living from some source. Whether legal or not, I don't know. Since he was a CPA and a shrewed operator, he has

managed to shield his assets from the authorities and, therefore, he should be made -- be made to make the restitution back.

Thank you.

THE COURT: Thank you very much.

MS. KERIN: Your Honor, the government would like to have Mr. Daniel Kass come up.

MR. KASS: Hello. My name is Daniel Kass. D-a-n-i-e-l. K-a-s-s.

I was born in New Jersey and grew up between there and Florida in my grade school years. It was in these early years that I found skateboarding and snowboarding and dedicated my whole life perfecting these sports. I even saved all of my money I earned to split tuition with my parents to attend a Ski and Snowboard Academy in Vermont.

After high school, I competed professional snowboard events and earned a spot on the 2002 and 2006 U.S. Olympic teams. I helped America win its first medal sweep in 56 years in the Men's Halfpipe in 2002 and again won a silver medal in 2006. I started a successful sports apparel business in 2001 that focused on making technical winter gloves and outerwear. We had our headquarters in Portland, Oregon, which employed almost a hundred people over the seven years it was in the Portland area.

I was working for the American dream, but that dream

became a nightmare when I met Nathan Wheeler. He gained my trust through the taxes and said I needed to invest my money and that he would do it for me. Eventually, I had to hire a lawyer to try to get my money back and learned that the money was all gone.

He stole over $800,000 that I had saved over my 17-year career, of which I got back only $200,000. I've reached a settlement where he promised he was going to repay on a schedule he agreed, and he failed to make the payments he promised to make, not even the first monthly payment of $3,000.

The pain and depression it caused me after learning afterwards that he used my money for partying, drug operations, and to operate his strip club. My lawyer and I even joked about going to the strip club at The Rouge to find him to see if he would make any of those payments, where I did see him on occasion, but the sickness it caused made me leave.

Due to financial loss and mental and emotional disruptions, this derailed my snowboarding career and forced me to end up closing the business here in Portland because I couldn't have -- I had no funds to fall back on operating that company in 2015. I then had to sell my home in California -- the only home -- to move back in with my mother at the age of 37. It made me lose faith in our great nation which believes in protecting laws and punishing people that break them.

I find myself at 37 in school again, living with my mom,

as I did as a kid, all because of Nathan Wheeler. I hope to see justice for the crimes he has committed against other hardworking Americans, the government, and myself.

I may never get those golden years back or be able to earn the income I did earn, but today it feels good to see a man who's gone freely and spent all of other people's money at his own will and discretion, and I hope you give him justice and a maximum sentence for those crimes.

THE COURT: Thank you, Mr. Kass. Thank you very much.

MS. KERIN: The government calls Shawn-Anne Coverdale, Your Honor.

MS. COVERDALE: Hello. My name is Shawn-Anne Coverdale. S-h-a-w-n, hyphen, A-n-n-e. C-o-v-e-r-d-a-l-e.

I may be the only victim here that would say that I wish I had had more interactions with Nathan Wheeler, as ridiculous as that may sound, I should explain how I know Mr. Wheeler.

I'm the mother of Devin Coverdale. My 14-year-old son, Devin, lost his father, DK, on April 21, 2001. While his father was quite literally on his death bed, Mr. Wheeler visited him just hours before his passing to create a trust for the sole benefit of Devin and his half brother Hogan. Mr. Wheeler was named as executor of the will and trustee.

I was never given final value of the estate but would conservatively guess that the value was around a million

dollars. While it was very sad that two boys lost their father, it was nice to know that his last wishes were that his sons would be financially taken care of. He was assured by Mr. Wheeler that they would be.

Now this brings me back to why I wish I had had more interactions with Mr. Wheeler.

Should he have been an honest, honorable, noncriminal of a person, I would have recently contacted Mr. Wheeler when Devin needed braces. Unfortunately, the money that should have been paid for Devin's braces was spent by Nathan Wheeler on hotel rooms and strip clubs and his own fun.

I wish I could have contacted Mr. Wheeler when Devin went to summer camp. His father's wishes were that his sons would have any educational opportunity possible. It turns out that within a year of time Nathan had stolen every last cent of the boys' trust fund to use as his own personal play money.

About a year after Mr. Wheeler had stolen all of the funds from the trust, my son Devin was walking and struck by a motorcycle and suffered a broken femur. After getting all of the bills from the children's hospital, ambulance, and physical therapy, I would have loved to contact Mr. Wheeler for help with the thousands of dollars that was owed. This was what the money in the trust was there for.

Sadly, there was no money in the trust to help pay for Devin's medical bills. That money had been spent taking

extravagant trips and impressing his friends. You know, I think I could show compassion and understand if Nathan had stolen to feed his children or paid for medical treatment for someone he loved. That wouldn't have make it legal, but I could understand if that were the case. The sad fact, though, is that he couldn't be -- that couldn't be farther from what he actually stole the money for.

He stole from children to act like a bigshot and have fun and party with friends. He stole from children so that he could go out and stay in fancy hotels. He stole from children so that he could live it up and have carefree fun.

Yes, stealing is absolutely wrong; but, in my opinion, what Nathan Wheeler has done is far, far worse. He stole from two innocent children everything that their father worked hard to earn and left for them so that he could have a good time.

That isn't just wrong. It's despicable.

THE COURT: Thank you very much.

MS. KERIN: I'm just going to check with the other victims to see if anybody has changed their mind.

Hogan Coverdale.

MR. COVERDALE: Hi. My name is Hogan Coverdale. H-o-g-a-n. C-o-v-e-r-d-a-l-e.

THE COURT: And, I do have your letter, Mr. Coverdale as well.

MR. COVERDALE: Right. I'm going to do the same and

read it.

To whom it may concern: To describe the effects Nathan Wheeler has had on my well-being, emotional state, and health, I first have to describe myself. As I sit to write this, I am on an hour break from school. I'm attending the Washington State University of Vancouver, where my area of study is digital technology and culture. I'm currently a 3.8 GPA student in this program, taking 12 credits this term, and I'm hoping to one day work on video games/table top role-playing games as a career.

I live in northeast Portland, just under four miles from my place of work at AT&T. During the days I don't go to school, I work a full 40 hours a week as an area sales lead for Connect Wireless leads. I'm currently on track to finish this year -- my first year in the industry -- top ten for all around performance in my entire company of 300-plus stores. I have a beautiful partner named Brooklyn and a wonderful dog name Chief, and, quite frankly, a comfortable living.

However, I did not reach this point easily. Through nothing other than hard work and the support of those who love me, have I been able to achieve this lifestyle. At an early age, my father, Nathan's former client, hammered into me the importance of taking pride in one's own chosen field of endeavor. I have not been hired on a job where I was not promoted within the first six months, all while earning a

two-year degree, and I'm moving on to pursue my four-year degree. Nothing is to be given; it is to be earned.

At every instance in my working adult life, I have excelled due to working harder than my peers. For years, my father was my rock and the man who I looked up to; yet in 2011 he died. My entire life took a turning point and will forever be affected by that loss.

Nathan knew me prior to this, but this is when Nathan stepped into my life. At the time I regarded Nathan as a man I could trust, as he was appointed -- more on that in a second -- by my father to execute his will.

My father was a hard-working man and had earned himself more than a comfortable living, that he hoped to one day -- that he could pass on to my brother and I. Nathan was to see it through that we received that. Nathan met with myself and my brother in his office, telling us how he was handling my father's will. We were to sell my father's assets. Those assets would go into a bank account that would accrue interest until the first payout, which I would receive once I turned 25.

The money could be used for various things previous to then, but he would have to approve these matters first before payment would be made. All this seemed fine and dandy, but, in fact, was a house of lies. Thus the beginning of the wrongdoing began.

Unbeknownst to me, just days prior to my father's death,

Nathan went and visited my grandmother and my father, with his Bridge City Advisors team of lawyers, with intentions of strong-arming my grandmother into reversing -- revising the will and naming Nathan has the executor. He succeeded.

Once my father's assets were cashed, Nathan moved them into an account, and the investigation shows what he did with it. He bailed his brother out of a bad property deal and proceeded to party with the rest of the money in Las Vegas.

Of course I was oblivious at this time. I was grieving. I was a kid who lost his father in arguably the most crucial and needed time in a kid's life. No child at the age of 15 should experience loss like that. The only semblance of closure I was receiving was the meetings that still incurred with Nathan, telling me my future is secured and that the money my father accrued over the years was mine to do with as I pleased.

It could have been a college or a home or the start of a business; yet, instead, this man took my -- took that future my father spent so long building and blew it on his brother's failings and partied the rest away.

All I thought to myself was even though my dad is gone, his memory will forever live on with my success in life, as I would owe it all to him. To say I was shocked when I found out the full news of Nathan's wrongdoing just prior to my 18th birthday would be an understatement. It felt like I had lost

my father all over again. Not only having to deal with that loss, I was catapulted into a series of unknowns. My options shrank immensely. I was hoping to attend the University of Washington in Seattle; yet now I had to choose between putting myself into a lifelong debt to attend or picking a two-year college in my local area.

My career path choices now had to be weighed more heavily in favor of money-making instead of enjoyment, and that's the journey to where I am today began. I enrolled in community college, became employed, and put my father's teachings to use, but I still fall short in certain things. I don't have health insurance, as I can't afford it. I have had to go into debt in order to get through rough times. My grandmother so graciously helped me pay my way through college at times, even going into major debt of her own.

To circle back, the hard work I have endured to be comfortable in my position now is something I'm proud of; however, if these crimes never took place, the possibilities are endless as to where I would be right now. That hard work I placed into just surviving certain months could have been rerouted into a more constructive outcome.

I could be thriving in a career field at this point, having already graduated from a more prestigious university. I could be a homeowner, building equity that would last me a lifetime; or, better yet, I could be living in the house I grew

up in, which Nathan sold so quickly because he knew the money gain would just go straight into his pocket.

What this man, Nathan Wheeler, did is unforgivable. He crushed my dreams, stole my future, proceeded to lie to my face about this, and then made me relive losing someone so dear to me. He made me feel insignificant. As tall as I stand today, he made me feel no taller than three inches. He made me question my faith in humanity. If someone my father trusted could do this to me, someone who has known me since I was a little kid, what could someone I don't even know do to me?

He continues to do this to this day, showing off on Instagram the fun times he has with his family, knowing damn well what he has done to my family. The dollar amount he took is unimportant. What is important is he knowingly sought out the fortune of a dying man, enacted the plan to steal it, and, in the process, destroyed the precious -- most precious thing any child in this county has: Their future.

And I'm also requesting that he get the max sentencing for this.

THE COURT: Thank you very much.

MR. COVERDALE: Thank you.

MS. KERIN: Misty Dewitt.

MS. DEWITT: My name is Misty Dewitt. That is M-i-s-t-y. D-e-w-i-t-t.

Have you read my letter?

THE COURT: I have read your letter. Thank you.

MS. DEWITT: I don't feel like I need to restate that. What I would like to implore and share with the Court is that as I listened to all of the proceedings today in the sophistication and the numbers that are being thrown around, had Mr. Wheeler just left everything alone of those boys', 800,000, 914,000 -- I don't know what the real numbers are, as we never did get a breakdown of that, as Shawn-Anne said -- that money would have been sitting there earning interest. At what point does that come into play? I don't know. You can't prove it. The market crashed or didn't crash, but you can't prove it. And then you've heard it from everybody involved that he doesn't seem to be remorseful. I'm just asking that justice is served. I don't envy you. I don't want to be in your position. But consider what he has done and the fact that this was very sophisticated and premeditated and do what you need to do in the right way.

THE COURT: Thank you very much.

MS. DEWITT: Thank you.

MS. KERIN: All the victims who would like to address the Court have now done so.

THE COURT: Thank you, ladies and gentlemen, for being here through this process. I know it's not easy, having gone through all the years of this and the prosecution, and I appreciate your willingness to come in here and write me

letters in advance. I did read everyone's letters, and I appreciate you presenting those letters in your own words here in court, so that's a very important part of this procedure. And, certainly, without the cooperation of victims, we wouldn't be able to get to where we are today, at least to fully litigate these issues. So I appreciate all of you being here.

And, now, anything further from the government that you would like to argue before I hear the defense argument? Do you want to argue the 3553(a) factors that I'm going to hear from Mr. McDonald?

MS. KERIN: Your Honor, I'm going to be very brief on this.

THE COURT: Okay.

MS. KERIN: This Court is more than familiar with the facts in this case and the substantial fraud that Nathan Wheeler committed and his failure to pay taxes and his manufacturing and distributing illegal substances.

THE COURT: Actually, before you start, there were a couple of things I was interested in that I don't know much about. There were various victims alluded to some -- I couldn't tell if it was continuing or what the Facebook or Instagram or present media presence has either continued to be or was after these events. Could you tell me anything about that?

MS. KERIN: From what I understand from the victims,

we -- we have tried to access the social media accounts, and they are private, but my understanding is that they weren't at one point, and the victims' reports are what they saw. We did not verify it. We haven't -- we have seen Facebook posts where Mr. Wheeler has gone to the Dominican Republic in the last couple of years or had other travel, but we haven't seen the bragging about getting a country club facility and a short sentencing.

THE COURT: And the -- the travel to the Dominican Republic, for example, that you saw some indication about, was that prior to being charged or after being charged?

MS. KERIN: Yes. Post pleading guilty, I believe.

THE COURT: And I did also notice in the two searches -- this is now some time ago -- there were weapons in both the Damascus residence and in the Happy Valley residence. Is there anything you can -- I know that there was drug paraphernalia as well as packaging materials, scales, guns, ammunition at the Happy Valley residence and then more at the Damascus residence. Were there any charges ever brought on the drug trafficking?

MS. KERIN: There were no charges brought on the drug trafficking.

THE COURT: Okay.

MS. KERIN: Just -- and the weapons are still being held as evidence.

THE COURT: Okay.

MS. KERIN: Obviously, they won't be returned to Mr. Wheeler who's a felon now.

THE COURT: Okay. Are they part of a forfeiture or --

MS. KERIN: They are not, no.

THE COURT: Thank you. Go ahead. I interrupted your argument.

MS. KERIN: Again, I definitely want to be brief. It's been a long day, and you have heard a lot of evidence. We submitted a lot of information.

You're well aware of the scope of Mr. Wheeler's criminal conduct and now the impact that it has had on his victims. The manner in which he has spent the money that these victims, of a lifetime in some instances, were saving, how he spent it, how he spent money that was literally the dying wish of the father, inconsistent with those wishes.

And what I do want to address, we have outlined for you, I believe, compelling reasons to support our request of 51months under 3553(a). I do want to address the defendant's request for probation.

This defendant, despite of all his conduct and the voices of his victims, he asks you to ignore that and sentence him to probation. This Court can't do it. It must impose the sentence requested.

THE COURT: Let me ask you. You provided a chart of comps for other cases over quite a long period of years. It seemed to me that some of the comparables actually had 87 months, or in the 80s, as opposed to the 51 months, and is there -- so is it fair to say this is -- actually, a 51-month sentence is really toward the mid to lower range for that value -- the loss value?

MS. KERIN: Yes. In some instances, and I -- there are two very recent cases that are in the chart where 80-some-odd months were imposed. And in those cases, those were trials, and they weren't individuals who, like Mr. Wheeler, pled guilty, accepted responsibility, and other factors that we have identified for you.

But we do think that 51 months is, you know, well in line with what other people in this district have been sentenced to, and Mr. Wheeler seeks probation based on his conduct post pleading guilty and talks a lot about the impact of his family and what him going to prison for the requested amount will do. And there are lots of letters about Mr. Wheeler's contributions, and the government doesn't dispute that Mr. Wheeler is more than these bad deeds that are before you and that he has the great support and love of family and friends.

We agree, and you even heard it from the victims, that he's smart and charismatic and has been successful, but those

are not factors to depart and give Mr. Wheeler probation.

Unlike a lot of people who come before this court, Mr. Wheeler had everything. He had all of the gifts and all the accouterments of privilege in this society, and he still committed these atrocious acts. He still betrayed the trust of the victims in this case. That doesn't make Mr. Wheeler better in that he should -- that there should be a significant departure. In the government's mind, that makes it all the more egregious.

The idea that is submitted in these papers that -- the adverse impact to his family and to his children should be considered as a basis for departing, that it's somehow the fault of the government or the voices of the victims, or even this Court's decision, that is false. The impact of his -- to his family is solely the fault of Nathan Wheeler. The burden of that impact is his, and it's not dissimilar from any other criminal that comes before this case and asks for leniency.

The government, the victims, and this Court are not to bear the burden of the impact.

As I indicated, I think that we've laid out a very compelling case why the low-end guideline range of 51 months is appropriate under 3553(a). Nathan Wheeler asks for absolution and redemption from this Court in the form of probation, but those come at a cost. They come with atonement, and they come with punishment. And, quite frankly, there is limited

atonement to these victims, and this Court must impose the punishment of 51 months.  Thank you.

THE COURT:  All right.  Thank you.

Mr. McDonald.

MR. McDONALD:  The people who spoke today have a right to be angry.  They have been hurt.  They have been hurt badly.  When I first got this case and looked at the losses and the people, I thought, "What if it was me?"  I've worked hard all my life.  I would have lost my money.  I don't know what I would have done.  I would have been depressed.  The way that they eloquently spoke, I don't doubt they're in pain in what has been done to them.  And they -- they have had an impact on Mr. Wheeler.  I can tell you that from my interactions with him over the past 18 -- almost two years now.

When I come to the Court, I come as an advocate, and I come based upon the law and the facts and asking the Court to do what is within the realm of reason based upon what I see in what's been presented to me by the government and the wrong actions of the person I represent.

So it's not Mr. Wheeler who specifically is asking for probation or challenging the numbers.  That's my job as an advocate.  If I didn't do that -- if I didn't do that, I would be ashamed to be in this profession.

So I want these people to know it's not Nathan who's asking for this.  It's me.  Because that's what I believe based

upon what I've seen. I've been here 33 years. I've been trying and working in a lot of cases, and I want to tell you why I think this one is important and why I focused on three things. One was post offense rehabilitation, one was the loss of bonding with his daughter, and the third is the loss of his career, which I think is probably the least important; but still it's a collateral consequence.

The purposes of sentencing are set forth in the guidelines, and I don't need to repeat them here, but they are to -- they are to focus on what is the right sentence based upon the factors for the person who sits in front of you and who will stand in front of you.

In 2014, soon after the seizure of the beginnings of the grows, Mr. Wheeler did what he should have done. He got a lawyer. He got a good lawyer, and he paid that lawyer a lot of money, just like everybody else was doing. But the first thing they did was tell the government that they were going to accept responsibility.

Since May of 2014, five and a half years, Mr. Wheeler has made himself available at any time to do anything that was being requested of him as part of his working with the government, in terms of telling them that he would plead guilty; that he would take responsibility; that he would, as you know, do other things that would help to mitigate the damage that he had done.

THE COURT: So tell me a little bit about that. If that was in May of 2015, I guess what is --

MR. McDONALD: In May of 2015 they started -- 2014. That's when Scott Kerin was the AUSA handling the case and that -- the lawyers were beginning to work together to do things.

Mr. Wheeler was, in fact -- the property was then seized in July of 2014. So at that point what he had done is he had -- as people have said, he was investing in operations that he thought would be viable and turn a profit, even though he was not acting in a way that was in comport with the law. At least that's debatable at this point.

THE COURT: So in terms of just charges being filed, I know he pled -- I believe it was to an information.

MR. McDONALD: So what happened was --

THE COURT: What happened between then? Why didn't it happen sooner?

MR. McDONALD: Because the government didn't decide they were going to charge him until September of 2017. I got a call in -- he no longer had a lawyer by December of 2016. He couldn't afford one. And the last time he spoke with Ms. Kerin was by himself, without a lawyer, again, knowing that he was going to plead guilty. Nine months later, in September, he got contacted by -- I think it was Agent McGeachy, and said, "It's time." I got appointed.

You see the massive amount of material; right? I got appointed in October of 2017. I want -- this is important. I only had access to the Angeli file. I didn't have access to all this discovery.

In January of 2018, I met with the government. They gave me the interviews that they had done with Nathan. They gave me a spreadsheet that was actually less than the loss they've asked for today and said, "Here is the offer. We need to know in three weeks."

So in less than, really, two months' time, I had to absorb all of this, and I finally just went to him and said, "I can either fight this for the next five years, or you can take what has been offered to you today." And we accepted the offer by February 16th.

So from the time that I was appointed to the time that we accepted the offer, it was less than four months and over the holidays.

Now, the charges didn't get formally brought until April or May, and we didn't -- you know, no grand jury. Just walk in, waive information. And from the beginning the issues that Ms. Kerin and I have agreed on were the issues, have been the issues, but it was then that I saw all of these other documents. And it's been a massive amount. So that's what took from, I think, May to today.

But I also want you to know that, yes, there -- you have

been told in the pleadings that he filed a claim against the properties. He did. But he immediately told them, I believe two months later, that he would release it. And by February of 2017 he released it.

They didn't even sell his truck for -- until December of 2017, and we -- they just asked us this week to sign the papers to turn over whatever interest he might have in those properties, which we did.

He has done every single thing that has been asked of him. His lawyers tried to work out settlement agreements. They did. But as the marijuana house of cards fell, there was no money left. And we know one person who got a lot of benefit from all of this is running a very lucrative cannabis operation right now and is not being charged. Mr. Wheeler did what he did and he accepts it and admits to it and has from the beginning, while at least two other people who were intricately involved go free. He could have fought, just like they did. He didn't. I think that says something. Especially over that five-year period.

Then you look at, okay, what has he done? Did he screw anybody else? No, he didn't. You saw his performance on pretrial. He did what he was supposed to do. The Dominican, I hate to say it, the Court gave permission because he got married and his wife took her savings and spent it so they could go there to get married. It had been four years while

he's been waiting. I don't think that it's awful that his wife wanted to take some of her money to have their wedding.

In terms of the other social media, I talked to him, and he said, no, he's never boasted. He's never boasted to me.

So when I look at what has happened from February of 2014 to the forfeiture in July of 2014, to him saying, no -- no later than February of 2017, "We'll do anything we can to give you this property back. Take it. Sell it. Get the money to these people," that means something. He's clean and sober.

Yes, he is married. Yes, he is now a proud father. That is what we want people to do. If he had gone off and been horrendous, we would have held that against him. We can't hold it against him that he straightened up, got married, took responsibility for his child, moved her in, supports her, has a job. He doesn't make much money. We provided that information to the government. It's what the Court system and the justice system demand. And the cases recognize it. I'm not going to go through them all here, but you saw it, and there's many more. And it's what I'm asking for in this case for two reasons. One is it has been so long. He has tried to make good. You know, there's the old adage that you can't get blood from a stone; but, you know, he is going to be on a restitution payment. He didn't oppose the settlements that came, that you have also seen, which was half a million dollars.

I mean, is what he did awful? Yes. Does it grab at your

heart? It does mine. But that doesn't mean that the 51 months is the right sentence. It means it's the low end of the advisory guideline range, which, frankly, is high, given these numbers.

I mean, I have people who have been involved in large-scale drug operations that don't necessarily get that much. There's also a couple people, they may not have personally profited, but they went to trial recently in USA versus I think it's Heine and Yates. Those people got 18 and 24 months from the Bank of Lake Oswego. Their guideline ranges were 31 and 29. Way higher than his. They went to trial, and Judge Simon gave them 24 months and 18 months.

Mr. Nice (phonetic) was just before the Court -- not you -- he got 36 months or 30 months for similar actions, where a number of people, who were involved in the civil area, paid money and went free, and he got stuck with the sentence and the criminal conviction.

THE COURT: That was a large variance from the guideline range.

MR. McDONALD: It was. We're not -- I mean, the reason why -- you could go to a split sentence, and it's not that far a variance from the guideline range, right, from the 51 months. A split sentence would not be inappropriate. I just don't think it would have been professional for me not to ask for probation.

The Court is going to fashion a sentence that meets the standards. And in this case the standards are very, very clear that post offense rehabilitation, especially over this period of time, is a substantial factor.

I want to go back to the other factor that we talked about that's now under the 3553(a) just briefly. He wasn't given a promise. It's sort of like, as we call them and you know them as "the queen for a day"; right? No promise. He didn't have anything with Washington County. They just came to him and said, "We need him."

He did have an extensive interview with detectives, grand jury proceedings, led to charges. I mean, that's outside of the scope of even what we're talking about here.

At bottom, he went down a hole, and he took everybody with him, and there in his bad wake, and it's awful, but do we then take him and throw him away for 31 -- or for 51 months? I just -- based upon everything that he's done, what we expect him to do and what the law says for the purposes of sentencing, we can't.

You will fashion the correct sentence, I hope. That's your job, not mine.

He would like to address you at this time.

THE COURT: Thank you, Mr. McDonald.

Mr. Wheeler, anything you would like to say?

THE DEFENDANT: Yes.

My attorney has done a great job advocating for me, but make no mistake about it.  All of this is 100 percent on me.  I have no illusions of probation, Your Honor.  I take full responsibility for my actions, that I have hurt so many, caused financial hardship, mental anguish, broken relationships, and left open wounds for seven years.

The word "sorry" does not begin to fix what I have broken, and it feels far short of how I feel about my actions, but I'm going to start by saying "I'm sorry."

Devin and Hogan Coverdale, Jonathan and Jennifer Buss, Mark and Sheryl McDonald, Chris Liu, Danny Kass, and Carole Love, I'm truly sorry.  Most of you are more than just clients; you are friends.  But I took your money, I made you promises, and then I broke those promises.  The result is the money that you believed I would return to you, with interest, is gone.

My grandfather taught me your word is your bond.  He said if you're going to do something, then you damn well do it.  From 2010 to '15, my work was garbage.  It was dishonest.  It was manipulative and self-serving.  I was living a lifestyle of dysfunction and self-destruction with nightlife, booze, drugs, and women.  Rock bottom is different for everyone, and I pray my children never have to experience it in their life's journey.

At the first raid in 2014, the government should have

locked me up and thrown away the key.  By December '14, there was almost nothing left of the man my parents had raised, but I still wasn't at bottom yet.  I kept digging.  Going back to those places during all of my counseling sessions over the last few years and then preparing for this hearing is heartbreaking and utterly disgusting.  I destroyed so many people's lives and would have been better off dead.

They say time heals all things, but these wounds are deeper than ever.  I've read all of the victims' statements, and it's clear that the actions like mine will leave scars that no amount of reparations, prison time, community services, or good deeds will ever make right.

During that time period, the only thing that kept me alive was my love for my kids.  I was at rock bottom, but thankfully I met two separate great counselors.  Through hard work, lots of tears, and lots of love, I became a better person and a good father.

I'm sorry, and I'll be sorry and ashamed of those choices for the rest of my life.  I caused so much pain to all of you, to my family, to my wife, and to my kids.  All of you have paid a price for my actions, and now it's time for me to pay mine.  I spent the last few years working, learning, and trying to make myself into a better man and learn and practice humility and kindness.  After this awful time in my life that so many of you in the dirty wake of my out-of-control behavior, I have

been fighting and trying to earn my way back with my family, my community, and with the goal of working the rest of my life to repay you for the damage I've caused.

I spent almost 10 years broken and treating people with careless disregard and ignoring the morals and values I was taught, and now I'll spend the rest of my life trying to fix what I've broken.

I don't want any of you to think this is an excuse, but I've tried to understand why I conducted myself in such a reckless and despicable manner. I spent those years broken and using vices to put bandaids on the guilt I carried from my first marriage and not being in the same home as my son. I allowed everything in this world that doesn't matter to become the most important things in my life. I want you to know that those days are gone and done.

Those values that I shunned in those years when I deceived and cheated you all now are the driving force in my new life. I married the woman who I will spend the rest of my life with, and we share four children between us.

My family is everything to me and they have been a huge part in my rehabilitation. I've heard forgiving is healing, but I cannot forgive myself what I have done. I'm asking for you -- for your forgiveness today, knowing it is unlikely to come, but I hope some day you find it in your heart to do so.

I don't know if this is something that ever gets closure,

but I'll do everything I can and that the courts demand of me to try to make this right.

Thank you.

THE COURT: All right. Thank you.

I want to just take a ten-minute break before I give you my sentence. So let's resume at 3:35. We'll just be in recess.

(Recess taken.)

THE COURT: Good afternoon again, everyone. Please be seated.

First, let me say thank you again to all the victims who have participated in this process and who were here to give me their heartfelt statements. I really appreciate all of your input in this case, and I do appreciate the defendant's statement as well. I do think it was sincere. I think it demonstrates that he does have remorse and that he is putting into action some of what he's saying and really making every effort to change his life, and for that, I think he deserves credit.

I also appreciate the presentations of the lawyers, and I think they have obviously worked very hard to present their respective views of the guidelines and the loss in the case in a way that was clear and very helpful to the Court.

As I previously mentioned, the advisory guideline range, based on adjusted offense level of 24, which, although there

was a dispute about whether certain guidelines applied or adjustments applied, with those adjustments that I previously found and the loss amount, the actual loss amount that I found, the Criminal History Category I, the advisory guideline range is 51 to 63 months, which is the starting point and a factor that the Court must consider, but I'm not bound by that particular range. That range does account for three levels for acceptance of responsibility. And without that reduction, the defendant would be facing a sentence of an advisory guideline range of 108 to 135 months.

He is also receiving four levels for his very significant cooperation with the government investigators in this case, and without that cooperation, he would be facing approximately two to four years more in prison. And he is to be commended for that cooperation.

The scheme in this case was one that involved manipulating and luring innocent people who trusted Mr. Wheeler with their children's livelihood, their life savings, and their features, as we have heard today and in the letters that were presented to me before this hearing.

In the course of carrying out this scheme, Mr. Wheeler demonstrated utter disregard for others. He betrayed people who trusted him. He lied to them and stole from them, and he unabashedly used their hard-earned money for his lavish lifestyle.

I considered the advisory guideline range and selected a sentence that I think is sufficient, but not greater than necessary, to serve the objectives of sentencing. And I think this sentence reflects the seriousness of the offense, the nature and circumstance of the offense, the respect for the law, and to provide adequate deterrence to -- for the criminal conduct.

I believe the sentence is worthy of someone who has had all of the advantages of his life -- of life and education and a career, and he didn't need to steal from anyone in order to proceed with his life because he was already set with that career.

So based on my assessment of the factors that I need to take into account under § 3553(a) and the advisory guidelines, I am going to impose on Counts I and 2 a sentence of 51 months at the Bureau of Prisons in confinement on both counts, to be served concurrently with each other. Upon release from confinement, the defendant shall serve a term of three years of supervised release on each count, subject to the mandatory conditions of supervision, the standard conditions of supervision adopted by this court, and the special conditions listed in the presentence investigation report. So all of those will apply. I will also order a $200 special assessment in this case; $100 for each count.

I understand the lawyers wish to set restitution and

forfeiture proceedings over for 60 days, and I believe -- is that correct?

MS. KERIN: That's correct. We would like the Court to determine the amount and to impose the judgment for restitution purposes. I think we have talked about the week of January 6th is an agreeable date for the parties.

THE COURT: How much time do you think will be needed for that hearing?

MS. KERIN: I want to say maybe two hours. I'm hoping that we will be able to agree to most of it, given the posture where we are right now.

DEPUTY COURTROOM CLERK: January 10th at 10:00 a.m. That's a Friday.

MS. KERIN: That works for the government, Your Honor.

THE COURT: What is the government's position on release, pending the restitution hearing?

MS. KERIN: Your Honor, we think that the Court should set the surrender date in the usual course. We don't see any need to change any of his conditions. If there is a need for more time, given the restitution hearing, we can address it at that time.

THE COURT: So is the defendant to remain out of custody? Is that what you're saying?

MS. KERIN: Yeah. No change in his current status is

being requested by the government.

THE COURT: And is he currently on any conditions of release?

MS. KERIN: Yes, he is, Your Honor.

THE COURT: Still checking in with Pretrial Services?

MS. KERIN: Yeah. He's being supervised out of the Western District, I believe. So, yeah. And there are conditions.

THE COURT: All right. So in terms of -- do you want me to set a -- are we going to schedule a self-surrender date today, following the restitution, or what did you have in mind about when he would surrender?

MS. KERIN: I would say that the Court -- the Court should set it -- I think 90 days is the normal course for setting the surrender date. We should set it in 90 days. Again, if we need to adjust it because of restitution, that's fine. But BOP needs to start looking at classification and things of that nature, so setting it is a good idea.

DEPUTY COURTROOM CLERK: 90 days would be January 24.

THE COURT: I will say surrender date of January 24th to the facility selected by the marshals.

So Mr. Wheeler does have to go down to the marshals today to start that process, and then I'll see everybody before that for the restitution hearing in early January.

MR. McDONALD: I have two things for you.

THE COURT: Sure.

MR. McDONALD: First of all, I would like the Court, in its special findings, to make a finding that substance abuse was a substantial factor in these crimes that were committed. It's clear, from the draft PSR and the final, that -- and the testimony, that that is what was going on in this particular case. They were crimes fueled, in part, by just an addictive personality, in terms of drugs and alcohol, and I would also ask the Court to make a recommendation for the RDAP program based upon that, as well as a recommendation for Sheridan.

THE COURT: Is there -- first -- on the first issue, because I don't -- obviously, it's alluded to in the briefing, but I don't have enough information in the evidence whether drugs were a significant factor.

MS. KERIN: Drugs were definitely a factor. We don't have an objection to any of those issues.

THE COURT: Okay. So I will make the findings that drugs were a part of the offense.

What was the second one?

MR. McDONALD: "Substantial contribution to the offense conduct," I think, is the language.

The second thing was recommendation for the RDAP program.

THE COURT: And then Sheridan?

MR. McDONALD: And then Sheridan.

THE COURT: That's fine. If it's not opposed by the

government, I'll recommend it.

MR. McDONALD: Thank you.

THE COURT: We'll be in recess.

Anything further I neglected to mention from either side?

MS. KERIN: No, Your Honor.

MR. McDONALD: Not that I can think of right now. I'm sure there will be something later.

THE COURT: Oh, are there any objections to all the conditions that were listed in the PSR?

MS. KERIN: No, Your Honor.

MR. McDONALD: No, Your Honor.

THE COURT: Does anyone need me to read those out loud, or is your client sufficiently familiar with what is in the PSR?

MR. McDONALD: That's fine.

THE COURT: Okay. Thank you.

(Hearing concluded.)

C E R T I F I C A T E

United States of America v. Nathan Wheeler

3:18-cr-00161-IM-1

SENTENCING

October 24, 2019

I certify, by signing below, that the foregoing is a true and correct transcript of the record, taken by stenographic means, of the proceedings in the above-entitled cause.  A transcript without an original signature, conformed signature, or digitally signed signature is not certified.

/s/Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
_____

Official Court Reporter        Signature Date: 1/16/2020
Oregon CSR No. 98-0346         CSR Expiration Date:  9/30/2020